| | |
|---|---|
| Chicago Alliance against Racist and Political Repression, Anti-War Coalition and Students for a Democratic Society at UIC,<br><br>        Plaintiffs,<br><br>v.<br><br>City of Chicago, an Illinois Municipal Corporation, and Tom Carney, solely in his capacity as Commissioner of the Chicago Department of Transportation,<br><br>        Defendants. | Case No. 24-cv-02347<br><br>Judge Andrea R. Wood<br><br>Magistrate Judge David Weisman |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

## I.      INTRODUCTION

At a time when over 35,000 Palestinians in Gaza, many women and children, have been killed with bombs and missiles made in and funded by the United States and over one million Gazans – mostly children – face catastrophic conditions and are literally starving to death due to military action supported by and largely funded by the United States, the need for freedom of speech, particularly directed at federal Democratic officials scheduled to attend the Democratic National Convention ("DNC") in Chicago – including the President Biden – is at its peak. Plaintiffs seek to direct their political speech through peaceful marches to the President of the United States, the one person who could stop the suffering in Gaza with a single phone call, while he is at the DNC. Defendants, relying on its parade permit ordinance, have unconstitutionally denied Plaintiffs and their members' right to engage in political speech through peaceful assembly on public forums, thereby violating their First Amendment rights.

## II.    FACTUAL BACKGROUND

The Democratic National Committee ("Dem. Nat'l Comm.") is scheduled to hold its 2024 convention to nominate its Democratic candidate for President and Vice President of the United States, federal elected offices. Chicago successfully lobbied the Dem Nat'l Comm. to hold the 2024 Democratic National Convention ("DNC") in Chicago. The DNC will be held at the United Center ("UC") located at 1901 W. Madison Street in Chicago, Illinois, at least three (3) miles west of the city center. As the city hosting the 2024 DNC, Chicago has the obligation to protect not only the safety and security of the delegates, politicians and other attending the DNC and the residents of the City of Chicago, but also to secure the First Amendment rights of citizens and residents of the City of Chicago and the United States to engage in political speech and to peacefully assemble in public venues with the restrictions narrowly tailored only to meet a compelling government interest.

### **CAARPR's Applications**

On January 10, 2023, Plaintiff the Chicago Alliance Against Racist and Political Repression ("CAARPR"), through Kobi Guillory, applied for a parade permit pursuant to the Ordinance for a march proposed to be conducted in the area of the UC entitled "March on the DNC 2024" ***to be held on August 19, 2024***. *See* CAARPR January 10, 2024[1] parade permit application (hereafter "January 10th Application"), Attachment 1, CAARPR Appeal File in Case 24PA3 (hereafter "CAARPR File, 17-19. On January 22, 2024, the CDOT Commissioner, through his designee, Assistant Commissioner Bryan Gallardo, denied the January 10th Application. *See Id*. at 20-22. Kobi Guillory, who submitted the January 10th Application, gave unrebutted testimony that

---

[1] The application is dated August 7, 2023 but the Chicago Department of Transportation ("CDOT") would not accept a parade permit application in 2023 for an event in 2024 so it was resubmitted on January 10, 2024.

CAARPR initially sought to submit the January 10th Application on August 7, 2023, prior to the genocidal bombings in Gaza that began in November 2024, but was not permitted to submit an application for an event in the following year. Attachment 2, 24PA3 Appeal Trans. (hereafter "CAARPR Transc., _:_"), 89:24-90:16. Kobi Guillory also gave unrebutted testimony that the purpose of the march to be held on the first day of the DNC was to convey a list of seven demands to the attendees to the DNC, which are:

1. To end [aid] to the USA for Israel,
2. For community control over the police,
3. For rights for immigrants,
4. For rights for LGBTQ people,
5. For reproductive rights,
6. For workers' rights to organize and strike, and
7. For money for health care, housing, education, jobs, the environment.

*Id*., 80:14-23. The City denied the January 10th Application based on Section (g) of the Ordinance, which permits the CDOT Commissioner to deny an application if:

> *(1) the proposed parade will substantially or unnecessarily interfere with traffic in the area contiguous to the activity, or that, if the parade will substantially interfere with such traffic, that there are available at the time of the proposed parade sufficient city resources to mitigate the disruption; or (2) there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees authorized to regulate traffic, to police and protect lawful participants in the parade and non-participants from traffic-related hazards in light of the other demands for police protection at the time of the proposed parade.*

Ordinance 10-8-330(g). CAARPR File, 20-22. In the January 22, 2024 denial letter, the City offered an alternate route for the parade which could be conducted on Columbus Avenue between East Roosevelt Road and East Jackson Boulevard, in downtown Chicago (hereafter "City Alternate Route"). *Id., 22*; *see also* Exhibit C to Plaintiffs' Complaint (map of the "City Alternate Route"). The City Alternate Route is more than three (3) miles east of the UC, the site of the DNC, at its closest point and that section of Columbus Drive is a tree-lined street which is largely not visible from either Lake Shore Drive to the east or

Michigan Avenue to the west. *See* Plaintiffs' Complaint, Exh. C. The denial gave no

explanation of how the alternate route complied with subsection (k) of the Ordinance which

states, in pertinent part:

> *When the commissioner denies an application for a parade permit, the commissioner shall authorize the conduct of a parade on a date, at a time, at a location, or over a route different from that named by the applicant. This alternate permit shall, to the extent practicable, authorize an event that will* ***have comparable public visibility and a similar route***, ***location*** *and date to that of the proposed parade.*

Ordinance 10-8-330(k)(*emphasis added*). Plaintiffs did not appeal the January 10th

Application denial.

On January 30, 2024[2], Plaintiff CAARPR applied for a second parade permit

pursuant to the Ordinance for a march proposed to be conducted in the area of the UC

entitled "March on the DNC 2024 08/22/24" ***to be held on August 22, 2024***. *See* CAARPR

January 30, 2024 parade permit application, CAARPR File, 23-25 (hereafter "January 30th

Application"). On February 1, 2024, Mr. Gallardo sent a letter denying the January 30th

Application based on the application being duplicative of the January 10th application filed

by CAARPR. *Id., 26-27 (*February 1, 2024 CDOT Commissioner Denial Letter). In support

of the February 1, 2024 denial, Mr. Gallardo relied exclusively on subsections (d)(1), (d)(2)

and (d)(4) of the Ordinance. Subsection (d)(1) states:

> *No person or organization may submit more than one application* for the same parade date and route, or for a parade substantially similar in theme or units described *but requesting an alternate date or route*, whether using the same name, different names, or different affiliations *that the person or organization may control or be a member of.*

Ordinance 10-8-330(d)(1)(*emphasis added*). *Id.* Subsection (d)(2) makes an individual or an

---

[2] The application is dated January 7, 2024 but it was delivered to CDOT on January 30, 2024. *See* Complete File of Case No. 24PA000003 (hereafter "24PA000003 File, at _"), 109:2-10.

organization ineligible for a parade permit if a permit is duplicative as defined by subsection (d)(1) and subsection (d)(3) authorizes CDOT to disregard multiple applications, without any First Amendment considerations. The City did not offer any alternative route with the denial of the January 30th Application. CAARPR appealed the denial of the January 30, 2024 parade permit application to the Chicago Department of Administrative Hearings and the permit denial was upheld. *Id., 3-10* (Hearing Officer Decision).

At the hearing, Mr. Gallardo testified that he found them to be "substantially similar" because each application: (1) was submitted by the same organization, (2) was submitted by the same applicant, (3) proposed the same route, and (4) stated there would be 1000+ people in attendance. *See* CAARPR Ttranc., 47:5-48:22. Mr. Gallardo acknowledged that the two applications sought parade permits on different dates. *Id*. at 43:3-5. Subsection (d)(1) of the Ordinance only authorizes the City to deny a permit parade by the same organization on different dates as duplicative if it is "substantially similar in theme or units." *Id*. at 42:24-43:5; *see*, also, Ordinance, subsection (d)(1). The application for a parade permit does not seek information about the theme of the parade. CAARPR File, 17-19, 23-25. The two parade permit applications indicated there would be no "floats", "vehicles" or "marching groups", the things which Mr. Gallardo testified "units" referred to. *Id*., 17-19, 23-25; *see* also CAARPR Transc., 51:12-52:4.

When asked if the proposed parades were substantially similar in theme or units, Mr. Gallardo made it clear that he did not consider the differences in the intended messages or target audiences of the two parades:

Q.      Okay. And so what does "in theme or units" mean?

A.      So we receive all kinds of parade applications. Whether it's a protest march, whether it's for a holiday celebration like St. Patrick's Day or Thanksgiving. So some parades have a specific theme, as can protests have a specific theme.

But if the application is a similar route by the same organization, but simply changing the date, and in this particular case, both of them said they were

5

expecting 1,000 plus attendees as well as using the same route. So that's how it was deemed to be duplicative.

Q.  And did you give any consideration to the fact that the name was different when assessing whether the theme was the same?

A.  I did see that the name was different, but the only difference that I see in the name is that they added the new date that they were requesting onto the name.

Q.  And did you reach out to the applicant to assess whether they actually had a different theme?

A  For this second application?

Q.  Yes.

A.  No. I did not.

Q.  Okay. And so what makes a theme the same in your professional opinion?

A.  That would be basically in this particular case they were both protesting outside the DNC location, same number of locations, same route, same -- basically everything in the application was the same except for they added the date to the end of the name and they asked for a different date.

*Id.*, 49:16-51:3

At the hearing on the January 30th Application, the City argued, and the ALJ accepted, that Mr. Gallardo could look at the four corners of the two applications side by side and determine they were duplicative based on the similarity in the name of the proposed marches, the name of the organization applying, the name of the individual applying, the proposed routes, the number of attendees, the absence of any "units" (defined as floats, vehicles or marching groups). *See* CAARPR File, 8-10 (ALJ 2/16/24 Decision). The ALJ ignored testimony from Kobi Guillory as to the origin of CAARPR's decision to seek a second parade permit, originally dated November 9, 2023, for the last day of the DNC, the day the President would be in attendance, after the catastrophic bombings of Gazan civilians began in November 2023. *Id.*; *see*, also, Complaint, ¶16, Exh. A.  The ALJ also determined that the absence of any "units" at all (defined as floats, vehicles or marching groups) "were not only similar but were identical." CAARPR File-10. The ALJ determined that CAARPR's January 30th Application was duplicative of its January 10th Application, an application for a parade which had already been denied and which would not take

place. *Id*.

**AWC's and SDS's Applications[3]**

On February 29, 2024, Plaintiff the Anti-War Committee ("AWC"), through John Metz, applied for a parade permit pursuant to the Ordinance for a march proposed to be conducted in the area of the UC entitled March for the People's Agenda Parade to be held on August 22, 2024. *See* Attachment 3, 24PA4 File (hereafter "AWC File, _"), 8-10. On March 7, 2024, the CDOT denied the February 29, 2024 AWC parade permit application for the March for the People's Agenda Parade to be held on August 22, 2024 based on Section (g) of the Ordinance. *See Id*., 18-20 (March 7, 2024 CDOT Denial Letter).

On February 29, 2024, Plaintiff SDS at UIC, through Liz Rathburn, applied for a parade permit pursuant to the Ordinance for a march proposed to be conducted in the area of the UC entitled March against US Funded Gaza Genocide to be held on August 19, 2024. *See* Attachment 5, 24PA5 File (hereafter "SDS File, _"), 15-17. On March 7, 2024, the CDOT denied the February 29, 2024 SDS parade permit application for the March against US Funded Gaza Genocide to be held on August 19, 2024 based on Section (g) of the Ordinance. *See Id*., 19-21 (March 7, 2024 CDOT Denial Letter).

Mr. Gallardo testified that he was the ultimate decision maker on whether to grant or deny AWC and SDS's parade permit application. Attachment 4, 24PA4 Appeal Transc. (hereafter "AWC Transc., _:_"), 30:14-31:19; *see*, also, Attachment 6, 24PA5 Appeal Transc. (hereafter "SDS Transc., _:_"), 21:5-17. Despite being the ultimate decision maker on parade applications, the ALJ sustained an objection to questions directed to Mr. Gallardo about how he determines

---

[3] While the AWC (Case 24AP4) and SDS (Case 24AP5) parade permit applications were filed separately and separately appealed and decided, the basis for the denial, the testimony and decision were all substantially the same, so Plaintiffs will summarize in the same section.

whether a denial of a parade application complies with the requirements of the First Amendment or of subsection (k) of the Ordinance, which requires the City to authorize an event that will *"have comparable public visibility and a similar route, location and date to that of the proposed parade"* if the original parade application is denied. AWC Transc.*,* 31:20-35:6; SDS Transc., 84:19-87:7.

In the March 7, 2024 denial letters, the CDOT Commissioner offered the same City Alternate Route as in the denial to CAARPR. AWC File, 8; SDS File, 20. At the March 18, 2024 appeal hearings, Defendants testified that the Secret Service had to set a "security perimeter" around the DNC but, at the time of the denial of AWC's parade permit, the City did not know where the Secret Service would set the security perimeter. *See* AWC File, 4; SDS File, 74:9-75:10. Defendants did not wait for the security perimeter to be set before denying AWC and SDS's parade permit applications and offering only the City Alternate Route on a take-it-or-leave-it-basis with no opportunity to discuss alternative routes or wait until the security perimeter was set to determine a route. AWC Transc., 153:2-156:17; SDS Transc., 26:7-34:8. Gabriella Shemash, Area 3 Deputy Chief of Patrol for the Chicago Police Department ("CPD"), testified that she would not recommend any routes within sight and sound of the UC because "We don't know exactly where the security perimeter will end." AWC Transc., 114:17-115:3; SDS Transc., 74:12-75:10. Mr. Gallardo also testified that he did not consider alternate routes near the UC because "We weren't able to determine whether those alternates would be acceptable because there's a lack of information – or at least on my part, as the extent of the DNC [sic] footprint." AWC Transc., 43:5-24; SDS Transc., 38:13-39:3 ("Q: Did you give any consideration to something in sight of the United Center? A: Yes. However, without more information from the Secret Service as to the full layout, providing a route that I can't promise that would be available to them seemed impractical."). The ALJ allowed no questions about what considerations Mr. Gallardo would take into account once the security footprint was determined. AWC Transc., 65:14-66:13 ("Again,

sustained. We don't have a footprint yet from the Secret Service."); SDS Transc., 77:24-78:12.

Mr. Gallardo testified that he based the denial of the AWC and SDS applications on a written report from the CPD, but the CPD report was not produced at the hearing and Mr. Gallardo referred Plaintiffs to the CPD for more information about the report. AWC Transc., 35:8-40:1; SDS Transc., 22:6-24.  However, CPD Deputy Shemash testified that she was tasked with analyzing the resources needed for the proposed parade route *but did not* prepare any kind of written report. AWC Transc., 110:22-111:4; SDS Transc., 97:22-98:20. Deputy Shemash testified CPD has between 11,000 and 13,000 police officers. AWC Transc., 110:18-21. In addition to testifying that she did not know the security perimeter for the DNC, she testified she did not know how many officers it would take to secure a parade route in the area of the DNC or how many officers would be assigned to the area of the DNC during the convention. AWC Transc., 111:5-112:3. Deputy Shemash also testified that she did not recommend the City Alternate Route or offer any alternative routes closer to the UC. AWC Transc., 112:16-113:5 ("It was not of my choosing."), 119:15-24. Deputy Gallardo testified that there would be additional police resources available because the City had postponed the Air and Water Show and the start of the Chicago Public Schools until after the DNC. AWC Transc., 111:5-112:3; SDS Transc., 100:1-14.

Mr. Gallardo testified that he came up with the City Alternate Route, that it was not based on any kind of analysis or comparison of the resources needed for the proposed parade route and the City Alternate Route. AWC Transc., 40:2-40:1. Defendants made no effort to communicate with ACW or SDS to discuss an alternate route with comparable visibility and a similar route and location to the extent possible as required by Section (k) of the Ordinance (*see* p. 4, *supra*), instead making the offer of the alternate route on a take-it-or-leave-it basis. AWC Transc., 154:23-155:21; SDS Transc., 117:16-121:13 (ALJ denied the opportunity to take testimony on this in this case.) Defendants made no effort to consider alternate routes that would be more narrowly tailored

restrictions on the proposed route in terms of time, manner and place. AWC Transc., 154:23-155:21; SDS Transc., 117:16-121:13 (ALJ denied the opportunity to take this testimony here.)

City witness, Deputy Shemash, acknowledged that the DNC is an inherently political event. AWC Transc., 122:14-18. AWC and SDS testified that they did not accept the City Alternate Route because their target audience was the numerous elected federal officials and candidates for federal office from across the United States, including President Biden, Vice President Harris and senators and congressional representatives, Policy-makers will be in attendance at the DNC and, specifically, will be conducting their nominating activities at the UC during the week of the DNC and the City Alternate Route is not within sight or sound of the UC so they would not be able to deliver their political messages to their target audiences. AWC Transc., 146:8-149:7, 153:2-154:22; SDS Transc., 113:5-115:9. The parade permits Plaintiffs seek are to conduct peaceful marches on public forums to convey a different political message to different attendees attending on different dates at the DNC being held at the UC. AWC Transc., 150:3-151:6; SDS Transc., 153:3-155:2. Each Plaintiff organization agreed it would engage with Defendants to find a more narrowly tailored parade route with more comparable visibility and closer in terms of location and route. AWC Transc., 154:23-156:4; SDS Transc., 118:6-121:12 (ALJ refused to allow Plaintiff to answer the questions).

ACW and SDS each appealed the denial of their February 29, 2024 parade permit application to the Chicago Department of Administrative Hearings and the permit denial was upheld. *See* AWC File, 3-7; SDS File, 2-7. It bears repeating here that Defendants' position is that once an applicant's parade permit during the DNC has been denied, any subsequent application by the same individual or organization (even if filed after the security perimeter was established), would be considered duplicative and subject the applicant to civil and criminal penalties. *See* 4-7, *supra*.

## III.    ARGUMENT

CAARPR, ACW and SDS are each separately seeking to bring a political message on public streets to the policy makers who have the greatest ability to affect those policies. Notably, the President, Vice-President, majority leader of the U.S. Senate and minority leader of the U.S. House of Representatives, among other numerous Democratic party leaders, will be among those attending the DNC. The Democrats are holding their convention at a time when U.S. funds are funding weapons of war that are killing tens of thousands of civilians in Gaza, women's reproductive rights are being diminished, drastic immigration policies are being implemented, among many other issues. The need for the right to free speech for the people of the United States could not be higher.

Yet, the City of Chicago and Commissioner Gallardo offer these citizens a single alternative, a blocked off tree lined city street more than three miles from the convention, out of sight and sound of the DNC. The members of CAARPR, ACW and SDS followed the rules and timely submitted parade permit applications, all so they could march peacefully in a place where those policy makers will be able to see and hear their message. The Defendants made no effort to find a less restrictive alternative route designed to meet a compelling need. There was no communication with the parade applicants, no other alternative routes were considered.

Plaintiffs seek a preliminary injunction before the convention to protect their First Amendment rights. Specifically, Plaintiffs ask the Court to enjoin Defendants from enforcing their decision to deny Plaintiffs' applications for permit parades and direct the Defendants to engage with Plaintiffs to consider less restrictive alternatives for a parade permit within sight and sound of the Convention or, alternatively, to direct the Defendants to allow Plaintiffs to conduct parade protests immediately outside the secure perimeter of the Convention. Plaintiffs further ask this Court to enjoin Defendants from enforcing Section (d)(1) of the Ordinance and direct the Defendants to reevaluate parade permits previously denied based solely on the grounds of being

duplicative and direct the Defendants to advise the public through publication that parade permits will not be denied on the basis of being duplicative.

## A. Standard for a Preliminary Injunction

Courts in this Circuit weighs five factors when considering a motion for preliminary injunction: (1) plaintiffs' reasonable likelihood of success on the merits, (2) whether a legal remedy is adequate, (3) whether the plaintiffs face irreparable harm, (4) whether the balance of the equities weigh in plaintiffs' favor, and (5) whether preliminary injunctive relief is in the public interest. *Turnell v. CentiMark Corp.,* 796 F.3d 656, 662 (7th Cir. 2015). All five factors weigh in favor of granting an injunction in this case.

### 1. Plaintiffs are likely to succeed on the merits

The threshold for establishing likelihood of success on the merits is low. *Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011). "…the Supreme Court has warned against 'improperly equat[ing] 'likelihood of success' with 'success'…" *Id.* (citing *University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981)).

#### a. Plaintiffs are likely to prevail on claim that Section (g) of the Ordinance violates the First Amendment.

There is a strong likelihood that Plaintiffs will prevail on the merits of their claims that the denial of parade permits to Plaintiffs CAARPR, ACW and SDS based on Subsection (g) of the Ordinance violated the First Amendment. Subsection (g) permits the CDOT Commissioner to deny a permit application if:

> *(1) the proposed parade will substantially or unnecessarily interfere with traffic in the area contiguous to the activity, or that, if the parade will substantially interfere with such traffic, that there are available at the time of the proposed parade sufficient city resources to mitigate the disruption; or (2) there are not available at the time of the parade a sufficient number of on-duty police officers, or other city employees authorized to regulate traffic, to police and protect lawful participants in the parade and non-participants from traffic-related hazards in light of the other demands for police protection at the time of the proposed parade.*

Ordinance 10-8-330(g).

The manner in which the Defendants applied this subsection of the Ordinance clearly violates the First Amendment rights of the Plaintiffs and their members. As the U.S. Supreme Court made clear in *New York Times Co. v. Sullivan*, there is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. 254, 270 (1964). The U.S. Supreme Court has long recognized that the government does not have a free hand to regulate private speech on government property… that members of the public retain strong free speech rights when they venture into public streets and parks, 'which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The government's ability to regulate speech in such locations is "very limited." *United States* v. *Grace*, 461 U.S. 171, 177 (1983).

"'Even in public forum' however, 'the government may impose reasonable restrictions on the time, place, or manner of protected speech, *provided that* they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (*emphasis added*). The government bears the burden to prove that a restriction furthers a compelling interest and is narrowly tailored to achieve that interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). This burden applies to their speech restrictions even at the preliminary injunction stage, *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Here, the Defendants' decision to deny the routes in the parade permits sought by Plaintiffs

was not narrowly tailored to meet a compelling government interest. The Defendants unilaterally decided to offer one alternate route for parade marches for all Plaintiffs, a location more than three miles away from the location where the DNC was held, on a tree lined street that the City intended to close off from traffic. The City provided no testimony that it attempted to narrowly tailor the restrictions on the political speech Plaintiffs intended to engage in on public walkways targeted at attendees at the DNC. While Defendants testified that there would be a security perimeter around the United Center, the site of the DNC, Defendants admitted that they had no idea where the boundaries of that perimeter would be at the time the permits were denied. Rather than informing Plaintiffs that the parade permits would be taken under advisement until the City had further information, the City offered the alternative route on a take-it-or-leave-it basis. The City admitted that it never reached out to Plaintiffs to see if there were modifications to the parade permits that placed more narrowly tailored restrictions on Plaintiffs. Instead, when Plaintiffs refused to accept the alternate route, the Plaintiffs were foreclosed from even seeking any other parade permits for the period of the DNC. As discussed below, because of the ability of the City to deny parade permits based on being duplicative pursuant to subsection (d) of the Ordinance, once the proposed parade routes were rejected by the City and the sole City Alternate Route out of sight and sound of the DNC was not accepted by Plaintiffs, Plaintiffs are all now foreclosed from submitting a new parade permit application even after the security perimeter is set, despite this being critical information for both Defendants and Plaintiffs.

Further, the denial of the parade routes requested in Plaintiffs' applications and offering of only a single alternative three miles away did not provide Plaintiffs with "ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477. Restriction on expressive activity may be invalid if the remaining modes of communication are inadequate. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (citations omitted.

To determine whether alternative channels are adequate, the court assesses the speaker's ability to reach his or her target audience. *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989).

Here, by selecting a single alternative route more than three miles from the DNC, the City has denied Plaintiffs access to their audience. In assessing whether restrictions on political speech at other major party conventions, courts have found that designating an official demonstration area away from the convention was not an adequate alternative for groups that wanted to protest or march near the convention's venue. *Serv. Employee Int'l Union [SEIU] v. City of Los Angeles*, 114 F. Supp. 2d 966, 972 (C.D. Cal. 2000)("Since [the delegates] are the ones who will determine the party's platform, nominate its candidate for president, and who include in their ranks many elected officials, one can hardly contend that the desire to reach this audience is frivolous.") On the other hand, at other conventions where protesters were permitted to reach delegates with their message, courts have denied injunctions. *See*, *e.g.*, *Marcavage v. City of New York*, 689 F.3d 98, 102 (2d Cir. 2012) ("protest zone" was one block away from the site of the convention with a stage a block away from the convention venue and where expressive activity was permitted at any time during the convention"); *Coalition to March on the RNC v. The City of St. Paul, Minn.*, 557 F. Supp. 2d 1014, 1028 (D. Minn. 2008) ("The permit provided unprecedented proximity to convention site" and "had ample alternatives available for communicating its message").

> b. *Plaintiffs are likely to prevail on claim that Section (d) of the Ordinance violates the First Amendment.*

Subsection (d) of the Ordinance permits the City to deny a parade permit to an applicant based solely on the application being duplicative, without any consideration of the need to narrowly tailor a restriction based on a compelling government need. Section (d) of the Ordinance states in pertinent part:

> *No person or organization may submit more than one application* for the same parade date and route, or for a parade substantially similar in theme or units

described *but requesting an alternate date or route*, whether using the same name, different names, or different affiliations *that the person or organization may control or be a member of.*

Ordinance 10-8-330(d)(1)(*emphasis added*)

The breadth of the City's authority to deny a parade permit is staggering, and well beyond the limits permitted by the First Amendment. The City can effectively deny any two parade permits during the DNC from the same organization without regarding to First Amendment considerations. For example, the City denied Plaintiff CAARPR's second parade permit, the January 30th Application, based solely on Section (d) of the ordinance, considering it duplicative of an earlier application and conducting none of the analysis on restrictions on political speech on public property the First Amendment requires. The January 30th Application sought a parade permit for August 24, 2024. This is not just another day at the DNC, it is the final day, the day Joe Biden is expected to be in Chicago to accept the nomination and to speak to the delegates. CAARPR chose this date for the protest around the Gazan genocide specifically to "speak", through First Amended-protected peaceful protest, directly to the one person who can most influence the Israeli government and staunch the flow of U.S. weapons to fuel the genocide of tens of thousands of Gazans – the President of the United States. Despite the fact that CAARPR submitted parade permit applications for two different dates and two different times to convey two different messages to two different audiences, CAARPR's January 30th Application was denied as being duplicative of the earlier January 10th Application. The Ordinance requires that for a parade permit sought by the same organization on different dates to be denied, the "theme or units" must be substantially similar between the two applications. Defendants admitted that they made the determination that these two parade applications were duplicative based only on the permit applications themselves. Notably, there is no question on the application about the "theme" of the parade. Nor is there any definition of the term "theme". It is apparently, whatever Assistant

Commissioner Gallardo believes it is.

CAARPR submitted its original parade permit application in August 2023[4], before the horrific bombings in and after November 2023 against Gazan civilians even began. In the original application, resubmitted on January 10, 2024, CAARPR sought to a parade permit to march on August 19, 2024, the first day of the convention, to convey a list of seven demands to the attendees to the DNC. Conversely, the decision by CAARPR to file a second parade permit application was made around November 19, 2023, after the systematic bombings of Gaza had begun. The purpose of seeking to march on August 22nd was to protest the bombing at the Convention when the President was there. Clearly, the message of these two marches was different, the audience was different…but not the theme? The Ordinance is impermissibly vague. "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (internal citations omitted). To prevent a government regulation from being a prior restraint on First Amendment rights, the regulation must contain "narrow, objective, and definite standards to guide the licensing authority." *Id*. ("The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted)(internal citations omitted). Mr. Gallardo probably earnestly believes the two parade permit applications are duplicative, but that was his opinion based on his own interpretation of an impermissibly vague ordinance. He relied solely on the four corners of the permit applications, which does not even have a space to identify the theme of the parade. So it is left solely to CDOT

---

[4] CDOT originally rejected CAARPR's initial parade permit application as being untimely because it was filed in 2023 for a 2024 event and so CAARPR resubmitted the application on January 10, 2024.

to determine what is meant by "theme" and when a "theme" is substantially similar.[5]

The City's application of Section (d) to deny Plaintiff CAARPR a parade permit for a march to be held on August 22, 2024, *at the end of the convention*, based solely on it being duplicative of an application by CAARPR seeking a parade permit for a march to be held on August 19, 2024, *at the beginning of the convention* (a permit application that was also denied based on Section (g) of the Ordinance)*,* violates the First Amendment as it is applied to Plaintiff CAARPR. First, the DNC is a four day event and, importantly, different political figures come for different parts of the event. For example, the presumptive presidential nominee, in this case the President of the United Stated, typically does not come until later in the DNC. Denying a permit parade on multiple days for a multi-day event is not a narrowly tailored restriction to meet a compelling government need.

In addition, Section (d), in conjunction with Defendants' take-it-or-leave-it approach to alternative routes pursuant to Section (g) means Plaintiffs or other individuals or groups who have sought one route, only to have it denied, are barred from submitting a new permit application seeking another route. Importantly, Section (d) states that "no person or organization may submit more than one *application*", not a second application after a prior one had been granted. If a person or organization applies for a parade permit and it is denied, that person or organization is then barred from even applying for an alternate route or date.

Finally, Section (d) is so broad and vague that individuals and organizations may be chilled in seeking a parade permit. For example, there is no clear definition of what a "substantially similar theme" means. Does this refer to a similar political message? Are protests of the war in Gaza and

---

[5] In its application, CAARPR said there would be no "units" (defined as floats, vehicles and marching groups) at all. The City's attorneys seized on this to argue in their closing remarks, and the ALJ adopted, the position that not having any units in the parade, really a protest march, was equivalent to having the same number of units. The absurdity of this argument is beyond the pale and certainly no basis, by itself, to deny Plaintiffs' First Amendment rights.

the war in Ukraine substantially similarly themed? Is protesting for health care in general substantially similarly themed to protesting for reproductive rights? In addition, Section (d) bars organizations with even a single member in common from both seeking a parade permit even on alternate days. Section (s) of the Ordinance establishes civil fines of not less than $200.00 nor more than $1,000.00 *and establishes criminal penalties* for any person who violates any section of the Ordinance, including Section (d).

This threat of facing penalties for seeking a "duplicative" parade permit. At the March 18, 2024 hearing on the appeal of the denial of Plaintiff SDS's parade permit, the City made an attempt to add to the basis of its denial of the permit application to include that it was duplicative because the City believed that SDS and AWC had a member in common and made it clear that the City wanted the ability to impose penalties under the Ordinance, which include both civil and criminal penalties.[6] The mere fact that the City raised that possibility of punishing parade applicants has had a chilling effect on residents of Chicago who might otherwise seek a permit to protest. See, e.g., declaration of long-time immigrant rights activist, Inhe Choi (hereafter "Choi Decl., ¶ _"), attached as Attachment 4. Because Ms. Choi is a member of multiple advocacy organizations, she has been deterred from seeking a parade permit during the DNC for fear it will be determined to be duplicative and subject her and other members of the organizations of which she is a member to civil and criminal penalties. Choi Decl., ¶¶ 7-9.

This Court should enjoin enforcement of Section (d) of the Ordinance and require parade permit applications be considered on their merits. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even

---

[6] Because the City made its attempt to amend the basis of its denial of the SDS permit to include Section (d) was done before the hearing formally began, the City's efforts, ultimately unsuccessful, do not appear in the transcript of proceedings.

though its application in the case under consideration may be constitutionally unobjectionable. *Forsyth County*, 505 U.S. at 129-130 (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798-799 (1984); *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574v(1987). The *Forsyth* Court determined this called for an exception from general standing rules based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. *Id.* (citing *New York v. Ferber*, 458 U.S. 747, 772 (1982); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)). Thus, the Supreme Court has permitted a party to challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, *Id.* (citing *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940); *Freedman v. Maryland*, 380 U.S. 51, 56 (1965); *Taxpayers for Vincent*, 466 U.S. at 798, n.15,).

"When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

The other factors are easily met.

### 2. *Plaintiffs will have no adequate remedy at law*

Plaintiffs will have no adequate remedy at law. Plaintiffs do not seek any kind of monetary damages and such damages would be an inadequate remedy in exchange for the denial to engage in protected First Amendment speech.

### 3. *Plaintiffs will be irreparably harmed*

Plaintiffs will be irreparably harmed if they are not granted relief until after this matter is adjudicated to a final judgment. With the Convention approaching in less than two and a half

months, the harm cannot be remedied after the fact, after the Convention has concluded and the opportunity to deliver political speech at that event has passed. Once the DNC has come and gone, the harm will be done and will be irreparable.

### 4. *The balance of equities weighs in favor of Plaintiff*

The balance of hardships weighs in favor of Plaintiffs. Plaintiffs seek limited and narrowly tailored relief to protect the First Amendment rights of their members from the denial of parade permits during the Convention designed to peacefully deliver a political message to decision-makers in the government. Plaintiffs merely ask that the denial of the requested parade permits be reversed, the take-it-or-leave-it alternative be rescinded and that the City engage with Plaintiffs to find an alternative that is narrowly tailored to meet a compelling government need and offers ample alternative channels for Plaintiffs to communicate its message to its target audience, delegates and politicians at the DNC.

### 5. *The balance of equities weighs in favor of Plaintiff*

The public interest weighs in favor of granting preliminary injunctive relief. The U.S. Supreme Court has long recognized that the government does not have a free hand to regulate private speech on government property… that members of the public retain strong free speech rights when they venture into public streets and parks, 'which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" See, e.g., *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). Here the Defendants are attempting to regulate political speech on public streets in contravention of this core principle of the U.S. Constitution.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for a Preliminary Injunction and:

A. Enjoin Defendants enforcing their decision to deny Plaintiffs' applications for permit parades, direct the Defendants to engage with Plaintiffs to consider less restrictive alternatives for a parade permit within sight and sound of the Convention or, alternatively, for the Court to direct the Defendants to allow Plaintiffs to conduct parade protests immediately outside the secure perimeter of the Convention; and

B. Enjoin Defendants from enforcing Section (d)(1) of the Ordinance and direct the Defendants to reevaluate parade permits previously denied based solely on the grounds of being duplicative and direct the Defendants to advise the public through publication that parade permits will not be denied on the basis of being duplicative; and

C. Such other relief the Court deems appropriate and just.

Respectfully submitted,

Dated: June 7, 2024

*/s/Christopher J. Williams*
Christopher J. Williams (ARDC #6284262)
Workers' Law Office, P.C.
1 N. LaSalle, Suite 1275
Chicago, Illinois 60602
(312) 945-8737

*Counsel for Plaintiffs*