# ATTACHMENT 4

IN THE CITY OF CHICAGO

DEPARTMENT OF ADMINISTRATIVE HEARINGS

MUNICIPAL HEARINGS DIVISION

APPEALS - DENIALS OF PARADE PERMITS


```
March for the People's Agenda,   )
                                 )
           Petitioner,           )
                                 )
       V.                        )
                                 ) Docket #24PA000004
CITY OF CHICAGO,                 )
(Dept. of Streets & Sanitation), )
                                 )
           Respondent.           )
```


Hearing date:                  March 18, 2024


Location:                      Central Hearing Facility,
                               400 West Superior,
                               Chicago, IL


Administrative Law Judge:      Dennis Fleming

For the City of Chicago:

Attorney:                      Matthew Spahr
Attorney:                      Christopher Dionne
Attorney:                      Christine Hake
Witness:                       Bryan Gallardo
Witness:                       Gabriella Shemash


For the Respondent:

Respondent:                    None
Attorney:                      Christopher Williams
Witness:                       John Metz
Other Representative:          None

```
                                              Page 2
 1                ADMINISTRATIVE LAW JUDGE FLEMING:  All

 2    right.  We are going to go on the record with

 3    24PA000004.  This is an application that was filed by

 4    sponsoring organization, Anti-War Committee, Chicago,

 5    for the parade named March for the People's Agenda.

 6    And the application was filed 2-29-24.  The

 7    application was denied on March 7, 2024.  A Request

 8    for Hearing was made and the matter was scheduled for

 9    today.

10                For the record, my name is Dennis Michael

11    Fleming.  I am the duly appointed Administrative Law

12    Judge on this matter.  And respective Counsels,

13    please identify your voices for the record.

14                MR. SPAHR:  ACC Matthew Spahr for the

15    City.

16                MR. DIONNE:  ACC Chris Dionne for the

17    City.

18                MR. WILLIAMS:  And Christopher Williams

19    for the Petitioner.

20                ADMINISTRATIVE LAW JUDGE FLEMING:  All

21    right.  Are there any preliminary matters that we

22    need to address?

23                MR. DIONNE:  The City would have a

24    preliminary motion to exclude any witness not
```

1   presently testifying.

2            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

3            MR. WILLIAMS:  I would object to that.

4   There's no real basis for that.  They have a right to

5   be here and listen to the City's case.

6            ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

7   it's a standard practice that there's -- when there's

8   a motion of that sort that it would be granted.  So

9   if you want to make it on both sides, we can make it

10  on both sides.

11           MR. WILLIAMS:  Yeah, we would make the

12  same motion then.

13           ADMINISTRATIVE LAW JUDGE FLEMING:  So same

14  motions?  Motion to exclude.  What -- well, your

15  first witnesses can probably stay.

16           MR. DIONNE:  Okay.  Judge, do we want to

17  swear in witnesses now before we get started or --

18           ADMINISTRATIVE LAW JUDGE FLEMING:  I have

19  that written on the paper.  Are your witnesses here,

20  Mr. Williams?

21           MR. WILLIAMS:  They are.

22           ADMINISTRATIVE LAW JUDGE FLEMING:  All

23  right.  Then anyone in the room who is going to

24  testify, raise your right hands now.  Do you solemnly

```
                                                Page 4
 1   swear or affirm any testimony you give will be the

 2   truth?

 3             MR. GALLARDO:  Yes.

 4             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

 5   And we will revisit that with each individual

 6   witness.  All right.  With the motion to exclude,

 7   City, do you have any other motions?

 8             MR. DIONNE:  Not at this time, Judge.

 9             ADMINISTRATIVE LAW JUDGE FLEMING:  Do you

10   have any motions, Mr. Williams?

11             MR. WILLIAMS:  No, not at this time.

12             ADMINISTRATIVE LAW JUDGE FLEMING:  All

13   right.  Have the parties exchanged exhibits; do we

14   have any stipulations on exhibits?

15             MR. WILLIAMS:  No, we haven't.  I was just

16   retained and so I just received their exhibits.  I am

17   going to object to their Exhibit 2A --

18             ADMINISTRATIVE LAW JUDGE FLEMING:  Well, I

19   don't have them in front of me so I don't --

20             MR. WILLIAMS:  Yeah.  But just to on the

21   record, I'll stipulate -- the others I would

22   stipulate to.

23             ADMINISTRATIVE LAW JUDGE FLEMING:  All

24   right.  What's --
```

1          MR. SPAHR:  Exhibit 2A would be an

2    affidavit from Rashad Spriggs [phonetic].

3          ADMINISTRATIVE LAW JUDGE FLEMING:  All

4    right.  Well, let's go -- first let's go with City

5    Exhibit 1.  Give me the exhibits that we're going to

6    be putting in the record.

7          MR. SPAHR:  The exhibits, Judge.

8          ADMINISTRATIVE LAW JUDGE FLEMING:  All

9    right.  So City Exhibit 1 is a memorandum from

10   Kirstjen Nielsen, the then Secretary of Homeland

11   Security, rather -- to the designation of recurring

12   significant events as national security events.

13   That's going in without objection.

14          All right.  Then we have the affidavit,

15   which is actually 2A through 2C.  We'll put that

16   aside.  Exhibit 3A is the parade application dated

17   2-29-24.  That's going in without objection.  And

18   that's actually Exhibit 3A through C.

19          City Exhibit 4 is a Google map, which I'm

20   assuming is showing the route of the requested

21   parade, starting at 1403 East 14th Street.  That's

22   going in without objection.

23          City 5A through 5C is the denial letter.

24   And City Exhibit 6 is the Google map for the proposed

Page 6

1    alternate route.  So those documents are going in

2    without objection.

3

4                    (Whereby, City's Exhibit

5                     Numbers 1, 3, 4, 5, and 6

6                     having been admitted into

7                     evidence.)

8

9              ADMINISTRATIVE LAW JUDGE FLEMING:  Do we

10   want to hold off addressing the affidavit until we do

11   the testimony or -- how much -- do you need more time

12   to review it, sir?

13             MR. WILLIAMS:  No.  I don't need no more

14   time to review it.

15             ADMINISTRATIVE LAW JUDGE FLEMING:  All

16   right.  Do we want to address this now or do we want

17   to address it after --

18             MR. SPAHR:  We can address it now, Judge.

19   It would be the first exhibit that the City intended

20   to offer to Your Honor.  What's the basis for the

21   objection?

22             MR. WILLIAMS:  The testimony -- he's not

23   here to be cross examined.

24             MR. SPAHR:  Pursuant to the Department of

Page 7

1   Administrative Hearings rulings, evidence, including

2   hearsay, may be admitted only if it is a type

3   commonly relied upon by a reasonably prudent person

4   in the conduct of their affairs.

5           The City believes that this is a affidavit

6   that has been signed and notarized by Rashad Spriggs

7   who has direct knowledge and understanding of what it

8   takes to -- for a city to put on a national special

9   security event.

10          ADMINISTRATIVE LAW JUDGE FLEMING:  I tell

11  you what.  Let me hold off on that because it's

12  about -- I want to make sure I incorporate what I

13  have to when I make a ruling on that.  So I'm going

14  to defer a ruling on 2A through C at this point in

15  time.

16          MR. SPAHR:  Understood.

17          ADMINISTRATIVE LAW JUDGE FLEMING:  All

18  right.  With that, no other preliminary matters to be

19  addressed?

20          MR. WILLIAMS:  Judge, I've tendered

21  exhibits.  They are also Google maps to the City.  I

22  would like to -- if we can stipulation to the

23  admission of those two.

24          ADMINISTRATIVE LAW JUDGE FLEMING:  Have

Page 8

1    you guys seen these?

2            MR. DIONNE:  Yes, Judge.  They were just

3    tendered by Counsel.

4            ADMINISTRATIVE LAW JUDGE FLEMING:  Any

5    objection?

6            MR. DIONNE:  So as to 1, and 1 is a Google

7    map of just overview of Columbus; is that correct?

8            MR. WILLIAMS:  Correct.

9            MR. DIONNE:  All right.  So we don't have

10   an objection as to this picture.  But City's a little

11   unsure what 3 is trying to be established as.

12           MR. WILLIAMS:  It just shows the distance

13   between the proposed alternative and the United

14   Center.

15           MR. DIONNE:  Well, we'd object to

16   relevance at this time, Judge.

17           ADMINISTRATIVE LAW JUDGE FLEMING:

18   Overruled.  We'll allow it in and let them make their

19   argument in terms of it.  So those are allowed in.

20   One by agreement, one over objection.

21

22                   (Whereby, Plaintiff's Exhibit

23                    Numbers 1 and 3 having been

24                    admitted into evidence.)

Page 9

1

2          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

3   Anything else we need to address?

4          MR. WILLIAMS:  I don't believe so.

5          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

6   Anything from the City?

7          MR. DIONNE:  Nothing for the City, Judge.

8          MR. SPAHR:  Opening-wise, Judge.  We are

9   here today regarding a parade permit application that

10  was submitted by the Petitioner to the City of

11  Chicago Department of Transportation.  The City

12  responded to the Petitioner's application in a letter

13  denying it as to the precise terms applied for, while

14  offering a alternative route that the City could

15  approve.

16          The letter sent by Department of

17  Transportation provides the basis for its denial

18  being there are not sufficient city resources to

19  mitigate traffic disruptions caused by the parade and

20  that there are not sufficient on-duty police officers

21  or city employees to police and protect all

22  participants and non-participants of the parade at

23  the applied-for date, time, and location.

24          Specifically, the date and location that

Page 10

1    the Petitioner applied for is during the Democratic

2    National Convention and the route abutting one of the

3    main venues hosting the convention.  You will hear

4    through testimony the strain on city resources

5    resulting from hosting such a national special

6    security event.

7            At no point during this process has the

8    Department of Transportation stated that Petitioner

9    isn't allowed to parade.  To the extent practical,

10   the City approved the Petitioner to parade on the

11   same date, just in a different location, which the

12   City could meet its obligation under the Chicago

13   Municipal Code in terms of allocating city resources

14   to the parade.

15           Today, the City will illicit testimony as

16   to what is required of the city in terms of personnel

17   and resources needed for the DNC on top of keeping

18   all other city services fully operational for its

19   residents and businesses during this time.

20           For all the reasons City will provide in

21   this case, we are asking this Court to affirm the

22   determination from Transportation and deny the route

23   as proposed by the application.

24           ADMINISTRATIVE LAW JUDGE FLEMING:  Thank

Page 11

1   you.  Mr. Williams, do you want to give your opening

2   now or do you want to defer?

3          MR. WILLIAMS:  I'll defer.

4          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

5   All right.  City, call your first witness.

6          MR. SPAHR:  At this time, the City would

7   first call pursuant to the notarized affidavit,

8   Rashad Spriggs, which has been tendered to Your Honor

9   and tendered to Respondent as City's Exhibit 2A

10  through C.

11         ADMINISTRATIVE LAW JUDGE FLEMING:  All

12  right.  I'm going to defer my ruling on that at this

13  point in time.

14         MR. SPAHR:  Okay.

15         ADMINISTRATIVE LAW JUDGE FLEMING:  Okay?

16  Because I haven't a chance to read it.  So what I'm

17  saying is let's do the live witnesses and then I will

18  be able to read it and be able to make my ruling

19  relative to that.

20         MR. SPAHR:  Understood, Judge.

21         ADMINISTRATIVE LAW JUDGE FLEMING:  I've

22  gone over it so I understand.

23         MR. SPAHR:  Understood.  The City would

24  first call Bryan Gallardo.

Page 12

1            ADMINISTRATIVE LAW JUDGE FLEMING:  All

2    right.  Mr. Gallardo is here I know.  All right.  Mr.

3    Gallardo, you have been sworn, correct?

4            MR. GALLARDO:  Yes.

5            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

6    You know what?  Just to make sure it's on the record,

7    raise your hand again.  So you solemnly swear or

8    affirm any testimony you give will be the truth?

9            MR. GALLARDO:  Yes.

10

11                  DIRECT EXAMINATION

12   BY MR. SPAHR:

13       Q.   Mr. Gallardo, please introduce your

14     name, spelling your last name for the record?

15       A.   Bryan Gallardo, G-A-L-L-A-R-D-O.

16       Q.   And who do you currently work for.

17       A.   I work for the Chicago Department of

18     Transportation.

19       Q.   And is that for the City of Chicago?

20       A.   Yes, it is.

21       Q.   And how long have you worked for the

22     City?

23       A.   Since October of 2017 in my current

24     position.

Page 13

1      Q.    And what is your position's title?

2      A.    I am the Assistant Commissioner in

3   charge of the Public Way Permitting Office.

4      Q.    And how long have you held that

5   position?

6      A.    Since October of 2017.

7      Q.    And as the assistant commissioner, what

8   are some of your responsibilities?

9      A.    So our office takes in applications for

10   use of the public right-of-way for construction,

11   for moving vans, for parades, protests,

12   festivals, athletic events, all sorts of

13   activities.  Basically anything that takes place

14   on the public right-of-way.

15      Q.    And to be clear, your job includes

16   responding to applications for parades that use

17   the public way?

18      A.    Yes.

19      Q.    And what is a parade permit?

20      A.    A parade permit is a permit that we

21   issue, which allows a group to gather and march

22   down the public right-of-way.

23      Q.    And who can apply for one of these

24   permits?

Electronically signed by Susan Bonomo (001-416-118-4005)     82ce4973-01f5-4d37-b20a-4ec54b1c995e

Page 14

1        A.      Anyone can apply.

2        Q.      And where would these individuals go to

3    make the application?

4        A.      So the applications are taken in City

5    Hall, Room 905.

6        Q.      And once City of Chicago Department of

7    Transportation receives the application, what is

8    CDOT's process?

9        A.      We do the initial intake of the

10   application and then we will date and time stamp

11   it and send it out to various other departments

12   for review to see if there will be any conflicts

13   with the request.

14       Q.      And what departments is CDOT sending

15   the application for review?

16       A.      We send it both internally to other

17   CDOT personnel, as well as the police department,

18   Office of Emergency Management and

19   Communications, Streets and Sanitation, the

20   associated ward or wards, as well as the special

21   event department.

22       Q.      And what is the purpose of sending the

23   application to these other city departments?

24       A.      It's to see if there's going to be any

Page 15

1    conflicts or any issues in terms of being able to

2    provide resources that might be needed for the

3    request.

4        Q.    And do you, as the assistant

5    commissioner, review every parade application

6    that comes through CDOT?

7        A.    I don't review every single one that

8    comes in personally.  But I do from time to time

9    review them if there's a specific reason, if a

10   conflict is brought to my attention, or if there

11   are -- if it's in a particularly high-profile

12   location or during dates we know there are other

13   activities going on.  It can be brought to my

14   attention.

15       Q.    And when a parade application is, in

16   fact, brought to your attention, do you follow

17   the same CDOT process in reviewing this

18   application?

19       A.    Yes.  We don't change the process of

20   how it's reviewed.  It's simply brought to my

21   attention if somebody notes something about it.

22       Q.    Great.  Now, I'll bring your attention

23   to the parade permit application we're here for

24   today.  Did Chicago Department of Transportation

Page 16

1      receive a parade permit application submitted by

2      John Mets for a parade named March for the

3      People's Agenda?

4          A.    Yes, we did.

5          Q.    And who at CDOT received this

6      application?

7          A.    The intake was initially done by Susan

8      Pollack, who's a member of the public way

9      permitting staff.

10         Q.    And when was it, specifically, brought

11     to your attention?

12         A.    After the initial intake, as we

13     normally do, it was date, time, and stamped and

14     e-mailed out to any other departments that would

15     need to review it.  And then she mentioned it to

16     me.  She brought it to my attention because she

17     made note that it was going to take place during

18     the DNC near one of their locations.

19         Q.    And what is the DNC?

20         A.    Democratic National Convention.  So

21     it's the nominating convention held by the

22     Democratic National Committee and it's going to

23     be hosted here in Chicago.  We're expecting

24     upwards of 50,000 people that will be in

Page 17

1    attendance.

2         Q.    And do you know the date that the DNC

3    is scheduled to take place on?

4         A.    It will take place in August, from

5    officially the -- from the 19th through the 22nd.

6    But there will, obviously, be some set up and

7    tear down time before and after that event as

8    well.

9         Q.    And are you familiar with what venues

10   the DNC is scheduled to take place at?

11        A.    The two official locations that have

12   been announced are the United Center and

13   McCormick Place.

14        Q.    Great.  I will now show you what's been

15   marked as City's Exhibit 3A through C, which has

16   been tendered to Respondent and Your Honor.  Do

17   you recognize this document?

18        A.    This is a copy of the application that

19   was taken in on February 29th.

20        Q.    And how many pages it that application?

21        A.    It's three pages detailing the

22   information associated with the request.

23        Q.    And when was this application submitted

24   and received by CDOT?

Page 18

1        A.    So we received it on February 29th.

2        Q.    And do you recall what date you

3    specifically were handed a copy of this

4    application?

5        A.    It was not too long after it was turned

6    in.  It was distributed, as I said, by e-mail to

7    other stakeholders.  And then Susan brought it to

8    my attention because she noticed that it was

9    during the DNC.

10        Q.    And on this application, does it

11    specify who is requesting a parade permit?

12        A.    So the name of the organization is

13    Anti-War Committee Chicago.  And the individual

14    who is listed as the organizer is John W. Mets.

15        Q.    And day is the parade being requested

16    for?

17        A.    It is being requested on August 22nd.

18        Q.    And as you previously testified, August

19    22nd is a date that the DNC is, in fact,

20    happening?

21        A.    Yes.

22        Q.    And on this application, does it

23    provide a proposed route for the parade?

24        A.    Yes, it does.  So it's standard on all

Page 19

1    the applications to provide details of the

2    parade.  So it does have a proposed route as well

3    on the second page.

4         Q.    And for the benefit of the Court, can

5    you identify what the route is being requested

6    for?

7         A.    Their proposal was to assemble at

8    Addams/Medill Park and then proceed north on

9    Ashland to Adams and then turn down Adams to

10   Damen.  And then Damen to Roosevelt and then back

11   to Addams/Medill Park.

12        Q.    Great.  And does this application as

13   proposed have submitted an number of attendees?

14        A.    Yes.  That is one of the lines here and

15   it does note that they're expecting 1,000 plus in

16   attendees.

17        Q.    Does it have a proposed assembly time?

18        A.    Yes.  The proposed assembly time is

19   also required on the application.  And so they

20   have an assembly time of 5:00 p.m.

21        Q.    Does it have a start time?

22        A.    Yes.  So the step off time would be

23   6:00 p.m.

24        Q.    End time?

Page 20

1        A.      The parade would end at 8:00.

2        Q.      And a disband time?

3        A.      And then disband at 9:00.

4        Q.      And was this application signed by

5    anyone?

6        A.      Yes.  The application was signed by

7    John W. Mets.

8        Q.      And what is the date of that signature?

9        A.      His signature is noted at being on

10   February 24th.

11            MR. SPAHR:  At this point, just for the

12   benefit of the Court, City seeks to have City's

13   Exhibit 3A through C admitted, which I believe

14   it's already been admitted without objection.

15            ADMINISTRATIVE LAW JUDGE FLEMING:

16   Submitted by stipulation.

17

18   BY MR. SPAHR:

19       Q.     Mr. Gallardo, I'm now showing you

20   what's been marked and previously admitted as

21   City's Exhibit 4.  Do you recognize this?

22       A.      It is an outline of the proposed route.

23       Q.      And it's the same route that was

24   applied for on the application we just went

Page 21

1    through; is that correct?

2        A.    Yes.

3        Q.    And on this route, is it near any of

4    the DNC venues?

5        A.    Yes, it does proceed up Damen, which is

6    within the United Center footprint.

7        Q.    And now, what are your next steps once

8    you receive the application?

9        A.    One we receive the application, again,

10    it's distributed to various other departments for

11    their review to see if there are any conflicts

12    with their activities or in case there are

13    resources that are needed to support the event to

14    make sure that they are available to do so.

15        Q.    And does CDOT, Chicago Department of

16    Transportation, review the application and

17    proposed route in terms of traffic for the

18    streets that were applied for?

19        A.    Yes, we do.  We check for our own

20    complex, as well as any impacts to traffic.

21        Q.    And did you review the -- any conflicts

22    on Ashland for the proposed date and time?

23        A.    Yes, I did.

24        Q.    And what was your review of that?

Page 22

1    A.    So the proposal -- they requested a

2    date and time.  The date, obviously, is during

3    the DNC, which is going have traffic impacts of

4    its own, so this would only exacerbate those

5    impacts by closing additional streets surrounding

6    the event.

7         And the proposed time would also

8    conflict with the afternoon commuter rush.  And

9    then additionally, by proceeding up Ashland, it

10   could impact the ability for emergency vehicles

11   to get to the Illinois Medical District, which is

12   just to the south.

13        So for that reason, we felt that the

14   traffic impacts would be too much to be able to

15   manage in that particular area.

16   Q.    And you testified as to the medical

17   district being impacted by the proposed route; is

18   that correct?

19   A.    Yes.  So the Illinois Medical District

20   is an area just south of here that houses three

21   different hospitals.  And so they all often use

22   Ashland as their emergency access route from

23   various parts of the city.

24   Q.    And did you reach out to CPD to review

Page 23

1    the application?

2         A.    Yes.  So it's standard procedure to

3    provide a copy of the application to the police

4    department.

5         Q.    And did CPD provide you any response?

6         A.    Yes.  So they responded stating that

7    they did not believe they were going to have

8    resources available to support this event at the

9    time.

10        Q.    And did CPD ultimately provide you with

11   their recommendation or advised as to whether or

12   not they could, in fact, accommodate this

13   application as proposed?

14        A.    They stated that they did not believe

15   they would have the resources to do so.

16        Q.    And do you review this route in terms

17   of public transportation?

18        A.    Yes, we do.  And many of the streets

19   that they had requested impact multiple CTA

20   routes, including on Ashland and Damen.

21        Q.    And what was your next step after

22   receiving feedback from the other client

23   departments of the City of Chicago?

24        A.    So after reviewing the application and

Page 24

1    checking for any potential traffic impacts or

2    conflicts with other activities in the area, I

3    also reviewed responses from the other

4    departments.  And based on the information I

5    received, the City is not going to have

6    sufficient resources to support the event.

7         And with the other -- with the impacts

8    of other streets in the area, it would be

9    extremely cumbersome and it would, again, impact

10   access to the Illinois Medical District and other

11   facilities in the area beyond what's already

12   being done.

13   Q.   And to be clear, did anybody in the

14   City of Chicago direct you to either approve or

15   deny the permit?

16   A.    No.  I gather the information from the

17   other departments and if the City, for whatever

18   reason, whatever department isn't able to provide

19   resources or it conflicts with other events or

20   activities in the area, then I would provide a

21   response back to the applicant.  But that comes

22   from CDOT, from our office.

23   Q.   And did you provide a response from

24   CDOT to this application?

Page 25

1      A.   Yes.  We provided a response letter on

2    March 7th.

3      Q.   And in that response letter, did you

4    deny or approve this permit?

5      A.   We denied the permit, again, based on

6    the impacts to traffic, as well as the lack of

7    resources to support the request.

8      Q.   I'll now show you what's been

9    previously admitted into evidence as City's

10   Exhibit 5A through 5C.  What is this document?

11     A.   This is a copy of the denial letter

12   that was sent to the applicant on March 7th.

13     Q.   And who signed off on this letter?

14     A.   I signed this letter.

15     Q.   And who did this letter get mailed to?

16     A.   It was sent to March for the People's

17   Agenda in care of John W. Mets.  And then various

18   other city departments and individuals were cc'd.

19     Q.   And is this a true, accurate, and

20   complete copy of the letter that you signed,

21   prepared, and sent?

22     A.   Yes, I believe it is.

23     Q.   And in this letter you indicate that

24   you provide the basis for your denial; is that

Page 26

1    correct?

2        A.   Yes.  So by the -- per the ordinance

3    we're required to respond and so in this letter I

4    note that there will be various impacts to

5    traffic due to the DNC occurring, as well as a

6    lack of city resources to safely manage traffic

7    for both the parade participants and any other

8    individuals that might be using the public way at

9    that time.

10       Q.   Okay.  And just to break it down.  So

11   for the [inaudible] under 10-8-330(g)(1), what

12   did you review in support of this denial?

13       A.   So what I reviewed were the traffic

14   impacts to the streets that they had requested,

15   the time frame, as well as any other activities

16   that would be taking place in the area.

17            As well as the specific time that they

18   wanted to step off, which would be during the

19   afternoon rush, which is when we see a large

20   amount of traffic.

21            As well as responses from the other city

22   departments who may need to provide resources to

23   safely support the event.

24       Q.   And when accommodating a parade route,

Page 27

1    is it just the streets that the route is

2    proceeding on that are affected in terms of

3    traffic?

4        A.    Not necessarily, no.  Because,

5    obviously, you'll have to close cross streets as

6    they're proceeding down their route.  And then

7    you'll also have to push traffic onto other

8    streets to accommodate that, whether it's for CTA

9    buses or commuters or delivery vehicles.  You

10   have to see what other streets would be available

11   and are those streets going to be large enough to

12   accommodate the increase in traffic.

13       Q.   And under this subsection, would the

14   medical district's relation to the proposed

15   applicated [sic] route be impacted?

16       A.    So, yes.  As I mentioned before, the

17   Illinois Medical District, a lot of -- it has

18   three separate hospitals and a lot of emergency

19   vehicles will utilize Ashland to reach those

20   hospitals.  So if it were closed and in addition

21   to being during the rush hour and having other

22   streets in the area closed due to the DNC, it

23   could cause delays in people being able to get to

24   the hospital.

Page 28

1      Q.    And now, under your denial basis,

2    10-8-330(g)(2), what did you review in support of

3    this basis for your denial?

4      A.    So again, looking at the time frame

5    that they had requested, the days that they had

6    requested, and looking at the responses from

7    other departments, we didn't believe there were

8    going to be enough city personnel available

9    qualified to manage traffic during that time.

10   The resources would either be deployed elsewhere

11   or just aren't available at that time.

12     Q.    And in this letter to the Petitioner,

13   did you provide an alternative?

14     A.    Yes.  As per the ordinance

15   requirements, the denial does always provide an

16   alternative.

17     Q.    And what was the proposed alternative

18   route?

19     A.    The alternative route was to utilize

20   Columbus between Roosevelt and Jackson.

21     Q.    And what date was your proposed route

22   for?

23     A.    August 22nd, the same date that they

24   had requested.

Page 29

1     Q.    And then the time for start, step off,

2     and disband?

3     A.    We kept those times the same as they

4     had requested as well.

5     Q.    I'll now show you what's been

6     previously admitted as the City's Exhibit 6.  Do

7     you recognize that?

8     A.    Yes.  This is an outline of the

9     proposed route.  The route proposed by the City,

10    I should say.

11    Q.    And do you know why the proposed route

12    on Columbus was offered?

13    A.    So in terms of traffic impacts, it's

14    more manageable.  It requires fewer resources.

15    And although, would have impacts, would not have

16    the same level of impacts on the afternoon

17    commuter rush.

18    Q.    And is this located in City of Chicago,

19    County of Cook, State of Illinois?

20    A.    Yes, it is.

21    Q.    And to your knowledge, has the

22    alternative route proposed by CDOT been accepted

23    by the Petitioner?

24    A.    No, I don't believe it has yet.

Page 30

1      Q.    Okay.

2            MR. SPAHR:  No further questions at this

3      time.

4

5                      CROSS EXAMINATION

6   BY MR. WILLIAMS:

7      Q.    Mr. Gallardo, my name is Chris

8      Williams, I'm going to ask you some questions on

9      behalf of the Anti-War Coalition.  How long have

10     you been the assistant commissioner for the

11     Department of Transportation?

12     A.    Since October of 2017, a little over

13     six years.

14     Q.    Are you the person ultimately charged

15     with deciding whether to approve a permit or not

16     for a parade?

17     A.    So I collect information from all of

18     the departments, but the denial letter does come

19     from me.

20     Q.    But my question is are you the one

21     charged with ultimately making the decision?

22     A.    In terms of am I the one who -- are you

23     asking if I do it unilaterally or are you asking

24     if I'm the one who ultimately sends the letter

Page 31

1    out?

2        Q.    Let me ask it this way.  You get

3    information from a lot of city departments,

4    correct?

5        A.    Yes.

6        Q.    Does anybody tell you to deny the

7    permit?

8        A.    No.  So the denial has to come from the

9    Department of Transportation.  And that comes

10   through the permitting office, which I manage.

11   So yes, in that sense, yeah, I am the one who

12   ultimately looks at what was provided and crafts

13   that letter and sends out the denial.  I am the

14   one who does that.

15       Q.    Okay.  So you're the ultimated decision

16   maker, correct?

17       A.    Yeah.  In the sense that I'm the one

18   who gathers all the information and determines

19   whether or not is there any alternative.

20       Q.    Okay.  Are you familiar with the First

21   Amendment of the United States Constitution?

22       A.    I'm not an attorney, but I'm aware of

23   the First Amendment.

24       Q.    You are?  Is it your understanding that

1      people have a right to conduct political speech

2      under the First Amendment of the Constitution?

3              MR. SPAHR:  I would object on relevance.

4              ADMINISTRATIVE LAW JUDGE FLEMING:

5      What's the basis on whether he feels that people

6      have a right to political protest or if he does

7      to what extent?

8              MR. WILLIAMS:  So he has just testified

9      he is the ultimate decision maker about whether

10     to accept or deny a permit parade -- a permit for

11     a parade.  The ordinance necessarily [inaudible]

12     the First Amendment of the Constitution, there's

13     a balancing act between allowing political

14     protest under the Constitution.  All laws in the

15     United States have to comport with the

16     Constitution of the United States.

17             So he's the ultimate person who has to

18     decide that balancing between the two.  We're

19     going to get into how he decided that balance.

20             ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

21     the objection is sustained.  The testimony that

22     Mr. Gallardo is giving me is that the process

23     that he follows is to follow the ordinance.

24     There are steps in the ordinance.  And pursuant

Page 33

1    to his following the steps and doing his

2    investigation, he made a determination.

3            That determination is -- does not come

4    from him as to whether he is supposed to, on his

5    own, take into consideration what he feels is --

6    the First Amendment rights are of these people.

7            He's following what's set up in the

8    ordinance.  The cross examination should be based

9    on whether he did or did not follow the steps of

10   the ordinance.  But we're not going to get into a

11   philosophical cons -- discussion of the extent of

12   the First Amendment.

13           MR. WILLIAMS:  Your Honor, I would

14   respectfully push back.  I don't this is a

15   philosophical discussion.  This is a city

16   official who is charged with making the decision

17   about where, when, and under what circumstances

18   people can exercise their First Amendment rights

19   to engage in political speech.

20           And the ordinance, itself, must comply

21   with the First Amendment.  And in fact, contains

22   information in it -- the ordinance, in Section

23   (f) about conducting the investigation.  In

24   Section (k) about making -- if not the proposed

Page 34

1    route, must make one with comparable visibility.

2          So implicitly in the ordinance, there's

3    understanding and a respect for the requirement

4    for any law and any city official to respect the

5    right of -- the First Amendment right of

6    political speech.

7          And so he had to make -- he is the

8    person who was enforcing the ordinance.  And he

9    had to make a balancing decision under the

10   ordinance that incorporates into it the right to

11   political speech.

12         ADMINISTRATIVE LAW JUDGE FLEMING:  Mr.

13   Gallardo has testified that he followed the

14   municipal code, he followed the steps of the

15   municipal code.  That's what his testimony is

16   dealing with.  Whether or not the municipal code

17   violates the First Amendment is not relevant --

18   Mr. Gallardo's opinion as to that is not relevant

19   to me.

20         The question is did he follow the steps

21   that are set forth in the code.  If the steps in

22   the municipal code are insufficient to ensure

23   that this group or any other parade applicant's

24   First Amendment rights are protected, that's not

Page 35

1    an issue to be decided here.

2            That's an issue that you can bring to

3    another tribunal that would have jurisdiction on

4    it.  But it's not an issue that comes in play at

5    this point in time here.

6            MR. WILLIAMS:  Okay.  Thank you.

7

8    BY MR. WILLIAMS:

9        Q.    Is it your understanding that the

10   ordinance in question here gives some discretion

11   on whether or not to grant the permit?

12       A.    I guess it depends on what you mean by

13   discretion.  I mean, if we don't have the

14   resources to support it, then more than likely we

15   would issue a denial unless there's some

16   mitigating circumstances that I'm unaware of.

17       Q.    How do you know whether you'd have the

18   resources to support it?

19       A.    Again, it's not just CDOT resources.  I

20   receive information from other departments.  They

21   will let me know if they have the resources to

22   support it.

23            And then I look at it from a CDOT

24   standpoint in terms of are there conflicts with

Page 36

1    other activities, construction, in this case the

2    DNC, or with traffic impacts, based on the time

3    that they're trying to it, or the streets that

4    they're requesting.

5         And so depending on how significant

6    those impacts are, there would always be some

7    level of city resources that would be needed.

8    And if they're not available then it wouldn't be

9    safe to proceed.

10   Q.   Okay.  So your testimony is that you

11   get reports from other agencies that inform your

12   decision; is that correct?

13   A.   Yes.

14   Q.   Okay.  Are those reports in writing?

15   A.   Yes.

16   Q.   Okay.  And what agencies are those?

17   A.   In this particular case, I received a

18   response Chicago Police Department, noting that

19   they would not have sufficient resources to

20   support this event.

21   Q.   Is that the only report you got?

22   A.   That's the -- yes, that's the only one

23   that I'm aware of.

24   Q.   Okay.  So you didn't receive a report

Page 37

1    from any other agency that said, "We don't have

2    sufficient resources?"

3         A.   Well, when the police don't have

4    resources, we can always go to traffic management

5    authority.  But they also stated they would not

6    have resources available to manage traffic at

7    this time.

8         Q.   Did they do that in writing?

9         A.   No.  That was a conversation.

10        Q.   Was is it in a meeting?

11        A.   Yes.

12        Q.   Okay.  Were there minutes to that

13   meeting?

14        A.   Not that I'm aware of.

15        Q.   When did that meeting occur?

16        A.   It was after another meeting.  I simply

17   brought up the response to see if they had any

18   questions.  They had their own concerns about

19   access to the Illinois Medical District, as well

20   as not believing they would have resources to

21   manage traffic.

22        Q.   Okay.  And do you know the date of that

23   meeting?

24        A.   Again, it was after another meeting.

Page 38

1      So off the top of my head, I don't.

2          Q.    Do you know who it was that told you

3      that?

4          A.    So I've spoken to Chris Pettineo and

5      Bob Lajewski at Traffic Management Authority.

6          Q.    Do you know which one told you that

7      specifically?

8          A.    They were both at that meeting.

9              ADMINISTRATIVE LAW JUDGE FLEMING:  Can I

10     get -- I'm sorry.  Chris Pettineo,

11     P-E-T-T-I-N-E-O?

12             THE WITNESS:  Yes.

13             ADMINISTRATIVE LAW JUDGE FLEMING:  And

14     the second name?

15             THE WITNESS:  Robert Lajewski.  I

16     honestly don't know how to spell his last name.

17

18     BY MR. WILLIAMS:

19         Q.    Did you bring the written police

20     report, CPD report, with you today?

21         A.    I believe there might be a copy of it,

22     but I don't have it.

23         Q.    Did you tender it to your attorney, to

24     the attorneys for the City?

1      A.    Yes.  So all that information does get

2   circulated.

3      Q.    Okay.  And it was circulated to the

4   attorneys here?

5      A.    I believe they do have a copy.

6      Q.    Okay.  And you don't have it to give to

7   me today?

8      A.    I didn't know I needed to bring it.

9      Q.    Can you describe what was in that

10  report?

11     A.    It's a standard letter that's sent to

12  CDOT from the commander of the district, either

13  supporting or objecting to an event.

14     Q.    What did it say; what did the letter

15  say?

16     A.    The letter stated that they didn't

17  believe they were going to have sufficient

18  resources to support the event.

19     Q.    Was there any kind of written analysis

20  of why they thought they wouldn't have sufficient

21  resources?

22     A.    You'd have to talk to the police

23  department as to their -- what they did to

24  determine if they weren't going to have

Page 40

1    resources.

2         Q.    But they didn't tell you to deny the

3    permit, correct?

4         A.    No.   Again, we send out the information

5    to several departments and then they would

6    provide information back to us.   Their response

7    letter does not constitute any kind of denial.

8    It's simply an assessment of their ability to

9    support the event.   So that's why it's an

10   objection, not a denial.

11        Q.    Okay.   So other than their general

12   statement they didn't have the resources, you

13   don't have any information to support that CPD

14   didn't have the resources to allow for this

15   route?

16        A.    No.   I didn't ask them for their

17   analysis.   It's not standard practice for us to

18   determine what other department can and can't do.

19        Q.    Okay.   How did you come to propose the

20   alternate route?

21        A.    Well, as you mentioned, it has to be a

22   similarly high-profile location, visible route,

23   so we selected a route that's in the central

24   business district so that it would be highly

Page 41

1    visible.

2          But the route would require fewer

3    resources to support.  Although it will have some

4    traffic impacts, it's not going to have the same

5    level of traffic impacts as the requested route.

6       Q.    And did the CPD give you an analysis of

7    the resources needed for that area?

8       A.    No, they didn't tell me the resources

9    that would be needed, but they did state that

10   they would be able to support that route.

11      Q.    So there was no comparison in the

12   resources needed for closer to the United Center

13   versus further away?

14      A.    There may have been, but not by CDOT.

15      Q.    Okay.  Was there one by the CPD?

16      A.    You'd have to ask them.  Again, it's

17   not our practice to determine what other

18   departments are capable of doing.  We simply

19   share information and then each department would

20   review it on their own.

21      Q.    Okay.  Well, as I understand your

22   testimony, you didn't get anything from CPD

23   related to the alternate route that you proposed

24   and you testified to; is that correct?

Page 42

1          A.    They did in their response letter state

2     that they would be able to support that route.

3          Q.    Did you take into consideration any

4     other routes, alternate routes, besides the one

5     you proposed?

6              MR. SPAHR:  Objection to vagueness.

7              MR. WILLIAMS:  He knows if there any

8     any others, I can't testify to specific ones.  It

9     was a question, yes or no.

10             ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

11     objection is overruled.  You know, Mr. Gallardo,

12     if you understand it you can answer it.

13             THE WITNESS:  If you're asking like were

14     there any kind of discussions as to what routes

15     would be usable, we've had -- or I should say

16     I've have conversations with other departments

17     opposing various routes during the time of the

18     DNC.  And seeing, you know, what would be

19     feasible, what would be safe to do.

20             If that's what you're asking, then, yes,

21     we have looked at other areas of the City where

22     protests may be able to take place or any kind of

23     parades or assemblies.

24

Page 43

1    BY MR. WILLIAMS:

2        Q.    Were any of those within the sight and

3    sound of the United Center; any of those

4    alternatives?

5        A.    We have looked at locations near the

6    United Center, yes.

7        Q.    Which locations?

8        A.    Well, it's -- so in terms of like near

9    the United Center, basically Union Park.  There's

10   also another park north of the United Center

11   called Park 578 that we've looked at.  We've

12   looked at areas on Washington and Warren to see,

13   you know, what the availability of those

14   locations would be.

15       Q.    What determination did you make about

16   those alternates?

17       A.    We weren't able to determine whether or

18   not those alternates would be acceptable because

19   there's a lack of information -- or at least on

20   my part, as to the extent of the DMC footprint.

21       Q.    Where do you get information about the

22   DNC footprint?

23       A.    That would have to come from the

24   organizers and the Secret Service.

Page 44

1      Q.    Okay.  Is there some kind of committee

2    that comes together around the DNC?

3      A.    They do have groups that get together.

4    But those are run by, again, by the Secret

5    Service and the DNC, not by CDOT.

6      Q.    Okay.  Who -- the DNC has a say in the

7    security planning around the United Center; is

8    that correct?

9          MR. SPAHR:  Objection.  Speculation.

10          ADMINISTRATIVE LAW JUDGE FLEMING:  All

11    right.  I'm going sustain the objection.  The

12    issue that is in front of this tribunal today,

13    again, is whether or not Mr. Gallardo complied

14    with the ordinance.

15          The ordinance requires the City to

16    propose, taking into consideration all of the

17    circumstances, a proposed route.  It does not

18    require Mr. Gallardo and the Department of

19    Transportation to give a list of whatever number

20    possible proposed routes?

21          They issued the denial letter with a

22    proposed alternate route in compliance with the

23    ordinance.  What the DNC and what the Secret

24    Service may be doing and what the Department of

Page 45

1    Homeland Security may be doing is not within

2    Mr. Gallardo's testimony.

3            MR. WILLIAMS:  This Section (k) of the

4    ordinance says, "...the commissioner shall

5    authorize the conduct of a parade on a date, at a

6    time, at a location, or over a route different

7    from that named by the applicant.  This alternate

8    permit shall, to the extent practicable,

9    authorize an event that will have comparable

10   public visibility and a similar route, location

11   and date to that of the proposed parade."

12           He's -- we're talking about a protest

13   of -- at the United Center because that's where

14   the delegates are who are the subject if the

15   political speech.  He's exercising discretion as

16   to provide an alternative.  I'm inquiring into

17   how he exercised that discretion to see if he met

18   the requirements of Section (k).

19           ADMINISTRATIVE LAW JUDGE FLEMING:

20   That's not what you're asking him.  You're asking

21   him if there were other proposed routes.  What

22   other was discussed.  That's not relevant to me.

23   What was proposed is what is in the denial

24   letter, which was not accepted.

1          So the question, again, in front of me,

2    when we're dealing with the alternate proposed

3    route was did Mr. Gallardo follow the ordinance;

4    did they propose a route that meets the

5    requirements of the ordinance.

6          Your argument will probably be that it

7    doesn't meet the requirements of the ordinance

8    because it's not close enough to the United

9    Center, the delegates aren't going to be in a

10   certain area.  That's the argument that you can

11   make.

12         But the question of other proposed

13   routes is not relevant and can't be relevant here

14   because none of the bases of the denial is

15   dealing with speculative proposed routes.

16         MR. WILLIAMS:  No, it's dealing with the

17   investigation that they conducted and the

18   analysis they did in making a decision about what

19   was an alternate route.  Which -- you know, with

20   respect is very far away and not even near the

21   United Center.

22         ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

23   again, that's a factual matter you can argue.

24         MR. WILLIAMS:  But so is the steps they

Page 47

1       took to do an analysis.

2               ADMINISTRATIVE LAW JUDGE FLEMING:  No,

3       sir.  The steps that we're dealing with here,

4       again, it's a very limited scope.  The steps I'm

5       dealing with here is whether or not the ordinance

6       was followed.

7               We don't address constitutional issues

8       here.  Those have to be addressed in a different

9       forum.  It's very, very straightforward.  Was the

10      ordinance followed?

11

12   BY MR. WILLIAMS:

13      Q.   Do you know how far the alternate route

14   is from the United Center?

15      A.   I haven't taken any kind of

16   measurements as to the distance.

17      Q.   The alternate route would run from

18   Roosevelt Road -- on South Columbus Drive from

19   Roosevelt Road to Jackson; is that correct?

20      A.   Yes.

21      Q.   Okay.  And from Jackson to the United

22   Center -- Jackson and Columbus Drive to the

23   United Center would be about three miles; does

24      that sound about right?

Page 48

1          A.    I'd have to take a look but that's

2     possible, yes.

3          Q.    Okay.  I'm going show what's been

4     marked as AWC, for Anti-War Coalition, Exhibit 1.

5     Do you recognize this photo?

6          A.    Looks to be a photo of the Grant Park

7     area.

8          Q.    Okay.  And it's labeled Columbus Drive

9     Overhead View.  Based on your experience, your

10    six years of experience, does it sound -- does

11    this seem like it's a view of the Columbus Drive

12    section that you're proposing [inaudible]?

13         A.    It does appear to be so, yes.

14         Q.    Okay.  Can you tell me -- have you

15    driven that part or been on that part of Columbus

16    Drive?

17         A.    Yes, I've been on Columbus Drive

18    before.

19         Q.    Okay.  Does it appear to be tree-lined?

20         A.    There are trees along Columbus, yes.

21         Q.    Okay.  Do you know how tall those trees

22    are?

23         A.    No, I have not measured those trees.

24         Q.    Is it fair to say they're taller than a

Page 49

1    human?

2         A.    I would imagine they are.

3         Q.    Okay.  And is it fair to say that those

4    trees would block visibility of anybody not on

5    Columbus Drive?

6              MR. SPAHR:  Objection.  Speculation.

7              ADMINISTRATIVE LAW JUDGE FLEMING:

8    Sustained.

9

10   BY MR. WILLIAMS:

11        Q.    Is it fair to say that trees would

12   block visibility?

13             MR. SPAHR:  Objection.  Speculation.

14             ADMINISTRATIVE LAW JUDGE FLEMING:

15   Sustained.  That's an argument you can make.

16

17   BY MR. WILLIAMS:

18        Q.    And to the right, you can see hotels

19   from Michigan Avenue; is that correct?

20        A.    You do see the buildings to the west on

21   Michigan Avenue.

22        Q.    Okay.  And is that the hotel district

23   of -- part of the hotel district of Chicago,

24   downtown Chicago?

Page 50

1          A.     There are some hotels there, as well as

2      office buildings and condos and other structures.

3          Q.     Okay.  So from this you would -- the

4      route you're proposing take place behind the

5      trees relative to Michigan Avenue or in front of

6      the trees, closer to Michigan Avenue?

7          A.     So the route would be on Columbus from

8      Roosevelt to Jackson.  So I'm not sure what

9      you're asking about.

10         Q.     Okay.  Do you think a route three miles

11     from the United Center is comparable public

12     visibility in your opinion?

13             MR. SPAHR:  Objection.  Improper basis.

14             ADMINISTRATIVE LAW JUDGE FLEMING:

15     Overruled.  He can answer.

16             THE WITNESS:  Yeah, it's -- the central

17     business district is one of our most busy areas

18     of the city.  So there are routinely tens of

19     thousands, hundreds of thousands of individuals

20     there.  As you pointed out there are buildings

21     across the way on Michigan Avenue that have clear

22     view onto Columbus.

23             You also have Lake Shore Drive, which

24     has over 100,000 cars daily on it, which can also

Page 51

1    view areas near Columbus.

2            So there -- you also have thousands of

3    visitors that come to Grant Park on any given

4    day.  So it is a very -- it's a highly visible

5    area where lots of activity typically take place.

6

7  BY MR. WILLIAMS:

8        Q.    You're not proposing that they can go

9    on Lake Shore Drive.  Are you?

10       A.    No, I said on Columbus.

11       Q.    Okay.

12       A.    I said they can be viewed from Lake

13   Shore Drive.

14       Q.    Between the trees; on the street

15   between the trees, correct?

16       A.    We regularly have folks on Lake Shore

17   Drive that can see into Grant Park.

18       Q.    There have been a number of other

19   permit requests for parades during this

20   Democratic National Convention; is that right.

21            MR. SPAHR:  Objection.  Relevance.

22            ADMINISTRATIVE LAW JUDGE FLEMING:

23   What's the relevance of that?

24            MR. WILLIAMS:  I want to see if he is

Page 52

1    the one who responded to and made a decision

2    about those permits and the extent to which he

3    used that information to make a decision about

4    this permit.

5              ADMINISTRATIVE LAW JUDGE FLEMING:

6    What's the relevance of that?

7              MR. WILLIAMS:  Well, in the denial

8    letter, they talk about -- I don't want to get

9    into the testimony, but they talk about something

10   that appears pretty obviously about another

11   permit.

12             ADMINISTRATIVE LAW JUDGE FLEMING:  Why

13   don't you direct him to the denial letter and to

14   that so we know --

15             MR. WILLIAMS:  All right.

16

17  BY MR. WILLIAMS:

18       Q.    The Democratic National Convention ends

19   on August 22nd, correct?

20       A.    Uh-huh.

21       Q.    Okay.  And that's the date of this

22   permit request, correct?

23       A.    Yes.

24       Q.    Okay.  And in your response under

Page 53

1    Paragraph 2, Section 2 of your letter relating to

2    (g)(2), looking at the second paragraph, you

3    indicate, "...moreover the proposed parade winds

4    through the city center on a day many attendees

5    are expected to arrive and would create

6    significant traffic concerns [inaudible] existing

7    police resources."  Do you see that?

8         A.    Uh-huh.

9         Q.    You see that line?

10        A.    Yes.

11        Q.    Okay.  Do you expect a lot of the

12   attendees to arrive on the last day?

13        A.    I would imagine that there will be

14   people coming and going the entire week.

15        Q.    Was this what you said in response to a

16   permit requested for August 19th?

17             MR. SPAHR:  Objection.  Relevance and

18   foundation.

19             ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

20   there is a foundation problem because we don't

21   have that there, but getting to the heart of it,

22   you've made your point that this is the last day

23   of the convention, so in my mind you can

24   certainly argue from there that it is less likely

Page 54

1      that delegates will be arriving on the last day

2      of the convention, as opposed to the 19th, the

3      20th, or what have you.

4              So that particular matter as set forth

5      as a basis for the denial may not have the impact

6      that it would in potentially other cases.

7              MR. WILLIAMS:  But again, Judge,

8      Section (f) of the ordinance requires that it be

9      an investigation of the permit application, in

10     this case this permit application.  I think

11     there's a strong inference to be made here that

12     this would be responding to an entirely different

13     permit application on a different day.

14             This is the person who signed the

15     letter.  He testified that he's the one

16     responding to these permit application for the

17     DNC.  He's the appropriate person to ask the

18     question to.

19             ADMINISTRATIVE LAW JUDGE FLEMING:  And I

20     believe he's answered it that his position is

21     that delegates or participants are going to be

22     coming off and on throughout.  So the question,

23     again, is more of weight to be given to that

24     particular section as opposed to getting into a

Page 55

1    application, potential application for a
2    different permit.
3            MR. WILLIAMS:  Judge, he has an
4    obligation under the ordinance to conduct an
5    investigation of this permit application.  It's
6    seems pretty clear that he's using, potentially,
7    a response to another permit application to
8    respond to this one.
9            ADMINISTRATIVE LAW JUDGE FLEMING:
10   Again, I'm going to let you make the argument on
11   that, but I don't believe that is relevant to the
12   issue here.  He has testified to the
13   investigations that were made.  He has testified
14   that specifically with this particular
15   application, to the effect -- his opinion as to
16   the effect on traffic.
17           He has testified that with this
18   particular application the response that he
19   received from the police department.  So if this
20   particular section of that denial letter is
21   something that you feel is improper or wrong, you
22   can make the argument.  You've made the point.
23           MR. WILLIAMS:  But what I can't make the
24   argument without asking these questions is that

Page 56

1     he didn't conduct an investigation of this permit

2     application.

3                 ADMINISTRATIVE LAW JUDGE FLEMING:  Ask

4     him.

5

6   BY MR. WILLIAMS:

7         Q.    Did you conduct an investigation of

8     this permit application?

9         A.    Yes.

10        Q.    Was it separate from your investigation

11    of other permit applications?

12        A.    Yes.  We review each application as

13    they come in.

14        Q.    Okay.  And why in this denial letter,

15    then, do you reference people arriving on the

16    last day but not leaving?

17        A.    As you mentioned, it's still going to

18    be taking place during the 22nd.  And there will

19    be people who will be here throughout the week

20    and they will be traveling back and forth from

21    wherever they're staying, whatever hotels, to the

22    various venues.

23                So if, I mean, is your argument that I

24    used poor language in the letter?

Page 57

1      Q.    No.  I'm asking if you relied on the

2      investigation of another permit application in

3      responding to this one?

4      A.    No, I did not.  We review each

5      application as they come in.

6      Q.    Okay.  So August 22nd, you didn't

7      expect people to be leaving, only arriving?

8      A.    I'm sure some of them may be leaving,

9      but that doesn't affect what we reviewed when the

10     application came in.

11     Q.    The -- taking a look at the City's

12     Exhibit 4.  Do you see that?

13     A.    It's the outline for the requested

14     route.

15     Q.    The proposed route, okay.  That runs

16     near United Center, correct?

17     A.    Yes, I does.

18     Q.    But it's a couple blocks south of

19     United Center, correct?

20     A.    Well, there -- it's a reasonably

21     lengthy route.

22     Q.    Okay.  But on -- as close as it get to

23     the United Center is a couple blocks south,

24     correct?

Page 58

1      A.    So I mean, it's still the area that is

2   in question, right, the United Center?

3      Q.    Yes.

4      A.    I guess I don't understand your

5   question.  I mean, yeah, they're going all the

6   way up to Adams, is that --

7      Q.    Okay.  And that's the closest they

8   would get to the United Center, the march,

9   correct?

10      A.    That's their request, yes.

11      Q.    But I'm asking, is that -- according to

12   this, is that the closest the march would get to

13   the United Center?

14      A.    Per their request, yes.

15      Q.    Okay.  And that's a couple of blocks

16   south of the United Center, correct?

17      A.    So if you're talking about strictly the

18   United Center, the building itself?

19      Q.    Uh-huh.

20      A.    Then yes, the front door of the United

21   Center is not on Adams.  But United Center

22   encompasses and entire campus, which includes

23   various parking lots and other buildings that are

24   associated with the United Center, which are

Page 59

1    likely to be within the footprint of that event.

2        Q.    Okay.  So how close is Adams to where

3    the event is?

4        A.    It's within the footprint of what we

5    expect to be in the -- it would be inside the

6    footprint of the event.

7        Q.    Okay.  How do you define the footprint?

8        A.    Of the -- so the extent of the event?

9    Where they're going to have vehicles or

10    individuals or they're going to have security

11    fencing or anything that might be associated with

12    the event, that would be part of the footprint of

13    the event.

14        Q.    Okay.  And how far do those things

15    extend?

16        A.    Again, we don't have a final answer

17    from the Secret Service.  But we expect that they

18    would extend at least a couple of blocks from the

19    main facility of the United Center.

20        Q.    Okay.  How far south?

21        A.    Again, I don't have -- that's not my

22    decision to make.  That comes from Secret Service

23    and the event organizer.

24        Q.    What would you consider a couple blocks

Page 60

1    south?

2        A.    It could go as far south as Harrison

3    for all I know.  I -- it's, again, I have to go

4    based on the information that they're giving me.

5    And right now I don't have a final footprint,

6    just that they are going to be using the entire

7    United Center campus, which could go as far as

8    Malcolm X College, it could go down to Jackson or

9    all the way to the expressway.

10           So I have to review that entire area

11   whenever there's a conflict for that event.

12       Q.    What is the information the Secret

13   Service has given you?

14       A.    That they going to have a security

15   footprint around the campus and they're going to

16   be taking over more than just the facility

17   itself.  There are parking lots as well as the

18   surrounding streets.

19       Q.    Okay.  Is that information given to you

20   in writing?

21       A.    That's -- there have been various

22   information that -- been meetings that I have

23   been in.  But if you want the details of it,

24   you'd have to get that from the Secret Service.

Page 61

1     Q.    Okay.  But my question was has the

2     Secret Service given you information about this

3     in writing?

4     A.    They have.  But it's my understanding

5     that I don't have the authority to share that.

6     It has to be approved by the Secret Service to

7     share that information.

8     Q.    Okay.  Have you relied on information

9     from the Secret Service in making your decision?

10    A.    They're one of the folks that I

11    received information from.

12    Q.    So yes, you relied on information from

13    the Secret Service?

14    A.    Yes.  Among others, yes.

15    Q.    Okay.  And yet, you're testifying you

16    don't know what area the Secret Service is going

17    to require?

18    A.    Again, I can only go by what they

19    provided me so far.  And my understanding is they

20    have not made a final determination as to what

21    the actual footprint will be.

22    Q.    So your denial is based on pure

23    speculation as to what the footprint might be?

24         MR. SPAHR:  Objection.  Misstates the

Page 62

1   testimony.

2            ADMINISTRATIVE LAW JUDGE FLEMING:  It

3   does.

4            MR. SPAHR:  And argumentative.

5            ADMINISTRATIVE LAW JUDGE FLEMING:

6   Sustained.  His denial is based upon the

7   information set forth as to two specific sections

8   of the ordinance.  That's the denial.  The

9   proposed route is putting -- it's -- you're

10  asking, I think, if the proposed applied for

11  route was denied because it would be within the

12  footprint of the United Center.  Is that what

13  you're asking?

14           MR. WILLIAMS:  Yes.

15           ADMINISTRATIVE LAW JUDGE FLEMING:

16  That's not in the denial letter.

17           MR. WILLIAMS:  Well, the denial letter

18  is not specific as to why.  It talks about the

19  need to move people back and forth, and people

20  who will be in town, the President will be here,

21  traffic safety issues.

22           You know, the denial is not specific.

23  That's why we're here, to determine whether this

24  denial complies with the ordinance or not.

Page 63

1          ADMINISTRATIVE LAW JUDGE FLEMING:  But

2     you're questioning on the proposed route at this

3     point in time.

4          MR. WILLIAMS:  Yes.

5          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

6     The proposed route is not within the bases for

7     the denial.  The denial are set forth in two

8     sections of the municipal code, okay?  They then

9     propose an alternate route pursuant to another

10    section of the ordinance.  But that's not a

11    denial portion.

12          MR. WILLIAMS:  The denial under

13    Section (g)(2) talks about the impediment and

14    safety of transportation.  And [inaudible]

15    existing resources, protection of various

16    locations, include city center, et cetera.

17          They're talking about the security

18    around the United Center during the DNC.  So

19    if -- that's the basis for denying the route that

20    was requested --

21          ADMINISTRATIVE LAW JUDGE FLEMING:  The

22    bases for denial are set forth in Sections

23    10-8-330(g)(1) and (g)(2).  And he has test --

24    Mr. Gallardo has testified to those matters.

Page 64

1    Now, the question of whether there's going to be

2    a footprint or how long -- much of a footprint is

3    not available now, so that was not a specific

4    bases for denial.

5              But the question of security, the

6    question of what needs to be done has been

7    testified to.

8              MR. WILLIAMS:  Well, respectfully, the

9    second part of Paragraph 2 very explicitly talks

10   about heightened security, security checkpoints,

11   and so forth.  That these are things that were

12   taken into consideration.  And I am inquiring

13   into the basis of using that information to use

14   his discretion to deny this application.

15             There's nothing he cited to that says he

16   has to deny it.  He testified he's the one that

17   makes the decisions.  So he's necessarily

18   exercising discretion.  The question is whether

19   that discretion comports was the ordinance.

20             ADMINISTRATIVE LAW JUDGE FLEMING:  Mr.

21   Gallardo has testified that he had reached out to

22   a number of agencies, including CPD.  And as a

23   result of that, he has received the information

24   that he input into the denial letter.

Page 65

1            So I am assuming, and I believe he has

2      testified to that and there will be police

3      testimony concerning these other matters.

4      Because the issue of security and the issue of

5      the ability to provide adequate security is

6      information that, again, would not necessarily be

7      under Mr. Gallardo's expertise.  But he would be

8      relying on the information that he received from

9      the Chicago Police Department and/or other

10     agencies.

11            MR. WILLIAMS:  I respectfully disagree,

12     Your Honor.  But this is your courtroom.

13

14   BY MR. WILLIAMS:

15       Q.    If the security footprint did not

16     extend to Jackson Boulevard, could you have

17     permitted the parade to extend -- go to Jackson

18     Boulevard.

19            MR. SPAHR:  Objection.  Calls for

20     speculation.

21            ADMINISTRATIVE LAW JUDGE FLEMING:

22     Speculation.  Sustained.

23

24   BY MR. WILLIAMS:

Page 66

1      Q.    Well, when you decide what is

2    permissible, do you take into consideration the

3    security footprint?

4      A.    I have to take into consideration any

5    information that I have.

6      Q.    Okay.  So certainly, you wouldn't

7    approve a parade that sought to go within the

8    security barrier set up by the Secret Service.

9           MR. SPAHR:  Objection.  Speculation and

10   relevance.

11          ADMINISTRATIVE LAW JUDGE FLEMING:

12   Again, sustained.  We don't have a footprint yet

13   from the Secret Service.

14

15   BY MR. WILLIAMS:

16     Q.    Would you agree the alternate route is

17   not visible from the United Center?

18          MR. SPAHR:  Objection.  Speculation.

19          ADMINISTRATIVE LAW JUDGE FLEMING:

20   Sustained.  [Inaudible].

21

22   BY MR. WILLIAMS:

23     Q.    Is it your testimony it's impossible to

24   approve a parade that goes from Roosevelt Road up

Page 67

1    Ashland?

2           MR. SPAHR:  Objection.  Calls for

3    speculation.

4           ADMINISTRATIVE LAW JUDGE FLEMING:

5    Sustained.

6

7  BY MR. WILLIAMS:

8      Q.   Has a parade permit ever been approved

9    that goes from Roosevelt Road up Ashland?

10          MR. SPAHR:  Objection.  Relevance.

11          ADMINISTRATIVE LAW JUDGE FLEMING:

12   Sustained.  We don't know that one's ever been

13   filed.

14          MR. WILLIAMS:  This is the person who

15   approves them over the last six years.  He can

16   testify to it if he knows.

17          ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

18   do you know if -- first of all, do you know if a

19   permit parade application has ever been made for

20   that site?

21          THE WITNESS:  I don't know.  Not off the

22   top of my head.

23

24  BY MR. WILLIAMS:

Page 68

1        Q.    You don't know if there's ever been a

2    permit for a parade on Ashland Avenue?

3        A.    The City's been taking in permit

4    applications for decades.  I can't say with any

5    kind of certainty that there's never been a

6    parade or never been an application that

7    requested that route.

8        Q.    You testified that part of the reason

9    you decided it could not take place around there

10   is because of the use of Ashland Avenue by the

11   medical district; is that right?

12       A.    That is one of the factors.

13       Q.    Okay.  And so if there was -- that

14   would apply forever and any parade permit,

15   correct; it wouldn't just be used to this?

16            MR. SPAHR:  Objection.  Calls for

17   speculation.

18            ADMINISTRATIVE LAW JUDGE FLEMING:

19   Sustained.  If you're going to try and cross

20   examine on that type -- that line, you can't just

21   say a parade.  Has there been an application for

22   a -- was there an application for a parade in the

23   1996 Democratic National Convention on that

24   route?  That might be relevant.

Page 69

1          But to say a parade, what type of

2     parade, what day of the week, what time of the

3     week?  Those are all factors that would come into

4     play.  And you can't cross examine Mr. Gallardo

5     on just asking has any parade ever gone down

6     Ashland Avenue.

7

8   BY MR. WILLIAMS:

9          Q.   Are there any times that would be

10    acceptable to have a parade on Ashland Avenue

11    during the Democratic National Convention?

12         A.   I have to review anyone's request, but,

13    I mean, if you're asking about the impact to the

14    Illinois Medical District, I mean, any time

15    you're going to be closing Ashland near that,

16    it's going to have an effect on any buildings

17    near that route.  So that would be something that

18    I would review regardless.

19         Q.   Is it possible to close part of Ashland

20    for a parade?

21              MR. SPAHR:  Objection.  Speculation.

22              ADMINISTRATIVE LAW JUDGE FLEMING:

23    Sustained.

24              MR. WILLIAMS:  Your Honor, he testified

Page 70

1    that it can't be done because it's used for --

2              ADMINISTRATIVE LAW JUDGE FLEMING:  The

3    application is not for part of Ashland Avenue.

4    So whether or not something could or could be

5    done for part of Ashland Avenue is not in front

6    of us.

7              MR. WILLIAMS:  It is for part of Ashland

8    Avenue.

9              ADMINISTRATIVE LAW JUDGE FLEMING:

10   You're asking if a parade permit could have been

11   issued for part of Ashland Avenue.  That's not

12   what the application asks for.  If that's the

13   situation, then someone could have applied to

14   have a parade go down part of Ashland Avenue.

15   That application could be reviewed.  And the

16   process can move on from there.

17             MR. WILLIAMS:  Is Section (k) not in

18   front of us today, of the ordinance, Judge?

19             ADMINISTRATIVE LAW JUDGE FLEMING:  Are

20   you talking about comparable route?

21             MR. WILLIAMS:  Yes.

22             ADMINISTRATIVE LAW JUDGE FLEMING:  It

23   certainly is.

24             MR. WILLIAMS:  Okay.

Page 71

1            ADMINISTRATIVE LAW JUDGE FLEMING:  And

2    he has testified as to why he felt it's a

3    comparable route.  You cross examined him on it.

4            MR. WILLIAMS:  I started to cross

5    examine him on that.  A more comparable, would

6    you agree, would be closer to where the original

7    permit requested?

8            ADMINISTRATIVE LAW JUDGE FLEMING:

9    That's not what the ordinance requires.

10            MR. WILLIAMS:  To the extent

11    practicable.

12            ADMINISTRATIVE LAW JUDGE FLEMING:

13    Practicable.

14            MR. WILLIAMS:  Yeah.  "Comparable public

15    visibility and a similar route, location and

16    date."  It does exactly require it.  There is a

17    requirement that there be a similarity between

18    that requested and that granted.

19            And if there was a possibility to

20    conduct the parade in the same area where the

21    political speech was targeted, the I submit to

22    you that Section (k) requires it to the extent

23    possible?

24            ADMINISTRATIVE LAW JUDGE FLEMING:  And

Page 72

1    that will be, again, part of your argument.  Mr.

2    Gallardo has testified about the proposed route.

3    He has testified why he felt it meets the

4    requirements of Section (k).  You, obviously, if

5    you agreed with him you wouldn't be here.  Okay.

6         But I don't know that there's anything

7    in the ordinance that suggests that the

8    Department of Transportation propose an alternate

9    route, during all of the circumstances that we're

10   dealing with here that is within X number of feet

11   of the proposed -- of the applied for route.  I

12   don't see that in the ordinance.

13        MR. WILLIAMS:  Well, obviously, this

14   permit request is not in the ordinance.  Nobody

15   is suggesting that.  I would know what he's --

16   whether there was an alternative on Ashland.  If

17   I could ask the question.  It's not if it's

18   unknowable.  He's sitting right here.  He's the

19   one who has exercised the discretion over whether

20   or not -- to move the alternate three miles away,

21   clearly out of site of the United Center.

22        ADMINISTRATIVE LAW JUDGE FLEMING:  This

23   is all argument.

24        MR. WILLIAMS:  But I'm -- it's argument

Page 73

1       based on fact.  The question is as the Assistant

2       Commissioner of the City of Chicago Department of

3       Transportation, is it a possible alternative to

4       shut down part of Ashland Avenue and still leave

5       traffic flowing on Ashland Avenue to accommodate

6       the medical district?

7               That's a question.  A factual question

8       for the commissioner -- Assistant Commissioner of

9       the Chicago Department of Transportation?

10              ADMINISTRATIVE LAW JUDGE FLEMING:  All

11      right.  City, do you want to respond to it?

12              MR. SPAHR:  And as Mr. Gallardo has

13      testified, it is in his job description to reach

14      out to numerous other agencies within the City of

15      Chicago to see if there's sufficient resources to

16      accommodate a parade as applied for.

17              By having Mr. Gallardo answer Counsel's

18      question would be effectively having him bypass

19      the entire process and analyze a full new parade

20      application without following the guidelines of

21      the ordinance.

22              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

23      The objection is sustained.

24

Page 74

1    BY MR. WILLIAMS:

2        Q.    What process did you follow to consider

3    alternative routes?

4        A.    So as we do with all applications, we

5    review activities that are going to be taking

6    place in the area, whether it's construction,

7    whether it's other events; it can be festivals,

8    athletic events, as well as input from other

9    departments whether or not they are going to have

10   the necessary resources to support the event.  So

11   that's all included in the review.

12       Q.    So there is no other part of the city

13   that's possible except this section of Columbus

14   Drive behind the trees?

15           MR. SPAHR:  Objection.  Speculation.

16           ADMINISTRATIVE LAW JUDGE FLEMING:

17   Sustained.

18

19   BY MR. WILLIAMS:

20       Q.    During the process that you engaged in,

21   did you consider any other part of the city?

22           MR. SPAHR:  Objection as to relevance.

23           ADMINISTRATIVE LAW JUDGE FLEMING:

24   Overruled if he can answer.

Page 75

1                THE WITNESS:  I believe you asked that

2       question already.  And we -- we looked at various

3       alternatives based on the information that we

4       have.  But again, I have to go with what's

5       available to me.

6

7    BY MR. WILLIAMS:

8          Q.    What was available to you?

9          A.    So Columbus is a route that we believed

10      as a city, both CDOT and other departments

11      involved, that would require less resources and

12      have less of an impact, so that's why it was

13      selected even though it is still a high-profile

14      location being in the central business district.

15         Q.    Who proposed that section of Columbus

16      Drive?

17         A.    Who proposed the section of Columbus

18      Drive?

19         Q.    As the alternate?

20         A.    So that was one of the locations that I

21      as well as other folks have discussed with other

22      departments as a possible route.  So that's why

23      we selected it.

24         Q.    Is that communication done in writing?

Page 76

1      A.    So you'll probably find it in the

2   response letter from the police.  You'll also

3   find -- you may find other information about it

4   from other meetings that we've had discussing

5   potential routes.

6           Again, part of the process for the

7   application is we do review it.  We do talk to

8   other departments and agencies and we ask them.

9   So it's not -- it's not done in a vacuum.

10          You know, I'm not determining for other

11  departments what their manpower resources are.

12  I'm not determining for them what their

13  responsibilities are going to be during that time

14  frame.

15          They provide that information to me and

16  we find a suitable alternative.  And if

17  there's -- if there is something that everyone

18  believes that they can support -- I'm not going

19  to select something based on their original

20  request not being supportable and then just foist

21  another location on others without making sure

22  that they can support it.  That would be -- that

23  would defeat the purpose.

24      Q.    So is all that information that you

Page 77

1    gather collected somewhere in writing?

2              MR. SPAHR:  Objection.  Asked and

3    answered.

4              ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

5    it's cross examination.  I believe the question

6    in one form may have been asked, but you -- it's

7    cross examination so.

8              THE WITNESS:  I don't know that that's

9    written down anywhere.  Like I said, you can see

10   the acceptance by police in their response

11   letter, that they were okay with that location.

12   But I don't know that there's specific writing of

13   every location that we may have reviewed.

14

15   BY MR. WILLIAMS:

16        Q.   Looking at Exhibit 5A through C,

17   particularly the last page, 5C.  There's a number

18   of people cc'd on this letter?

19        A.   Uh-huh.

20        Q.   I don't need to know who everybody is

21   and what department they are, but can you -- what

22   is this collection of people?  Why are they cc'd?

23        A.   They're various individuals that may

24   have responsibility in one form or another for

Page 78

1    reviews of a denial letter like this.  So there

2    are folks from the police department, from OEMC,

3    from my own department, transportation, as well

4    as the law department.  Anyone who might need

5    this information once it was sent out.

6         Q.    Are they all city employees?

7         A.    Yes.

8         Q.    So there's no federal people on this?

9         A.    No.

10        Q.    Are there any representatives of the

11   DNC on this?

12        A.    No.

13        Q.    Would you agree there are multiple

14   routes from downtown Chicago to the United

15   Center?

16             MR. SPAHR:  Objection.  Relevance.

17             ADMINISTRATIVE LAW JUDGE FLEMING:

18   Overruled.

19             THE WITNESS:  When you say routes from

20   downtown to the United Center?

21

22   BY MR. WILLIAMS:

23        Q.    Yes.

24        A.    I mean, there are multiple streets that

Page 79

1    go -- that you could take to get back and forth.

2         Q.    Okay.  Could you take 290, for example?

3         A.    You could.  290 does go by the United

4    Center, as well as multiple other streets.

5         Q.    Okay.  Randolph Street runs west from

6    downtown?

7         A.    It does, but it kind of cuts off before

8    you get to the United Center.

9         Q.    Lake Street?

10        A.    Lake Street is currently under

11   construction.  You would not be able to get to

12   Damen from Lake Street.

13        Q.    Madison runs out of downtown and it's

14   two-way; isn't that correct, to the United

15   Center -- runs right in front of the United

16   Center?

17        A.    Yeah.

18             MR. WILLIAMS:  Your Honor, I have no

19   further questions.

20             ADMINISTRATIVE LAW JUDGE FLEMING:

21   Redirect?

22             MR. SPAHR:  One moment.  No further

23   questions from the City for this witness.

24             ADMINISTRATIVE LAW JUDGE FLEMING:  I

Page 80

1    just want to ask a question for clarification

2    purposes pursuant to the ordinance.  Does the

3    Commissioner of the Department of Transportation

4    issue the denial through your denial letter?

5              THE WITNESS:  Yes, if I understand your

6    question.  The authority for the ordinance is

7    with the commissioner and then he designates

8    someone or an agency within his department.  And

9    that is the permitting office, which I run.

10             ADMINISTRATIVE LAW JUDGE FLEMING:  I

11   just want it clear.  You could not issue a denial

12   without the commissioner's authorization?

13             THE WITNESS:  Correct.  The ordinance

14   gives the commissioner the authority to do so.

15             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

16             THE WITNESS:  Yeah, I'm simply acting on

17   his behalf.

18             ADMINISTRATIVE LAW JUDGE FLEMING:  You

19   can cross on that if you have any questions on

20   it.

21

22                  RECROSS EXAMINATION

23   BY MR. WILLIAMS:

24        Q.   I thought you testified earlier you

Page 81

1    were the one with the authority to issue the

2    denial.  And you issued the denial, correct?

3        A.   As I said, yes, the letter, if you see,

4    I'm the one who's signing it as the

5    commissioner's designee.  So --

6        Q.   So you're a designee and authorized to

7    issue the denial?

8        A.   That's one of the responsibilities of

9    my job, yes, to review the applications and if

10   needed, issue a denial letter.

11       Q.   [Inaudible] you testified in your

12   earlier testimony.  Otherwise we would need the

13   commissioner here, right?

14            ADMINISTRATIVE LAW JUDGE FLEMING:  No.

15   Not necessarily.  But we don't at this point.

16   All right.  Let's take about ten minutes.

17

18   (A SHORT RECESS WAS TAKEN.)

19

20            ADMINISTRATIVE LAW JUDGE FLEMING:  All

21   right.  City, you can call your next witness,

22   please.

23            MR. DIONNE:  All right.  Judge, City

24   next calls Deputy Chief Gabrielle Shemash.

```
                                              Page 82
 1                ADMINISTRATIVE LAW JUDGE FLEMING:  All

 2    right.  Deputy, raise your right hand.  Do you

 3    solemnly swear or affirm any testimony you give

 4    will be the truth?

 5                DEPUTY CHIEF SHEMASH:  Yes.

 6                ADMINISTRATIVE LAW JUDGE FLEMING:

 7    Okay.

 8

 9                     DIRECT EXAMINATION

10    BY MR. DIONNE:

11         Q.    Good morning.  Could you please state

12      your name, spelling it for the record?

13         A.    Sure.  Gabrielle Shemash, last name is

14      spelled S-H-E-M-A-S-H.

15         Q.    Who is your current employer?

16         A.    The Chicago Police Department.

17         Q.    And how long have you worked for the

18      Chicago Police Department?

19         A.    22 years.

20         Q.    What is your current position?

21         A.    I'm the Area 3 Deputy Chief of Patrol.

22         Q.    How long have you held that position?

23         A.    Since December of 2001.

24         Q.    What is your role as Deputy Chief of
```

Page 83

1    the Chicago Police Department?

2         A.    I oversee patrol operations in four

3    districts.

4         Q.    Which districts?

5         A.    The 12th, 19th, 20th, and 24th.

6         Q.    And what does it mean to oversee those

7    districts?

8         A.    I just ensure that patrol operations

9    are done properly, policies are followed.  I

10   oversee any special events in any of those four

11   districts as well.

12        Q.    Does that also include overseeing

13   Chicago police officers?

14        A.    Yes.  Officers, sergeants, and up.

15        Q.    Approximately how Chicago police

16   members do you oversee?

17        A.    Approximately, 1,200.

18        Q.    Do you also, in your role, oversee any

19   large city events?

20        A.    Yes.

21        Q.    Which ones?

22        A.    Several.  Some of the largest that I do

23   are the Pride Parade and Puerto Rican Parade and

24   Festival.

Page 84

1        Q.    What do you have to do for these

2    events?

3        A.    Lots of planning, ensure we have the

4    proper resources in the district.  Request

5    additional resources and work with other city

6    agencies for outside resources.

7        Q.    What kind of other city agencies do you

8    speak with?

9        A.    OEMC, Streets and Sanitation, fire

10   department, CDOT.

11       Q.    Are you aware that the Democratic

12   National Convention is going to be in Chicago?

13       A.    Yes.

14       Q.    And how does the DNC compare to other

15   events that you've worked on?

16       A.    It will be larger than anything I've

17   worked on.

18       Q.    Have you, personally, been tasked with

19   working on the DNC?

20       A.    Yes.

21       Q.    What is your role in preparation of the

22   DNC?

23       A.    So with United Center being in my area,

24   I'm tasked with patrol operations outside the

Page 85

1    United Center area.

2         Q.    What has CPD generally been called upon

3    to do during the DNC?

4         A.    We have to ensure public safety outside

5    the secure parameter.  We also have to maintain

6    safety for the dignitaries and heads of state and

7    their transportation to and from the venues.

8         Q.    And when did you start working on this

9    event?

10        A.    January of 2023.

11        Q.    What are the dates of the DNC?

12        A.    August 19th through the 22nd.

13        Q.    And what are the primary locations of

14   the DNC?

15        A.    United Center and McCormick Place.

16        Q.    Now, generally speaking, what will

17   Chicago Police Department's role be while the DNC

18   is in Chicago?

19        A.    Ensuring the safety of all the citizens

20   outside of those two venues, along with the rest

21   of the city.

22        Q.    Does that include motorcades?

23        A.    Yes.

24        Q.    And what kind of security for the

Page 86

1    attendees will CPD be providing?

2        A.    There'll be dignitary protection at the

3    venues that the DNC is happening in, as well as

4    where the dignitaries are staying, and then the

5    motorcade transportation routes.

6        Q.    Now, while the DNC is in Chicago, are

7    there other events within the city that have been

8    affected?

9        A.    Yes.

10       Q.    All right.  Directing you to the Air

11   and Water Show, has that been affected by the DNC

12   being in Chicago?

13       A.    Yes.  It's been moved.

14       Q.    Do you know when it's been moved from?

15       A.    It's been moved from the week of DNC

16   ahead to August 10th and 11th.

17       Q.    Why was this event rescheduled?

18       A.    Because during the times of the DNC, we

19   don't have the resources to ensure public safety

20   at an event as large as the Air and Water Show.

21       Q.    What kind of resources are required

22   from CPD for the Air and Water Show?

23       A.    Personnel, being officers, vehicles,

24   squad cars, barricades, blue barricades, horses,

Page 87

1    irons.

2         Q.    And does that require working with any

3    other departments within the city?

4         A.    Yes.

5         Q.    Which ones?

6         A.    OEMC, Streets and Sans, fire

7    departments, CDOT.

8         Q.    All right.  And what about Chicago

9    public schools?  Has the start of the school year

10   been delayed because of the DNC?

11        A.    Yes.

12        Q.    When has it been changed to?

13        A.    It's been pushed back one week.

14        Q.    Why was it pushed back one week?

15        A.    Typically during the first week of

16   school, we man safe-passage routes and in this

17   particular case, during DNC, we wouldn't have the

18   manpower to ensure the safe-passage routes could

19   be properly manned for the kids to get safely to

20   school.

21        Q.    Besides manpower, are there any other

22   resources that would be required from CPD?

23        A.    Yes.  Again, vehicles, along with all

24   the equipment that goes with the officers;

Page 88

1    radios, body cams.

2        Q.    Okay.  Deputy Chief, do you know what a

3    national special security event is?

4        A.    Yes.

5        Q.    What is that?

6        A.    It's an event that's designated by the

7    Department of Homeland Security that has

8    significant national attention and requires extra

9    security for, you know -- high propensity for

10   terrorist threats or criminal activities that

11   requires extra security.

12       Q.    Is the Democratic National Convention

13   consider an NSSE?

14       A.    Yes.

15       Q.    And how did you find that out?

16       A.    From the Secret Service.

17       Q.    Okay.  Do you recall if you spoke to

18   anybody in particular in the Secret Service about

19   that?

20       A.    I don't remember a particular person.

21       Q.    Well, was it an agent from the Secret

22   Service?

23       A.    Yes.  They held a meeting with us.

24       Q.    And when you say "us" do you mean CPD?

Page 89

1        A.    Yes, CPD.

2        Q.    So what is being required of CPD during

3   an NSSE?

4              MR. WILLIAMS:  I would object to the

5   fact this is hearsay.  [Inaudible] foundation.

6              MR. DIONNE:  Judge, hearsay is permitted

7   in the Department of Administrative Hearings.

8   This officer just testified that she spoke to

9   Secret Service about it being an NSSE and the

10  next question was what was required of CPD.

11  That's not hearsay.

12             ADMINISTRATIVE LAW JUDGE FLEMING:  I

13  don't believe it is hearsay.  If it was hearsay,

14  hearsay is allowed in this particular venue.  So

15  the objection is sustained -- I mean, I'm sorry.

16  The objection is overruled.

17

18  BY MR. DIONNE:

19       Q.    Officer, do you need me to re-ask the

20  question?

21       A.    We will be required to provide

22  security, again, outside of the secure perimeter,

23  as well as any transportation routes for the

24  dignitaries.

Page 90

1      Q.    What's -- and I apologize.  Deputy

2      Chief, what do you mean when you say the secure

3      perimeter?

4      A.    So there will be a perimeter around

5      each of the venues.  CPD will be tasked with all

6      public safety issues outside of that.

7      Q.    And what date or dates do you have to

8      start deploying any resources from CPD?

9      A.    So it will likely be up to a week prior

10     to the event.

11     Q.    And when will these special deployments

12     end?

13     A.    Possibly a couple days later, not

14     positive.  But it will be a little bit after the

15     DNC actually ends.

16     Q.    And why does it have to extend after

17     the DNC?

18     A.    They're going to have to actually take

19     down equipment, take down fencing, take that

20     perimeter down and we'll be required to secure

21     the area for that.

22     Q.    During this time, how many officers are

23     going to be required to accomplish these

24     directives?

Page 91

1      A.    Thousands.

2      Q.    During this time, are officers allowed

3   for vacation?

4      A.    No.

5      Q.    Are officers allowed for furlough?

6      A.    No.

7      Q.    What about officer training during this

8   time period?

9      A.    All training has been cancelled during

10   this time.

11      Q.    How are officers going to be deployed

12   in relation to the Chicago Transit Authority?

13      A.    So we'll be deployed on all the buses

14   and trains, as well as the platforms, CTA

15   platforms.

16      Q.    Are officers going to be tasked with

17   barricading streets?

18      A.    Yes.

19      Q.    And what, if any, other agencies is CPD

20   working with during this time?

21      A.    The Illinois State Police, Cook County

22   Sheriffs, and some suburban agencies that border

23   us.

24      Q.    Will you be working with the Secret

```
                                          Page 92
 1    Service as well during this time?
 2         A.    Yes.
 3         Q.    Does the Secret Service direct the
 4    Chicago Police Department on how to allocate or
 5    use its resources?
 6         A.    No.
 7         Q.    Who makes that decision on how to
 8    deploy those resources?
 9         A.    CPD does.
10         Q.    Now, do you have an estimate as to how
11    many people will be arriving in Chicago during
12    this time?
13         A.    There'll be over a million.
14         Q.    All right.  And approximately how many
15    delegates, if you know?
16         A.    Approximately, 135 heads of states and
17    then tens of thousands of actual delegates that
18    go along with them.
19         Q.    Are you aware whether or not the
20    President and/or Vice President will be in
21    attendance as well?
22         A.    Yes, they'll both be in attendance.
23         Q.    All right.  Who or where did you get
24    this information from?
```

Page 93

1          A.     Secret Service.

2          Q.     And do you have an estimate how many

3     just lay-people or citizens will be descending

4     upon the city during this time?

5          A.     It'll be over a million.

6          Q.     Generally speaking, how large of an

7     event is this for Chicago?

8          A.     This will be the largest that I've seen

9     in my career.

10         Q.     Have you worked on prior large events

11    within the city?

12         A.     Yes.

13         Q.     Which ones?

14         A.     As mentioned before, Pride Parade,

15    large festivals, so Puerto Rican Festival,

16    anything that happens at United Center or Wrigley

17    Field.

18         Q.     And how does the Democratic National

19    Convention compare to these other events you've

20    worked on?

21         A.     It'll be much larger.

22         Q.     So I'm going to talk to you now about

23    parade applications generally.  How do you or do

24    you receive any parade application requests?

Page 94

1       A.      Yes.

2       Q.      Okay.  When you receive one, from whom

3    do you receive it?

4       A.      From our special events section.

5       Q.      And is that through the Chicago Police

6    Department?

7       A.      Yes.

8       Q.      Once you've received an application,

9    what do you do?

10       A.      I review it and make an assessment as

11    to how large it will be and what kind of

12    resources that we would need to accommodate it.

13       Q.      Do you receive every parade

14    applications or just specific ones?

15       A.      Just the ones in my area.

16       Q.      All right.  So once you've receive it

17    then do you speak to anybody?

18       A.      The District Commander.

19       Q.      All right.  And is that through the

20    Chicago Police Department as well?

21       A.      Yes.

22       Q.      And is that always the same district

23    commander or does it vary?

24       A.      It varies based on what district the

Page 95

1    event is in.

2         Q.    Do you do an analysis of what resources

3    are required from CPD to secure a parade route?

4         A.    Yes.

5         Q.    As part of that analysis, do you

6    contemplate how many officers?

7         A.    Yes.

8         Q.    What else is considered when you're

9    looking at an application?

10        A.    The amount of equipment that goes with

11   those officers, vehicles, as well as barricades

12   for the roads.  So blue horses, Type 3s, irons.

13        Q.    All right.  And what are Type 3s?

14        A.    The road barricades that you typically

15   see at a closure with the orange and white,

16   usually held at the bottom by sandbags.

17        Q.    And irons, what are those?

18        A.    Just the like gray fencing that you

19   typically see curbside at a parade.

20        Q.    And how about Chicago Police Department

21   vehicles?

22        A.    Squad cars, as well as CTA buses that

23   we used to move officers onto foot posts.

24        Q.    Are there any other city departments or

Page 96

1    clients that you contact in anticipation of

2    analyzing a parade application?

3        A.    Yes.

4        Q.    Which ones?

5        A.    OEMC, fire department, Streets and

6    Sans, and CDOT.

7        Q.    And why do you contact those

8    departments?

9        A.    Because we need to make sure that they

10   have the amount of resources that would be needed

11   for the same thing.  And then we deconflict to

12   make sure there's nothing else going on somewhere

13   else in the city that would pull those resources.

14       Q.    And who is in charge of directing the

15   implementation of all these resources?

16       A.    CPD.

17       Q.    Do you have any prior experience

18   working on parades which use the public way?

19       A.    Yes.

20       Q.    Approximately how many?

21       A.    About a dozen.

22       Q.    And have you ever worked on a parade

23   roughly the size of the Petitioner's application?

24       A.    Yes.

Page 97

1      Q.    Approximately how many times?

2      A.    Same, about a dozen.

3      Q.    And are you aware of the type of CPD

4   resources it takes to allow these types of

5   parades?

6      A.    Yes.

7      Q.    What types of CPD resources are

8   required for types of parades such as the

9   applicant Petitioner's?

10     A.    Officers, squad cars, and barricades.

11     Q.    And for parades of this size, does CPD

12  have to work with any other agencies within the

13  city?

14     A.    Yes.  As before, OEMC, fire department,

15  Streets and Sans, and CDOT.

16     Q.    And why for an application of this

17  size?

18     A.    To ensure that they have the resources

19  we need.  Barricades, ambulances, and personnel.

20     Q.    So I'm handing you what's been

21  previously entered into evidence as City's Group

22  Exhibit 3A through C.  Do you recognize this?

23     A.    Yes.

24     Q.    All right.  And what is this that

Page 98

1    you're looking at?

2         A.    A permit for an application for a

3    parade.

4         Q.    Were you ever given a copy of the

5    Petitioner's February 29, 2024 parade

6    application?

7         A.    Yes.

8         Q.    When were you given a copy?

9         A.    Several weeks ago.

10        Q.    Do you recall by whom?

11        A.    It would have been through Special

12   Events CPD.

13        Q.    Prior to today, did you review this

14   application?

15        A.    Yes.

16        Q.    And looking at this application, what

17   was the requested date of this parade?

18        A.    The 22nd of August 2024.

19        Q.    And the assembly time?

20        A.    5:00 p.m.

21        Q.    Start time?

22        A.    6:00 p.m.

23        Q.    End time?

24        A.    8:00 p.m.

Page 99

1      Q.   Disbursal time?

2      A.   9:00 p.m.

3      Q.   Was there an estimated number of

4   participants for this parade?

5      A.   Yes.  This is 1,000 plus.

6      Q.   All right.  And was there a proposed

7   route for this parade?

8      A.   Yes.

9      Q.   All right.  And what was that route?

10     A.   The start is Addams-Medill Park and

11   then northbound on Ashland to Adams.  Adams west

12   to Damen.  South on Damen towards Roosevelt.  And

13   then Roosevelt back to Addams-Medill Park.

14     Q.   And are you familiar with these streets

15   in this location?

16     A.   Yes.

17     Q.   How are you familiar with them?

18     A.   I was the commander of the 12th

19   District.

20     Q.   For how long?

21     A.   For two years prior.

22     Q.   So could you please describe

23   Addams-Medill Park?

24     A.   It's a large park, primarily used for

Page 100

1    sporting events; some soccer fields, baseball

2    diamonds.

3        Q.    And could you describe Ashland Avenue

4    at this location?

5        A.    Ashland is a major thoroughfare, runs

6    north south.  Two traffic lanes in each direction

7    and a parking lane.  And it is a major

8    thoroughfare into the medical district.

9        Q.    And how about Adams Street?

10       A.    Adams is a one-way going westbound.

11   Also has some parking lane, mixed residential and

12   business, and -- yeah, that's it.

13       Q.    Could you describe Damen Avenue,

14   please?

15       A.    Damen is also a larger north south

16   thoroughfare, two traffic lanes in each direction

17   and a parking lane.  Also runs through the

18   medical district.

19       Q.    Could you describe Roosevelt Road?

20       A.    Roosevelt Road is a large east west

21   thoroughfare, two traffic lanes and a parking

22   lane.

23       Q.    How close is this proposed route to the

24   United Center?

Page 101

1      A.    At the point of Adams and Damen it is

2   within a couple of blocks of the United Center.

3      Q.    And you also previously mentioned the

4   medical district.  Where is that in relation to

5   this route?

6      A.    It's actually within the route.

7      Q.    And when you say "within the route"

8   what, exactly do you mean?

9      A.    So Damen will run through it and both

10  Roosevelt and Ashland will run adjacent to it.

11     Q.    Now, looking at this parade

12  application, would CPD require just to close off

13  these streets?

14     A.    No.  It would require closing several

15  major intersections, as well as side streets.

16     Q.    Why?

17     A.    One, we'd have to ensure that there is

18  ample entrances to the emergency rooms at all the

19  hospitals in the area, as well as preventing

20  traffic from driving into the parade route.

21     Q.    Do you have an approximation of how

22  many additional streets would have to be closed

23  to secure this proposed route?

24     A.    Approximately 25 major intersections.

Page 102

1    Q.    And would that require more resources

2    from the Chicago Police Department?

3    A.    Yes.

4    Q.    Why would this take more resources?

5    A.    Simply, the personnel to close every

6    one of those intersections, as well as extra

7    personnel ensuring emergency room entrances.

8    Q.    Do you have an estimation of just how

9    many physical officers it would take to secure

10   this proposed route?

11   A.    It would be hundreds.

12   Q.    All right.  And does that hundreds

13   estimation include the additional side street

14   closures?

15   A.    Yes.

16   Q.    What other resources would be required

17   in order to secure this route?

18   A.    Vehicles, equipment for every officer,

19   radios, body cams, and several barricades.

20   Q.    Would other agencies besides CPD be

21   required to secure this route?

22   A.    Yes.  Streets and Sanitation and the

23   fire department would need an ambulance at least.

24   Q.    Would OEMC be required to be a part of

Page 103

1    this proposed route as well?

2        A.    Yes.

3        Q.    Did you ultimately make a

4    recommendation based on this Petitioner's parade

5    application?

6        A.    I did.

7        Q.    And what was that recommendation?

8        A.    I recommended that it be denied.

9        Q.    All right.  Well, why did you make that

10   recommendation?

11       A.    Based on the date -- it's the same day

12   as DNC is going on and all of our personnel will

13   already be utilized for DNC, as well as our

14   equipment and anything else we would need to have

15   an additional event or parade.

16       Q.    Did it's proximity to the United Center

17   make any factor in your declination?

18       A.    It did.

19       Q.    All right.  And why was that?

20       A.    The secure perimeter at -- around the

21   United Center will actually likely encroach into

22   this route and we wouldn't be able to walk or

23   drive on this route anyway.

24       Q.    Do you know what that secure perimeter

Page 104

1    is at this point?

2         A.    I don't.

3         Q.    Did you know what the secure perimeter

4    was when you made your recommendation?

5         A.    No, just an estimate.

6         Q.    Did the proximity or it going through

7    the medical district have an effect on your

8    determination?

9         A.    Yes.

10        Q.    All right.  Why?

11        A.    Because two of these streets, really

12   three of these streets are major thoroughfares

13   into our hospitals, so as to not delay any

14   medical care for anybody or emergency vehicles.

15        Q.    Which three streets in particular?

16        A.    Ashland, Damen, and Roosevelt.

17        Q.    Did the time play -- the time of the

18   proposed parade play a factor in your analysis?

19        A.    Yes.

20        Q.    And why?

21        A.    This is rush hour on a Thursday, very

22   heavily trafficked area to begin with.

23        Q.    Who did you share this information and

24   determination with?

Page 105

1        A.      The commander of the 12th District.

2        Q.      And how did you do that?

3        A.      We spoke.

4        Q.      And do you know where that information

5    went next?

6        A.      Yes.  She typed a rejection letter and

7    that went back to CDOT.

8        Q.      CDOT meaning the Department of

9    Transportation?

10       A.      Yes.

11       Q.      And that's for the City of Chicago?

12       A.      Yes.

13       Q.      So why can't we close down Ashland

14   Avenue as proposed on this application?

15       A.      So Ashland is the main thoroughfare to

16   the hospitals.  There's several hospitals in the

17   area, emergency rooms, and anything also coming

18   off of 290.  It just -- anything hindering

19   ambulances or even personal vehicles getting

20   people to hospitals is not something we want to

21   close down.

22       Q.      Is that the same for Damen Avenue?

23       A.      Yes.

24       Q.      Okay.  And for Adams?

Page 106

1        A.    Adams is a smaller street.  So it's not

2    as much affected by the hospitals.  My concern

3    with Adams on this particular parade was its

4    proximity to United Center and it will likely be

5    in that secure perimeter.

6        Q.    What about Roosevelt?

7        A.    Roosevelt, again, is another

8    thoroughfare to the hospitals from the south end

9    of the hospital district.

10       Q.    Generally speaking, do these streets

11   require more officers than other streets in

12   Chicago to secure?

13       A.    They take many officers to secure.

14       Q.    All right.  Why so many?

15       A.    Again, it's because of the hospitals.

16   We can't let any closure take place where an

17   emergency vehicle, an ambulance, could not get to

18   an emergency room.

19       Q.    Deputy Chief, do you know what a secure

20   footprint is?

21       A.    Yes.

22       Q.    What is it?

23       A.    So it's a perimeter that will restrict

24   a particular type of traffic, whether it's

Page 107

1    pedestrian, vehicle.

2         Q.    Is the United Center part of any secure

3    footprint that you know of?

4         A.    It will be, yes.

5         Q.    Why is that?

6         A.    Because it'll be the site of the DNC.

7         Q.    And what is CPD's role in securing the

8    secure footprint?

9         A.    So we'll be tasked with securing the

10   exterior of the footprint.  So we'll still need

11   to maintain the integrity of the perimeter as

12   well as maintain public safety around the

13   perimeter.

14        Q.    And does CPD anticipate that there'll

15   be more or less than the 1,000 participants

16   listed on the application?

17        A.    It would likely be more.  We have to

18   anticipate that it would be more.

19        Q.    Why do you have to anticipate that?

20        A.    We'd have to prepare that it would be

21   more than less so that we don't -- we're not

22   overwhelmed without any prior planning or ability

23   to get more resources.

24        Q.    All right.  So does that ultimately

Page 108

1       affect the amount of resources that you're

2       anticipating for this proposed route?

3           A.    Yes.

4           Q.    Are there any other resources that

5       would be needed outside of CPD to secure this

6       route to what you've already mentioned?

7           A.    Again, the fire department and Streets

8       and Sans.

9           Q.    Is CPD -- or would CPD be tasked with

10      coordinating the deployment of all those

11      resources for this proposed parade route?

12          A.    Yes.

13          Q.    And based upon your analysis, could CPD

14      accommodate the Petitioner's proposed parade

15      route?

16          A.    No.

17          Q.    Are you aware as to whether or not

18      there was an alternate parade route proposed?

19          A.    Yes.

20          Q.    Do you know what that parade route was?

21          A.    Yes.  Columbus between Roosevelt and

22      Jackson.

23          Q.    Do you know why this route was

24      provided?

Page 109

1      A.    It's still a very high-visibility

2   route, it's downtown.  It's also much easier to

3   close in terms of road closures, much less

4   manpower intensive for us to be able to allow a

5   parade along that route.

6      Q.    Do you know why it would be easier to

7   close?

8      A.    It's smaller, it's just one road, one

9   direction, less intersections.

10     Q.    And when you say "fewer," do have an

11  estimation of how many officers it would take to

12  secure that route?

13     A.    I don't exactly, but fewer.

14     Q.    Fewer than the proposed parade route

15  from this applicant?

16     A.    Yes.  Many fewer.  It's also not near

17  any hospitals or somewhere where medical

18  emergencies would occur.

19     Q.    Now, while the DNC is in Chicago, is

20  there anything else that Chicago Police

21  Department is also tasked with during this time?

22     A.    Yes.  We still have to operate the rest

23  of the city, 24/7.  All of our other districts,

24  roughly over 20,000 calls per day come into the

Page 110

1    911 center.  And those still all need to be

2    answered.

3        Q.   And does that have to be staffed by

4    officers from the Chicago Police Department as

5    well?

6        A.   Yes.

7            MR. DIONNE:  Judge, nothing further at

8    this time.  We tender the witness.

9            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

10   Cross examination?

11

12                  CROSS EXAMINATION

13   BY MR. WILLIAMS:

14       Q.   Good morning.  Can you give me your

15   name again?  I'm sorry.

16       A.   Sure.  It's Gabriella,

17   G-A-B-R-I-E-L-L-A, S-H-E-M-A-S-H.

18       Q.   Thank you.  How many officers are there

19   in the Chicago Police Department?

20       A.   I can only estimate.  Somewhere between

21   11 and 13,000.

22       Q.   I believe you testified you were tasked

23   with analyzing the resources needed for the

24   proposed route; is that correct?

Page 111

1     A.    Correct.

2     Q.    And did you prepare any kind of written

3    report?

4     A.    I did not.

5     Q.    What did you do to prepare -- to

6    provide that --

7     A.    So I made an analysis determination and

8    I spoke with the commander of the 12th District.

9    We were in agreement that it was not feasible

10   with what we have.

11    Q.    How many officers would be required to

12   secure the route?

13    A.    It would be hundreds.

14    Q.    Okay.  You don't know how many?

15    A.    No.

16    Q.    Okay.  How many officers will be in

17   that area anyway, without that parade permit to

18   man the parade?

19    A.    I don't know.

20    Q.    So there will be officers in the area

21   during the time of the DNC, correct?

22    A.    Yes.  They'll be tasked with

23   DNC-related work.

24    Q.    Okay.  It sounds like there's going to

Page 112

1     be a lot of work in Chicago during the DNC; is

2     that right?

3          A.    Yes.

4          Q.    Why allow any permits at all?

5               MR. DIONNE:  Objection.

6               ADMINISTRATIVE LAW JUDGE FLEMING:

7     Sustained.

8

9   BY MR. WILLIAMS:

10          Q.    Why would you -- why did you recommend

11    to allow a permit in this situation?

12               MR. DIONNE:  Objection.  Vague.

13               ADMINISTRATIVE LAW JUDGE FLEMING:

14    Sustained.

15

16   BY MR. WILLIAMS:

17          Q.    Did you recommend to allow a permit in

18    [inaudible], an alternate route permit for this

19    parade?

20               MR. DIONNE:  Objection.  Vague.

21               ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

22    no, I don't if recommend is the right term.  The

23    first deputy didn't say she recommended the

24    proposed route.  She was aware of it.

Page 113

1                  THE WITNESS:  Right, I was made aware by

2       our bureau of patrol that they had chosen an

3       alternative route that was in the downtown area

4       that would be more feasible for the manpower we

5       had.  It was not of my choosing.

6

7    BY MR. WILLIAMS:

8          Q.    Okay.  Did you have any say in choosing

9       that route?

10         A.    I did not.

11         Q.    Who made that decision?

12         A.    Our bureau of patrol.

13         Q.    And who is that?

14         A.    It was either Deputy Chief O'Connor or

15      at the time Chief of Patrol McDermott.

16         Q.    You had no input into that decision?

17         A.    I did not.

18         Q.    Okay.  But you did have input into the

19      decision about the denial of the proposed route;

20      am I correct about that?

21         A.    Yes.

22         Q.    Okay.  And you testified as to why and

23      the role that you play and so forth.  So you have

24      a legitimate reason to have input into that.

Page 114

1    Would it be your recommendation not to allow any

2    permits in Chicago at all during the DNC?

3              MR. DIONNE:  Objection.  Calls for

4    speculation.

5              ADMINISTRATIVE LAW JUDGE FLEMING:

6    Sustained.

7

8  BY MR. WILLIAMS:

9         Q.   Is there a route closer to the United

10   Center that you could recommend be allowed a

11   permit during the DNC on this date and time?

12             MR. DIONNE:  Objection, Judge.

13   Misstates --

14             ADMINISTRATIVE LAW JUDGE FLEMING:

15   Sustained.

16

17  BY MR. WILLIAMS:

18        Q.   Is there any route within sight of the

19   United Center that you could, in your capacity

20   and with your authority, sign off on?

21             MR. DIONNE:  Objection.

22             ADMINISTRATIVE LAW JUDGE FLEMING:  I'll

23   let her answer it.

24             THE WITNESS:  Around the United Center,

Page 115

1      I would not recommend any particular route for

2      the same reasons.  We don't know exactly where

3      the security perimeter will end.

4           So therefore, I can't say that any

5      street around the United Center will or will not

6      be available for either pedestrian or vehicle

7      traffic.

8           And I cannot recommend anything in the

9      direction of the medical district for the reasons

10     I've already stated.

11

12   BY MR. WILLIAMS:

13     Q.    Have you ever authorized a march on

14   Ashland Avenue using part of the street?

15          MR. DIONNE:  Objection.  Relevance.

16          ADMINISTRATIVE LAW JUDGE FLEMING:

17   Sustained.

18          MR. WILLIAMS:  She just testified she

19   could never authorize it.

20          ADMINISTRATIVE LAW JUDGE FLEMING:  She

21   can never authorize one there.  The question,

22   again, you're asking it in a vacuum.  Where on

23   Ashland Avenue?  What type of parade on Ashland

24   Avenue?  Is this part of Ashland Avenue during

Page 116

1    the DNC?  It's a question that is not relevant as

2    asked.

3              MR. WILLIAMS:  Okay.

4

5    BY MR. WILLIAMS:

6         Q.   So the proposed route goes -- as to

7    Ashland, it extends between Roosevelt Road and

8    Union Park, up by Washington [inaudible]; is that

9    correct?

10        A.   Yes.

11        Q.   Have you ever authorized the use of

12   that section of Ashland for a march?

13             MR. DIONNE:  Objection.  Relevance.

14             ADMINISTRATIVE LAW JUDGE FLEMING:

15   Sustained.

16

17   BY MR. WILLIAMS:

18        Q.   Is your concern about the medical

19   district, does that exist all the time for that

20   section of Ashland?

21             MR. DIONNE:  Objection.  Relevance.

22             ADMINISTRATIVE LAW JUDGE FLEMING:

23   Sustained.

24

Page 117

1    BY MR. WILLIAMS:

2        Q.    Are there any days when that concern

3    does not exist on Ashland Avenue; your concern

4    about the medical district does not exist on

5    Ashland Avenue?

6            MR. DIONNE:  Objection.

7            ADMINISTRATIVE LAW JUDGE FLEMING:

8    Sustained.

9            MR. WILLIAMS:  She's testifying she

10   could never approve it on Ashland, which is where

11   the request is because of concern about the

12   medical district.  And if she has approved it in

13   the past, that would undermine that testimony,

14   wouldn't it?

15           ADMINISTRATIVE LAW JUDGE FLEMING:

16   Respectfully, the deputy does not make the final

17   determination.  You're asking these things in a

18   vacuum.  So I'm not going to put the deputy in a

19   position where she is answering a general

20   question that doesn't have a foundation as to the

21   date, the time, et cetera, et cetera, so.

22

23   BY MR. WILLIAMS:

24       Q.    Was your recommendation to not allow

Page 118

1       this permit based, in part, on the proposal to

2       use Ashland between Roosevelt and Washington?

3           A.    Can you repeat that?

4           Q.    Was your recommendation not to approve

5       the proposed route in this permit based in part

6       on the use of Ashland between Roosevelt and

7       Washington?

8           A.    It was based on the fact that we don't

9       have the resources to properly close Ashland,

10      allowing -- to allow emergency vehicles a

11      thoroughfare due to the conflicting event.

12          Q.    Okay.  And is that concern about

13      emergency vehicles on that section of Ashland, is

14      that unique to the DNC or is that always the

15      circumstances?

16              MR. DIONNE:  Objection.  Calls for

17      speculation.

18              ADMINISTRATIVE LAW JUDGE FLEMING:

19      Again, sustained.  Other circumstances don't have

20      the DNC.  We're dealing with the circumstances

21      that we are addressing on this application.

22

23   BY MR. WILLIAMS:

24          Q.    If the application had requested only

Page 119

1    part of Ashland, would that have changed your

2    opinion?

3            MR. DIONNE:  Objection.  Improper

4    hypothetical.

5            ADMINISTRATIVE LAW JUDGE FLEMING:

6    Sustained.

7

8  BY MR. WILLIAMS:

9        Q.    Did you offer any suggestions as to

10   alternatives to the proposed route?

11       A.    The alternative that was given on

12   Columbus was given to me, that was sent by the

13   bureau of patrol and that was the alternative

14   that was given.

15       Q.    Did you offer any suggestions as to

16   alternatives that could be used?

17       A.    That was the alternative that could be

18   used.

19       Q.    I understand that you were told that

20   with the alternative, correct?

21       A.    Correct.

22       Q.    Okay.  I'm asking if you offered any

23   alternatives?

24       A.    Outside of that one, no.

Page 120

1        Q.    Is that because you don't believe there

2    are any alternatives outside of that one?

3           MR. DIONNE:  Objection.  Calls for

4    speculation.

5           ADMINISTRATIVE LAW JUDGE FLEMING:

6    Sustained.  That presupposes that the deputy's

7    role is to make suggestions on alternate routes.

8

9  BY MR. WILLIAMS:

10       Q.    Was it your role to make

11    recommendations as to the proposed route?

12           ADMINISTRATIVE LAW JUDGE FLEMING:

13    Proposed route or proposed alternative?

14

15  BY MR. WILLIAMS:

16       Q.    The proposed parade route that the

17    applicant received on Ashland, Adams, Damen, and

18    Roosevelt Road.  Was it your role to make

19    recommendations?

20       A.    No.  My role was to take what was asked

21    for and determine whether or not that was

22    feasible.

23       Q.    How did you determine whether or not

24    that was feasible?

Page 121

1      A.    Again, based on the date, the time of

2    day, the proximity to a large-scale,

3    high-security event with an unknown secure

4    perimeter; as well as proximity to the medical

5    district.  All of those factors combined led me

6    to make my decision.

7      Q.    Okay.  And what was the information

8    that you got regarding [inaudible], what factors?

9      A.    That based on this permit that 1,000

10    plus people wanted to close -- to march in

11    these -- on these streets, which would require an

12    amount of road closures, that we do have the

13    manpower for on this day and time.

14      Q.    How many extra police would it require

15    on the proposed route, other than what you

16    already have planned to be there?

17      A.    Barring nothing else happening,

18    hundreds.

19      Q.    How many hundreds?

20      A.    I don't know.  I didn't do an exact

21    plan because even if it was one hundred, it would

22    be -- we cannot -- because of the day and time,

23    and the amount of resources being utilized by

24    DNC, we do not have the extra manpower to handle

Page 122

1    something to this scale.

2        Q.    Is the -- you talked about the Air and

3    Water Show being rescheduled, correct?

4        A.    Yes.

5        Q.    So that's not happening.  You're not

6    using resources for that, correct?

7        A.    Correct.

8        Q.    And then school has been delayed, the

9    opening being delayed; is that correct?

10       A.    Yes.

11       Q.    Okay.  So that's not happening.  You

12   don't need extra resources for that, correct?

13       A.    Correct.

14       Q.    Okay.  Is it your understanding that

15   the Democratic National Convention is a political

16   event?

17       A.    I believe so.  I mean, it's in the

18   title.

19       Q.    Democratic Party --

20       A.    Yeah.

21       Q.    Okay.  So would you expect to see

22   political protest during a political event?

23            MR. DIONNE:  Objection.  Relevance.

24            ADMINISTRATIVE LAW JUDGE FLEMING:

Page 123

1    Sustained.

2

3    BY MR. WILLIAMS:

4         Q.    Do you believe that there any

5    accommodation needed to be made for political

6    protests?

7              MR. DIONNE:  Objection.  Relevance.

8              ADMINISTRATIVE LAW JUDGE FLEMING:

9    Sustained.

10

11   BY MR. WILLIAMS:

12        Q.    You testified about the NSED [sic].

13   What role do you play on the NSED [sic]?

14        A.    The NSSE?

15        Q.    NSSE --

16        A.    The National --

17        Q.    NSSE?

18        A.    So I'm part of -- as part of the

19   Chicago Police Department and having -- I'm

20   tasked with operations in the 12th District in

21   which United Center resides.  So I maintain all

22   patrol operations that are going to be outside of

23   that event.

24        Q.    Are there meetings of a task force or

Page 124

1    anything at the NSSE?

2        A.    There's lots of meetings.

3        Q.    Do you attend those meetings?

4        A.    Some of them.

5        Q.    And what role do you play in those

6    meetings?

7        A.    Coordination with Secret Service and

8    planning.

9        Q.    Okay.  And do you provide that

10   committee with information about resources?

11       A.    I do not.

12       Q.    Do you know if anybody does from the

13   police department?

14       A.    I'm sure somebody does.  That's not my

15   role.

16       Q.    Okay.  Are you here today to testify on

17   behalf of the Secret Service?

18            MR. DIONNE:  Objection.

19            ADMINISTRATIVE LAW JUDGE FLEMING:

20   Sustained.

21

22   BY MR. WILLIAMS:

23       Q.    Who are you here today to testify on

24   behalf of?

Page 125

1        A.     Myself and the Chicago Police

2     Department.

3        Q.     Anybody else?

4        A.     No.

5        Q.     You testified you know what the secure

6     perimeter is, a little bit about what that is.

7     Do you know what the secure perimeter around the

8     United Center is for the DNC?

9        A.     No, that hasn't been released to us

10    yet.

11       Q.     The secure perimeter will likely extend

12    north, west, east, and south of the United

13    Center, correct?

14       A.     Yes.

15       Q.     Is there any reason this parade could

16    not take place south of that secure perimeter,

17    wherever it is?

18            MR. DIONNE:  Objection.  Calls for

19    speculation.

20            ADMINISTRATIVE LAW JUDGE FLEMING:

21    Sustained.

22

23    BY MR. WILLIAMS:

24       Q.     Would you recommend an application for

Page 126

1     a parade taking place south of wherever that

2     secure perimeter is?

3              MR. DIONNE:  Objection.  Relevance.

4              ADMINISTRATIVE LAW JUDGE FLEMING:

5     Sustained.

6

7     BY MR. WILLIAMS:

8         Q.    You testified that you get information

9     from other agencies.  I think the Office of

10    Emergency Management, you called the fire

11    department, Streets and Sanitation; anybody else?

12        A.    That's about it.

13        Q.    Okay.  How do you get that information

14    from them?

15        A.    We usually have meetings.

16        Q.    With people from each of those

17    agencies?

18        A.    Yes.

19        Q.    Okay.  And are there minutes to those

20    meetings?

21        A.    Not to my knowledge.

22        Q.    Are there e-mails exchanged between

23    representatives of those different agencies?

24        A.    I'm sure sometimes there are.  It would

Page 127

1    depend on the issue.

2        Q.    Are there any reports created by those

3    agencies?

4        A.    The only report that usually comes out

5    at the end of one of those would be the IAP or

6    the Incident Action Plan for the event that

7    includes the plan for all those agencies.

8        Q.    Okay.  And was there an IAP created for

9    the DNC?

10            MR. DIONNE:  Objection as to vagueness.

11            ADMINISTRATIVE LAW JUDGE FLEMING:

12    Overruled.

13            THE WITNESS:  I'm sure it's being worked

14    on, but it's not ready yet.  It's going to be

15    quite a large undertaking for somebody.

16

17  BY MR. WILLIAMS:

18        Q.    When you -- you testified, I believe,

19    that you -- well, let me just ask you.  Who did

20    you communicate your recommendation to about the

21    proposed parade route?

22        A.    The commander of the 12th District.

23        Q.    And how did you communicate that to the

24    commander?

Page 128

1        A.     We spoke about it.

2        Q.     Did you put anything in writing?

3        A.     I did not.

4        Q.     Did you create any kind of report?

5        A.     I did not.

6        Q.     You had -- did you relay information

7    about other agencies?

8        A.     I did not.

9        Q.     So the information you got from the

10   Chicago Fire Department, OEMC, and Streets and

11   San that came to you, you didn't relay that to

12   the commander?

13       A.     I'm sorry, I don't understand your

14   question.

15       Q.     Maybe I misunderstood your testimony.

16   Did you not testify earlier that you got

17   information from the other city agencies?

18       A.     I don't believe the question was posed

19   to me as to whether or not I got information from

20   those city agencies for this specifically.  It

21   was a general question about what happens upon

22   reviewing a permit for a parade of this -- a

23   parade in general.

24       Q.     Okay.  Did you get information from the

Page 129

1    agencies about the proposed parade route on

2    August 22nd and this application?

3        A.    No.

4        Q.    You got no information from the other

5    city agencies?

6        A.    For this itself, no.

7        Q.    Okay.  So you were given no reason by

8    any other agency that this parade couldn't

9    happen?

10       A.    I know from a police perspective that

11   this -- we could not handle this.  There was no

12   reason to move further into a planning phase with

13   other city agencies because, we, as a police

14   department, could not feasibly handle this.

15       Q.    How many officers would be required for

16   the alternate route proposed by the city?

17       A.    I don't know.

18       Q.    Is it your understanding the plan is to

19   shut down Columbus Drive for that alternate

20   route?

21       A.    I didn't plan that route, so I don't

22   know what the plan is for that alternate route.

23   It's not under my purview.

24       Q.    Whose purview is it under?

Page 130

1          A.     It would be the Bureau of Patrol.

2          Q.     Do you know who?

3          A.     The -- either Deputy Chief O'Connor or

4     the newly-appointed Chief of Patrol Hine

5     [phonetic].

6          Q.     You're familiar with the alternate

7     route suggested by -- proposed by the Chicago

8     Department of Transportation --

9               MR. DIONNE:  Objection.  Asked and

10    answered.

11              ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

12    that question was asked and answered, but I think

13    it's preliminary to the next question.

14              MR. WILLIAMS:  It is.

15              ADMINISTRATIVE LAW JUDGE FLEMING:  So

16    it's overruled.

17              THE WITNESS:  Yes.

18

19    BY MR. WILLIAMS:

20         Q.    Okay.  Do you believe that that

21    alternate route is comparable public visibility

22    and a similar route location and date to that of

23    the proposed parade to the extent practical?

24              MR. DIONNE:  Objection.  Relevance.  It

Page 131

1    calls for speculation.

2              ADMINISTRATIVE LAW JUDGE FLEMING:

3    Sustained.  It's not her opinion that matters.

4

5   BY MR. WILLIAMS:

6         Q.    You said that you expect over a million

7    people during the DNC; is that correct?

8         A.    Yes.

9         Q.    Okay.  Where did you get that number?

10        A.    From Secret Service, an overview of

11   what to expect.

12        Q.    Did you share that number with the

13   Chicago Department of Transportation?

14        A.    I did not.

15        Q.    And how did the Secret Service

16   communicate that number to you?

17        A.    In a introductory planning meeting.

18        Q.    Was that in writing?

19        A.    No, it was just a spoken meeting.

20        Q.    Who said that?

21        A.    Somebody from the Secret Service.

22        Q.    You don't know who?

23        A.    I do not.

24        Q.    Do you have independent knowledge that

Page 132

1    there will be over a million people here in

2    Chicago?

3         A.    That's what I'm told to expect from

4    previous -- Secret Service previous experience at

5    these types of events.

6         Q.    But you don't know who told you that?

7         A.    I don't.  It was January of last year.

8              MR. WILLIAMS:  I don't think I have

9    anything further.

10             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

11   Redirect?

12

13                  REDIRECT EXAMINATION

14   BY MR. DIONNE:

15        Q.    All right.  Deputy Chief, what was the

16   purpose of you, as an employee of the Chicago

17   Police Department, to review this proposed permit

18   for August 22, 2024?

19        A.    So this permit falls in the 12th

20   District, which, again, I'm in charge of patrol

21   operations for.  That's why I was looking at this

22   particular one.

23        Q.    And when you look at that, what do you

24   review for CPD?

Page 133

1          A.    So I would review whether the district

2     had enough personnel and resources, equipment for

3     the officers, and then deconflict with any other

4     events going on in the area that would deplete

5     that.

6          Q.    Did you do that for this particular

7     application?

8          A.    Yes.

9          Q.    Once you've made that determination,

10    does that end your analysis of this application?

11         A.    Yes.

12         Q.    And who did you communicate that

13    determination to, specifically?

14         A.    To Commander Giltmier and subsequently,

15    to our special events and then CDOT, to CDOT.

16         Q.    All right.  Thank you.

17              MR. DIONNE:  Nothing further.

18              ADMINISTRATIVE LAW JUDGE FLEMING:

19    Anything on that?

20

21                    RECROSS EXAMINATION

22    BY MR. WILLIAMS:

23         Q.    Did you just say you communicated with

24    CDOT?

Page 134

1      A.    No.  Ultimately, it goes to CDOT, the

2   decision goes to CDOT.

3      Q.    Let's talk about you.  You communicated

4   with Commander Giltmier, correct?

5      A.    Correct.

6      Q.    And you communicated to someone in

7   special events?

8      A.    No.  So I communicated with Commander

9   Giltmier.  Then there is a rejection written that

10   then goes to special events and ultimately to

11   CDOT.  It is not my personal connection to CDOT.

12     Q.    Who writes the rejection?

13     A.    Commander Giltmier did.

14     Q.    Okay, so you don't write the rejection?

15     A.    I did not.

16     Q.    Okay.  And do you have a copy of the

17   rejection?

18     A.    I do not.

19     Q.    Do you know what Commander Giltmier put

20   in the rejection?

21     A.    Not without looking at it, no.

22     Q.    Okay.  And do you know what Commander

23   Giltmier relayed to special events?

24          MR. DIONNE:  Objection.  Judge, calls

Page 135

1    for speculation.

2              ADMINISTRATIVE LAW JUDGE FLEMING:  It's

3    cross examination so I'll let him ask.

4    Overruled.

5              THE WITNESS:  At one time, I read the --

6    I looked at the letter to make sure that I agreed

7    with it.  I don't remember what, specifically,

8    was in there.  It was weeks ago.

9

10   BY MR. WILLIAMS:

11        Q.    Was there anything in there you recall

12   you disagreed with?

13        A.    I don't recall.  I'd have to see it

14   again.

15        Q.    All right.  Do you know if that was the

16   only communication Commander Giltmier had with

17   special events?

18        A.    I don't know what other communication

19   she would have had.

20              ADMINISTRATIVE LAW JUDGE FLEMING:  I

21   just want to inter -- so the record's clear.

22   When you're referring to special events, you're

23   referring the Chicago Police Department Special

24   Events Section.  Not the City of Chicago's

Page 136

1      Department of Special Events.

2               THE WITNESS:  Correct.

3               MR. WILLIAMS:  Thank you for the

4      clarification.

5               ADMINISTRATIVE LAW JUDGE FLEMING:  It

6      gets --

7               MR. WILLIAMS:  I'm not sure I knew that,

8      so thank you for the clarification.

9               ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

10     the reason because, again, the Air and Water Show

11     has been mentioned and that is under the purview

12     of the Department of Special Events.  So this is

13     the City of Chicago Police Department's

14     department.

15              MR. WILLIAMS:  Understood.

16

17   BY MR. WILLIAMS:

18       Q.    And Commander Giltmier is the one who

19     communicated with Chicago Department of

20     Transportation, correct, related to this

21     application?

22       A.    The written report goes to them, yes.

23       Q.    So the written report to CDOT came from

24     Commander Giltmier?

Page 137

1        A.    Correct.

2        Q.    Not from you?

3        A.    Correct.

4        Q.    Did -- do you know what was in the

5    written report?

6              MR. DIONNE:  Objection.  Asked and

7    answered, Judge.

8              ADMINISTRATIVE LAW JUDGE FLEMING:  That

9    was asked and answered.

10             MR. WILLIAMS:  No, I asked about the

11   special events, not about the CDOT

12   communications.

13             THE WITNESS:  It's the same --

14             ADMINISTRATIVE LAW JUDGE FLEMING:  It's

15   the same communication.

16             MR. WILLIAMS:  CDOT is the special

17   event -- the Chicago --

18             THE WITNESS:  It's the same report that

19   goes to both.

20             MR. WILLIAMS:  Okay.  Well, then, I have

21   my answer.  That's the same report.

22             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

23

24   BY MR. WILLIAMS:

Page 138

```
 1        Q.   Do you know if Commander Giltmier

 2   communicated with Chicago Department of

 3   Transportation in any other way?

 4             MR. DIONNE:  Objection.  Vague and calls

 5   for speculation.

 6             ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

 7   again, I'm assuming if she knows concerning this

 8   report.  So overruled.

 9             THE WITNESS:  I do not know.

10

11   BY MR. WILLIAMS:

12        Q.   So in other words, you don't know what

13   the ultimate communication with CDOT was from

14   Chicago --

15             MR. DIONNE:  Objection.  Argumentative.

16             MR. WILLIAMS:  -- from the Chicago

17   Police Department, correct?

18             ADMINISTRATIVE LAW JUDGE FLEMING:

19   Overruled.

20             THE WITNESS:  I do not know.

21             MR. WILLIAMS:  I don't have anything

22   further.

23             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

24   Anything on that?
```

Page 139

 1          MR. DIONNE:  No, Judge.

 2          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

 3    Thank you, Deputy.  How many more witnesses does

 4    the City have?

 5          MR. DIONNE:  Judge, that concludes at

 6    this point all the live testimony.  We just have

 7    the affidavit that Your Honor was deferring

 8    ruling on.

 9          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

10    And then how many witnesses you got, Counsel?

11          MR. WILLIAMS:  Two.

12          ADMINISTRATIVE LAW JUDGE FLEMING:  All

13    right.  They did double book, so we've got a

14    hearing that's supposed start at one o'clock.

15          MR. WILLIAMS:  I'm supposed to be here

16    for that --

17          ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

18    no.  I don't want to rush everyone through as is

19    my tendency.  Do you want to take a couple

20    minutes?

21          MR. WILLIAMS:  I'm good.

22          MR. DIONNE:  City's fine.

23          MS. HAKE:  We're good.

24          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

Page 140

1        All right.  Then let's deal with the affidavit.

2        And Counsel, your objection is based -- is

3        basically based on hearsay and not having an

4        opportunity to cross examine -- confront the

5        witness?

6               MR. WILLIAMS:  Correct.

7               ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

8        Anything else you want to add to that?

9               MR. WILLIAMS:  No.  [Inaudible] due

10       process rights [inaudible] testimony of someone

11       who is not present.  They can't be cross

12       examined.

13              ADMINISTRATIVE LAW JUDGE FLEMING:  All

14       right.  City, what's your response?

15              MR. DIONNE:  So Judge --

16              ADMINISTRATIVE LAW JUDGE FLEMING:  I

17       understand hearsay, is there anything else.

18              MR. DIONNE:  Yes.  [Inaudible]

19       ultimately this goes to weight, then.  Just

20       because the Petitioner is unable to cross examine

21       this affidavit today that would go to weight that

22       Your Honor and the Court would give to this

23       affidavit.

24              Furthermore, Judge, the contents of this

affidavit just show to exhibit and give more context to the fact of the DNC as a National Secret Service Event. We've already had witnesses from the city testify that the DNC is an event. This just helps to color that more and gives more context to exactly that.

As such, Judge, ultimately there has to be a analysis of whether this is more prejudicial than probative. The City in balancing that and looking at it, believes that this not unduly prejudicial to the Petitioner attorney and ask that this be admitted into evidence.

ADMINISTRATIVE LAW JUDGE FLEMING: Okay. Anything?

MR. WILLIAMS: Your Honor, this -- Counsel said it himself, they are attempting to give context to the determination, that balancing that was made in considering the permit application. Implicitly acknowledging that the ordinance requires a balancing.

And so you can only get context if he can be cross examined. Because there are statements in here that I know he has testified in other proceedings and he has been cross

Page 142

1    examined.  And other information, which provides

2    context, has come out.

3              And so to allow this in without allowing

4    the full context would be highly prejudicial.

5              ADMINISTRATIVE LAW JUDGE FLEMING:  All

6    right.  I don't think it's prejudicial.  You've

7    reviewed this.  This is nothing -- Mr. Spriggs

8    does not make any opinion as to whether or not

9    this parade should or should not have been

10   denied.  He stayed away from that.

11             It's not the role of the Secret Service.

12   And in actuality the testimony from the witnesses

13   that we have today incorporates what's -- most of

14   what's in here.  So I probably could keep it out

15   and it wouldn't have much of an impact.

16             Putting it in doesn't have any

17   particular impact in terms of it.  It's nothing

18   that is substantive.  There is nothing in this

19   affidavit that deals with the two bases for the

20   denial.  There is nothing in the affidavit or

21   anything that would be allowed if he were going

22   to be here to testify relative to alternate

23   routes.  So it's allowed in the evidence.

24             MR. WILLIAMS:  Judge, can I ask them

Page 143

1    why, if it's not going to provide anything

2    additional, it's been covered by other witnesses,

3    why allow it in?

4         ADMINISTRATIVE LAW JUDGE FLEMING:  Why

5    allow it, why not allow it in?  It's also

6    something that's --

7         MR. WILLIAMS:  But I can't cross examine

8    anything.

9         ADMINISTRATIVE LAW JUDGE FLEMING:  Is

10   there -- would you -- if you could point out to

11   me based on the paragraphs that's in the

12   affidavit, what would need cross examination?

13        MR. WILLIAMS:  The security footprint.

14        ADMINISTRATIVE LAW JUDGE FLEMING:  In

15   what respect?

16        MR. WILLIAMS:  Understanding what has

17   been communicated about the security footprint.

18   And what information that the Chicago Department

19   of Transportation would have in trying to

20   establish an alternate route.

21        ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

22   It's allowed in evidence for what it's worth.

23   Okay.  City has rested?

24        MR. DIONNE:  City rests, Judge.

```
                                         Page 144
 1              ADMINISTRATIVE LAW JUDGE FLEMING:  Call

 2      your first witness.  Okay, sir.  Please raise

 3      your right hand.  Do you solemnly swear or affirm

 4      any testimony you give will be the truth?

 5              MR. METZ:  Yes.

 6              ADMINISTRATIVE LAW JUDGE FLEMING:  Thank

 7      you.

 8

 9                   DIRECT EXAMINATION

10   BY MR. WILLIAMS:

11         Q.   Can you state and spell your name for

12      the record?

13         A.   Yes, it's John W. Metz, J-O-H-N, W,

14      M-E-T-Z.

15         Q.   Are you affiliated with an organization

16      called the Anti-War Committee of Chicago?

17         A.   Yes, I am one of the co-chairs.

18         Q.   And I'm going to call it the AWC; is

19      that okay?

20         A.   Yes.

21         Q.   You said you were co-chair.  I'm going

22      to show you what's been previously marked

23      Exhibit -- City Exhibit 3A to C.  Do you

24      recognize this?
```

Page 145

1      A.    I do.

2      Q.    And what -- is there a title for your

3   parade?

4      A.    Yes.  It's March for the People's

5   Agenda.

6      Q.    Okay.  If you could look at the last

7   page, is that your signature?

8      A.    Yes, it is.

9      Q.    And you submitted the application for

10   that; is that correct?

11      A.    I did.

12      Q.    Okay.  Why did you choose to call it a

13   march in the title?

14      A.    Because we [inaudible].

15      Q.    So your proposed march would be a --

16   people would be moving throughout the whole time?

17      A.    Yes.  [Inaudible].

18      Q.    Could you summarize what AWC is seeking

19   in this permit request?

20      A.    Yes.  We are seeking a march that

21   initially assembled at a public park on Roosevelt

22   and Ashland.  We would then proceed north.  We

23   would assemble first at the park here.  From 6:00

24   to 8:00 we would march on a course from up --

Page 146

1    north on Ashland to west on Adams and south on

2    Damen.  We're disbanding on Adams [inaudible].

3         Q.    Okay.  I'm going to show you what was

4    previously marked as City's Exhibit 4.  Is this

5    an accurate reflection of the route you're

6    proposing?

7         A.    It is.

8         Q.    What is the purpose of the march?

9         A.    The purpose of the march is to present

10   a political message.  The AWC feels that we are

11   not pleased with the policies of the Democratic

12   Party, in particular, President Joe Biden.  And

13   we would like to present our political opinions

14   within sight and sound of the Democratic National

15   Convention.

16        Q.    Okay.  And how do you intend to convey

17   that message?

18        A.    We intend to do so through political

19   signs as well as chants.

20             ADMINISTRATIVE LAW JUDGE FLEMING:  I'm

21   sorry.  As well as what?

22             THE WITNESS:  Chants.  Political chants.

23

24   BY MR. WILLIAMS:

Page 147

1      Q.    So you mentioned within sight and sound

2    of the United Center.  Is that why it's important

3    to be within sight and sound?

4      A.    Yes.  In order to make sure that those

5    in attendance see and hear our message.

6      Q.    And so your political message relates

7    to a war being conducted outside of the United

8    States, correct?

9          MR. DIONNE:  Objection.  Relevance,

10   leading.

11         ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

12   what's the relevance of the specific political

13   message?  The issue is --

14         MR. WILLIAMS:  Who the target audience

15   is.

16         ADMINISTRATIVE LAW JUDGE FLEMING:

17   Political message.

18         MR. WILLIAMS:  Who the target audience

19   is.

20         ADMINISTRATIVE LAW JUDGE FLEMING:  The

21   target audience was the -- I thought he testified

22   to was the people going to the convention.

23         MR. WILLIAMS:  Federal officials.  You

24   know, figuring out an alternative, it matters

Page 148

1    where you are.  Because the federal officials who

2    deal with war will be at the United Center.

3              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

4    But -- overruled.  Let's go ahead.

5              MR. WILLIAMS:  All right.

6

7    BY MR. WILLIAMS:

8         Q.    It relates to war, correct?

9         A.    Yes.  As an anti-war group, we are

10   opposed to the ongoing U.S. funded war against

11   the Palestinian people in Gaza.

12        Q.    Okay.  As far you understand it's

13   federal officials who deal with foreign policy,

14   correct?

15        A.    Yes.  We would be focused on

16   [inaudible] members of Congress and the

17   President.

18        Q.    Okay.  And those -- because the

19   President is a Democrat, he'll be at the

20   Democratic National Convention, correct?

21        A.    That's correct.

22        Q.    And the Democratic members of Congress

23   will be at the Democratic National Convention,

24   right?

Page 149

1        A.    Correct.

2        Q.    And they'll be gathering at the United

3    Center?

4        A.    That's correct.

5        Q.    Is that why you requested something in

6    sight and sound of the United Center?

7        A.    Yes.

8        Q.    The route you requested is all on --

9    only on public streets and sidewalks, correct?

10       A.    That's correct.

11       Q.    You're not asking to go onto the United

12   Center grounds, correct?

13            MR. DIONNE:  Objection, Judge.  Leading.

14   Counsel's testifying.

15            ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

16   it's leading, but I mean, again, the exhibits are

17   in evidence, we know what the route is.  If we

18   can just kind of move it along.

19            MR. WILLIAMS:  [Inaudible].

20

21   BY MR. WILLIAMS:

22       Q.    Do you intend to go on the United

23   Center grounds?

24       A.    We do not.  We understand the security

Page 150

1    concerns and we want to be within sight and sound

2    but respect all security precautions.

3        Q.   Okay.  What are your plans for the

4    march; do you intend for it to be peaceful,

5    family-friendly, or violent, loud; how do you

6    plan on [inaudible]?

7        A.   We intend our protest and march to be

8    peaceful, family-friendly.  We are expecting

9    approximately 1,000 people.  The organization

10   will be utilizing banners [inaudible] and

11   political signage throughout.  [Inaudible]

12   chants.  We will maintain leadership over the

13   gathering as it moves without stops along the

14   course, the route.

15        And we will maintain a group of

16   marshals with neon vests clearly displayed who

17   will maintain order on the march and coordinate

18   with public safety officials as needed.

19        And once again, we would intend to

20   continue [inaudible] same period of time.

21       Q.   Okay.  Have you organized marches of

22   this type or size?

23       A.   Not -- I have not organized.  I have

24   primarily [inaudible] in a support role.

Page 151

1      Q.   Okay.  Is there anyone else in your

2    organization who has helped you work on this

3    march?

4      A.   Yes.  My fellow co-chair, Joe Iosbaker,

5    has extensive experience and is helping to

6    organize this venture.

7      Q.   Did you get a response from the Chicago

8    Department of Transportation regarding this

9    permit?

10     A.   Yes, I did.

11     Q.   And how did they respond?

12     A.   It was a rejection of our proposal

13    [inaudible].

14     Q.   Okay.  I'm going to show you what was

15    previously marked as Exhibit 5A through C.  Do

16    you recognize this?

17     A.   I do.

18     Q.   Okay.  What is it?

19     A.   It's the rejection that we received

20    from Chicago Department of Transportation.

21     Q.   Okay.  If I can direct your attention

22    to the numbered paragraph 2, the second paragraph

23    with that number, right down at the bottom

24    [inaudible].  It says, "Moreover, the proposed

Page 152

1    parade route winds through the city center on a

2    day many attendees are expected to arrive and

3    would create significant traffic concerns and a

4    depletion of existing police resources

5    [inaudible] DNC."

6            Are you -- you're requesting a parade on

7    the last day of the convention, correct?

8        A.    That's correct.

9        Q.    Okay.  Do you expect a large number of

10   convention attendees to just be arriving on the

11   last day?

12           MR. DIONNE:  Objection.  Calls for

13   speculation, lack of foundation.

14           ADMINISTRATIVE LAW JUDGE FLEMING:

15   It's -- what Mr. Metz expects is not relevant.

16   Objection sustained.

17

18   BY MR. WILLIAMS:

19       Q.    Does it appear to you that the denial

20   [inaudible] was not responsive to your specific

21   request?

22           MR. DIONNE:  Objection.

23           ADMINISTRATIVE LAW JUDGE FLEMING:

24   Sustained.

Page 153

1

2    BY MR. WILLIAMS:

3         Q.    The Chicago Department of

4    Transportation offered an alternate parade route

5    assembling at the corner of Roosevelt Road and

6    South Columbus Drive to Grant Park at 5:00 p.m.,

7    stepping off at 6:00 p.m., proceeding northbound

8    on Columbus Drive and ending no later than 8:00

9    p.m., disbanding at Jackson Boulevard; is that

10   correct?

11        A.    That's correct.

12        Q.    Okay.  Let me show you what was

13   previously marked City's Exhibit 6.  Does this,

14   and it's in blue, do you see the route marked on

15   this map?

16        A.    I do.

17        Q.    Okay.  Is this alternate route

18   acceptable to your organization for purpose of

19   [inaudible] message?

20        A.    It is not.

21        Q.    That's why you appealed, isn't it?

22        A.    That's right.

23        Q.    What's wrong with that route?

24        A.    First and foremost, it's three or more

Page 154

1    miles away from the United Center, which would

2    mean that the delegates in attendance, in

3    particular the President, would not be within

4    sight and sound of our protest and our political

5    message.  [Inaudible] or see any of it.

6             Secondly, the location is on a

7    tree-lined street, on Columbus Drive, which would

8    be [inaudible] see us would be even locations

9    close to Michigan Avenue.

10            And finally, given the fact that there

11   will be a march at that location, Columbus Drive

12   would presumably be closed, which [inaudible].

13       Q.   So you believe your protest would not

14   be visible to very many people?

15       A.   That's correct.

16       Q.   And certainly it wouldn't be visible to

17   anybody at the United Center?

18       A.   Absolutely.

19       Q.   Did anyone from the Chicago Department

20   of Transportation talk to you about how they came

21   up with this proposed route, alternate route?

22       A.   No.

23       Q.   Did anyone give you -- from Chicago

24   Department of Transportation give you an

Page 155

1    opportunity to discuss alternative routes?

2        A.    They did not.

3        Q.    Did they give you the possibility of

4    discussing using part of streets rather than

5    shutting the entirety of those streets that you

6    requested?

7            MR. DIONNE:  Objection.  Relevance.

8            ADMINISTRATIVE LAW JUDGE FLEMING:

9    Overruled.

10           THE WITNESS:  They did not.

11

12   BY MR. WILLIAMS:

13       Q.    Okay.  Is it fair to -- did anyone from

14   the Chicago Department of Transportation tell you

15   they considered other alternatives?

16       A.    None -- that was not communicated to

17   us.

18       Q.    So the only communication you got from

19   the Chicago Department of Transportation was the

20   rejection letter; is that correct?

21       A.    That's correct.

22       Q.    Okay.  Is it fair to say that Chicago

23   Department of Transportation presented the

24   alternate route on Columbus Drive as a

Page 156

1    take-it-or-leave-it proposal?

2            MR. DIONNE:  Objection.  Argumentative.

3            ADMINISTRATIVE LAW JUDGE FLEMING:

4    Sustained.

5

6   BY MR. WILLIAMS:

7       Q.   Do you believe you have other

8    alternatives for your parade on that day based on

9    the letter from Chicago Department of

10   Transportation?

11      A.   Not from the communications we

12   received.

13      Q.   Have you received any other

14   communication from the Chicago Department of

15   Transportation or any City agency that might lead

16   you to believe you might have an alternative?

17      A.   No.

18      Q.   Why do you think Chicago Department of

19   Transportation proposed this route as an

20   alternative?

21          MR. DIONNE:  Objection.  Calls for

22   speculation.

23          ADMINISTRATIVE LAW JUDGE FLEMING:

24   Sustained.

Page 157

1           MR. WILLIAMS:  It's what he believes.

2           ADMINISTRATIVE LAW JUDGE FLEMING:  It's

3     irrelevant to me what he believes.

4

5   BY MR. WILLIAMS:

6     Q.    Would you have been open to discussing

7     alternatives with the Chicago Department of

8     Transportation?

9           MR. DIONNE:  Objection.  Relevance.

10          ADMINISTRATIVE LAW JUDGE FLEMING:

11    Sustained.

12          MR. WILLIAMS:  Judge, the ordinance

13    requires --

14          ADMINISTRATIVE LAW JUDGE FLEMING:  Where

15    in the ordinance does it require that the

16    applicant meet with the Department of

17    Transportation?

18          MR. WILLIAMS:  It requires an

19    investigation in Section (f) and requires that,

20    to the extent practicable, authorize an event

21    that would have comparable public visibility

22    similar to that  [inaudible].

23          ADMINISTRATIVE LAW JUDGE FLEMING:  It

24    doesn't have anything in there that says that

Page 158

1    it's incumbent upon the Department of

2    Transportation, Mr. Gallardo, to reach out to an

3    applicant for a parade permit that has been

4    denied to discuss alternate routes.  It just

5    doesn't.

6           MR. WILLIAMS:  I respectfully disagree

7    that if it requires --

8           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

9    read to me -- read to me the section where it

10   says upon a denial, it is incumbent upon the

11   Department of Transportation to meet with the

12   parade applicant to discuss possible alternative

13   routes.

14          MR. WILLIAMS:  It requires the

15   department to --

16          ADMINISTRATIVE LAW JUDGE FLEMING:

17   Investigate.

18          MR. WILLIAMS:  -- propose a comparable

19   public -- with comparable public visibility as

20   similar route, location, and date.

21          ADMINISTRATIVE LAW JUDGE FLEMING:  But

22   it -- we can repeat it ourselves as much as we

23   want.  There's nothing in there that requires

24   them to do so after a meeting with the applicant

Page 159

1    who has been denied.

2              MR. WILLIAMS:  There was no meeting with

3    the -- there's no testimony that there was

4    meeting with the applicant.

5              ADMINISTRATIVE LAW JUDGE FLEMING:  I'm

6    saying, you're suggesting that it was incumbent

7    upon the Department of Transportation to meet

8    with Mr. Metz and his co-chair to discuss

9    proposed alternate routes.  And I am saying to

10   you that that is not set forth in the ordinance.

11             MR. WILLIAMS:  No, it's not.  But I am

12   saying that the ordinance requires finding an

13   alternative that -- with comparable visibility,

14   similar date, time, and location.  Right?  That

15   requirement is what's at issue here.

16             ADMINISTRATIVE LAW JUDGE FLEMING:  And

17   Mr. Metz has testified that in his opinion, this

18   proposed alternate route does not comport with

19   the ordinance.  He's testified to that.  That

20   becomes the question of fact.

21             But what I'm saying is that you seem to

22   be suggesting that Mr. Gallardo had an obligation

23   to reach out to Mr. Metz or his co-chair or both

24   to discuss possible alternate routes.

Page 160

1          MR. WILLIAMS:  I am not suggesting

2     anything specific that he had to do.  But that he

3     did have to take into consideration an alternate

4     route with comparable public visibility, similar

5     route, location, and date.  That's in the

6     ordinance.

7          ADMINISTRATIVE LAW JUDGE FLEMING:

8     And --

9          MR. WILLIAMS:  Whether he met is a

10     factual matter that goes to how much

11     consideration he gave to alternate routes.

12          ADMINISTRATIVE LAW JUDGE FLEMING:  We

13     can move on.  We're talking about the same thing

14     in terms of it.  It's a question of fact as to

15     whether or not the Department of Transportation

16     complied with the ordinance with respect to the

17     alternate route.

18          MR. WILLIAMS:  Very well.

19

20  BY MR. WILLIAMS:

21     Q.    Is it your understanding that there's

22     going to be a secure perimeter around the United

23     Center during the convention?

24     A.    That's my understanding.

Page 161

1      Q.    Like fencing?

2      A.    Yes.

3      Q.    Okay.  You're not suggesting that you

4  should be allowed to conduct a parade or march

5  inside of that fencing, are you?

6      A.    No.

7      Q.    Do you know where that fencing is going

8  to extend on the south side of the United Center?

9      A.    Not to my knowledge.

10     Q.    Okay.  You requested to go west on

11  Adams, correct?

12     A.    We did.

13     Q.    And why did you request to go west on

14  Adams?

15     A.    We wanted to follow the flow of traffic

16  to avoid unnecessary disruptions and we felt that

17  location just shy -- two blocks south of the

18  United Center would be sufficiently distant to

19  avoid any sort of [inaudible] restrictions.

20     Q.    So when you say you wanted to not

21  disrupt traffic, you weren't contemplating that

22  the entirety of that would be shut down; is that

23  correct?

24     A.    That's correct.

Page 162

1     Q.    Is that true of Ashland?  You wouldn't

2     expect the entirety of Ashland to be shut down?

3     A.    No.  We would expect just a portion

4     [inaudible] portions during [inaudible].

5     Q.    So on your application you expected

6     traffic to still flow on Ashland?

7     A.    Yes.

8     Q.    And is that true on Damen?

9     A.    Yes.

10    Q.    And true on Roosevelt?

11    A.    Yes.

12    Q.    If you found out that the secure

13    perimeter, the fencing, extended to Adams Street,

14    would you have understood why you couldn't march

15    on Adams?

16          MR. DIONNE:  Objection.  Improper

17    hypothetical.

18          ADMINISTRATIVE LAW JUDGE FLEMING:  It's

19    sustained.

20          MR. WILLIAMS:  If it goes to comparable,

21    it goes to whether there are alternatives.

22          ADMINISTRATIVE LAW JUDGE FLEMING:  The

23    objection is sustained.  And move on.

24

Page 163

1    BY MR. WILLIAMS:

2         Q.    I'm going to show you what's previously

3    marked as City's Exhibit 1.  You can see it's

4    labeled Columbus Drive Overhead View.  Do you

5    recognize that area?

6         A.    Yes.

7         Q.    Do you know this to be the area that

8    the City is proposing as an alternate route?

9         A.    I do.

10        Q.    What are your concerns about visibility

11   there?

12        A.    Our concerns about visibility is that

13   on the one side you have the lake, so that's

14   obvious no buildings, no area where the public

15   would be present.  And the other side we'd have a

16   lot of trees lining the roadway.  [Inaudible]

17   Michigan Avenue, so a number of high rise

18   buildings, including hotels and businesses so

19   that visibility would be very limited.

20        Q.    And there are trees on both sides of

21   the street, correct?

22        A.    That's correct.

23        Q.    How you ever been there?

24        A.    I have.

Page 164

1     Q.   Do you know how tall those trees are?

2         MR. DIONNE:  Objection as to relevance.

3         ADMINISTRATIVE LAW JUDGE FLEMING:

4  Overruled.

5         THE WITNESS:  I couldn't say, but

6  they're large trees.

7

8  BY MR. WILLIAMS:

9     Q.   Is it fair to say they're taller than a

10  human being?

11    A.   Yes.

12    Q.   Okay.  Taller than human being holding

13  a sign?

14    A.   Yes.

15    Q.   So is it fair to say the trees would

16  block any signs from people that were there on

17  Columbus Drive?

18         MR. DIONNE:  Objection.

19         ADMINISTRATIVE LAW JUDGE FLEMING:

20  Overruled.

21         THE WITNESS:  They would.

22         MR. WILLIAMS:  I don't have anything

23  further, Your Honor.

24         ADMINISTRATIVE LAW JUDGE FLEMING:  All

Page 165

1    right.  Are you ready with cross or you need a

2    moment?

3            MR. SPAHR:  One moment.

4            ADMINISTRATIVE LAW JUDGE FLEMING:  Take

5    your time.

6

7                    CROSS EXAMINATION

8    BY MR. DIONNE:

9        Q.   Mr. Metz, you mentioned that this is

10   going to be a safe and family-friendly event,

11   correct?

12       A.   Correct.

13       Q.   But your protest does have -- or your

14   parade does have a political message?

15       A.   That's correct.

16       Q.   And you're aware that there may be

17   counter protesters?

18       A.   That's a possibility.

19       Q.   And you mentioned that you will have

20   marshals present for your parade?

21       A.   Yes.

22       Q.   And they'll have vests?

23       A.   Yes.

24       Q.   But these marshals do not have any

Page 166

1    policing power, do they?

2         A.    No.

3              MR. DIONNE:  Nothing further, Judge.

4              ADMINISTRATIVE LAW JUDGE FLEMING:

5    Anything on that?

6              MR. WILLIAMS:  No.  Nothing.

7              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

8    Let's -- I'll be followed by you guys, you know.

9    Whatever you want to do.

10             MR. DIONNE:  I don't need a break --

11             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

12   Are we ready?

13             MR. DIONNE:  Yes, Judge.  One moment, my

14   co-counsel is making some photocopies.  But the

15   City would like to recall Mr. Metz for a few

16   additional questions on cross examination.

17             MR. WILLIAMS:  They had the opportunity,

18   Judge.  He was here, [inaudible] they crossed

19   him.

20             ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah,

21   they did, but you know.  I'll allow it.

22             MR. DIONNE:  Oh, sorry.  Yes, Judge, if

23   Mr. Iosbaker can step out.

24             ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah,

Page 167

1    you've gotta switch with the witness.

2           MR. WILLIAMS:  I'm not going to call Mr.

3    Iosbaker.

4           ADMINISTRATIVE LAW JUDGE FLEMING:  Oh,

5    okay.

6           MR. WILLIAMS:  I think we got what we

7    needed from Mr. Metz.

8           ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

9    Do you need the exhibits?

10          MR. DIONNE:  Yes, Judge.  We're waiting

11   for Mr. Spahr to come back.  One moment.

12          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

13   That's fine.  Here he comes.

14

15                  RECROSS EXAMINATION

16   BY MR. DIONNE:

17      Q.   Mr. Metz, it's your testimony that you

18   previously gave that you were the individual who

19   filled out the application submitted on February

20   29, 2024, correct?

21      A.   Yes.

22      Q.   And on Page 3, your signature appears,

23   John Metz?

24      A.   That's correct.

Page 168

1          Q.    And that was dated on February 24,

2     2024?

3          A.    Correct.

4          Q.    And on direct examination, you

5     previously said that you met with Mr. Iosbaker

6     before submitting this application?

7          A.    I did not say that.

8               MR. WILLIAMS:  Objection.

9     Mischaracterizes [inaudible].

10              ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah,

11     rephrase that.

12

13   BY MR. DIONNE:

14          Q.    Did you meet with Mr. Iosbaker prior to

15     submitting this application?

16          A.    Mr. Iosbaker?

17          Q.    Yes.

18          A.    Yes, we did --

19              MR. WILLIAMS:  I'm going to object.  Did

20     they meet at all, ever in this life?

21              ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah.

22     I'm assuming he's referring to this, but tighten

23     it up, Mr. Dionne.

24              MR. DIONNE:  Okay.

Page 169

1

2   BY MR. DIONNE:

3       Q.   Mr. Metz, what, exactly, is Mr.

4   Iosbaker's relation to March on the People's

5   Agenda?

6       A.   He is a fellow co-chair of the Anti-War

7   Committee and thus is [inaudible] process

8   [inaudible].

9       Q.   So he's part of the organization for

10  the march -- for this march application.

11          MR. WILLIAMS:  I'm going to object.

12  Counsel is mischaracterizing the  testimony.

13          ADMINISTRATIVE LAW JUDGE FLEMING:  First

14  of all, I guess, I would -- Mr. Iosbaker's name,

15  how do we spell that, so we have that right.

16          MR. WILLIAMS:  I-O-S-B-A-K-E-R.

17          ADMINISTRATIVE LAW JUDGE FLEMING:

18  I-O-S?

19          MR. WILLIAMS:  Pronounced Osbaker

20  [phonetic].  That's I-O-S, baker.

21

22  BY MR. DIONNE:

23      Q.   Mr. Metz, on direct examination you

24  stated that you consulted with Mr. Iosbaker

1    before submitting this application, did you not?

2            MR. WILLIAMS:  I'm going to object.  He

3    did not -- mischaracterize the testimony.

4            ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

5    I'll let him answer the question because if he

6    did say it that wasn't something that I was --

7            MR. WILLIAMS:  But I go on the record

8    that he testified --

9            ADMINISTRATIVE LAW JUDGE FLEMING:  No.

10   Just go back and ask him if he met with him.

11

12   BY MR. DIONNE:

13       Q.   Okay.  Before submitting this

14   application, all right?  Did you meet with the

15   co-chair of your organization, Mr. Iosbaker?

16           MR. WILLIAMS:  And I'm going object

17   again, meet about what and when?  Are we -- is

18   there any [inaudible].

19           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

20   why don't you ask -- I'm assuming we're dealing

21   with the applications.

22           MR. DIONNE:  We are.

23           ADMINISTRATIVE LAW JUDGE FLEMING:  Did

24   he meet and discuss the application?

Page 171

1

2    BY MR. DIONNE:

3        Q.    Did you meet with Mr. Iosbaker and

4    discuss this application prior to submitting it?

5        A.    We did.

6        Q.    And then you submitted the application?

7        A.    I did not say that.

8        Q.    You submitted this application, right?

9        A.    Are you saying delivering the

10   application?

11       Q.    Your signature is on Page 3 of this

12   application that was received on 2-29-24,

13   correct?

14       A.    Yes.

15       Q.    Okay.  Are you familiar with the

16   organization March on the DNC 2024?

17       A.    I am.

18       Q.    And how are you familiar with that

19   organization?

20       A.    Our organization, the Anti-War

21   Committee is a co-sponsor of it.

22       Q.    What, exactly, does co-sponsor mean?

23       A.    It means that we are one of the groups

24   that was active in organizing on its behalf.

Page 172

1      Q.    So you're working with that

2    organization as well?

3           MR. WILLIAMS:  I'm going to object to

4    the characterization.

5           ADMINISTRATIVE LAW JUDGE FLEMING:

6    Overruled.

7

8    BY MR. DIONNE:

9      Q.    Are you working with that organization

10    as well?

11     A.    Yes.

12     Q.    As part of parade permit applications?

13     A.    I don't understand the question.

14     Q.    Are you both submitting parade permit

15    applications during the DNC event is Chicago?

16           MR. WILLIAMS:  Object.  Who's both?  Are

17    you talking about Mr. Metz, personally?

18           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

19    I'll sustain the objection as it's -- from here.

20    Are we -- we're running around in circles.  Are

21    we dealing with the concept of a duplicate parade

22    application?

23           MR. DIONNE:  That's exactly what's at

24    issue here today, Judge.  That this -- our belief

Page 173

1    and through this line of questions to try to

2    prove up that these applicants are just using

3    different proxies to submit substantially similar

4    applications to parade on similar dates and

5    similar locations for similar agendas, Judge.

6              They're just using different names and

7    they all are related somehow together.

8              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

9    Now, I understand the concept, but bear with me

10   because I didn't really go through the specifics

11   of the ordinance with respect to this particular

12   argument.

13             But how do we address this, assuming we

14   can address this, procedurally, when that basis

15   was not alleged as a basis for the denial?

16             MR. DIONNE:  If I may, Judge?

17             ADMINISTRATIVE LAW JUDGE FLEMING:  No,

18   that's fine.  I mean -- [inaudible] as I said,

19   you can --

20             MS. HAKE:  Judge, may I speak for the

21   record?

22             ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah.

23             MS. HAKE:  Okay.

24             ADMINISTRATIVE LAW JUDGE FLEMING:  I

Page 174

```
1    mean, this is -- if it was coming in --
2            MS. HAKE:  Yeah, absolutely.
3            ADMINISTRATIVE LAW JUDGE FLEMING:  -- to
4    do cross examination, I wouldn't say this --
5            MS. HAKE:  Yeah.
6            ADMINISTRATIVE LAW JUDGE FLEMING:  --
7    but I'm trying to get my hands about this --
8            MS. HAKE:  Yeah.
9            ADMINISTRATIVE LAW JUDGE FLEMING:
10   Because this has come as a -- you know --
11           MR. WILLIAMS:  Why [inaudible] after
12   they rested and --
13           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,
14   that's --
15           MR. WILLIAMS:  They finished cross
16   examination.
17           ADMINISTRATIVE LAW JUDGE FLEMING:  --
18   Counsel, that's --
19           MR. WILLIAMS:  I just want an objection
20   for the record.
21           ADMINISTRATIVE LAW JUDGE FLEMING:  No,
22   you have your objection.
23           MR. WILLIAMS:  They finished cross
24   examination.  They rested.  They are now
```

Page 175

1    trying -- they did not deny based on that and

2    they are now trying to down a whole different

3    line.

4              ADMINISTRATIVE LAW JUDGE FLEMING:  I --

5              MR. WILLIAMS:  Without any -- any

6    notification or anything other than just coming

7    here today.

8              MS. HAKE:  I don't think there's --

9              ADMINISTRATIVE LAW JUDGE FLEMING:  I

10   understand --

11             MS. HAKE:  May I speak?

12             ADMINISTRATIVE LAW JUDGE FLEMING:  --

13   concern.  I have a concern, too.  That's why I'm

14   allowing the state to address as well as --

15             MS. HAKE:  Deputy Corporation Counsel

16   Christine Hake for the record.  I don't think no

17   notice needs to be given to the defense because

18   they're fully aware what they're doing.  The City

19   upon the direct examination --

20             MR. WILLIAMS:  Judge, I'm going to

21   object to that.  They fully know what we're

22   doing?  What are we doing?

23             MS. HAKE:  Well, I'd like to explain

24   that without the gallery laughing.

```
                                       Page 176
 1                ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.
 2                MS. HAKE:  Okay.  So Judge, on his
 3       testimony, we were listening.  The City is not
 4       trying to surprise anybody.  We just came to this
 5       realization as Mr. Metz was testifying truthfully
 6       that he was the one to submit the parade
 7       application.
 8                But he did say that he definitely
 9       communicated with somebody that had a lot of
10       relevant experience in this matter, which is
11       Mr. Iosbaker.  After he said --
12                MR. WILLIAMS:  [Inaudible].
13                MS. HAKE:  -- he was one of the
14       co-chairs of this committee, we went back and
15       reviewed the prior permit applications that were
16       denied.  Mr. Iosbaker, and we were going to
17       introduce this into evidence --
18                MR. WILLIAMS:  Oh, and Mr. Iosbaker
19       [inaudible] --
20                MS. HAKE:  Oh, Iosbaker, I'm sorry.
21                ADMINISTRATIVE LAW JUDGE FLEMING:  All
22       right.  I have --
23                MS. HAKE:  Okay.
24                ADMINISTRATIVE LAW JUDGE FLEMING:  --
```

Page 177

1    difficulty at times, too.  [Inaudible].  Unless

2    you're an O'Brien or O'Reilly, I sometimes get my

3    tongue tied.

4          MS. HAKE:  Okay.  Mr. Iosbaker submitted

5    on February 7, 2024, as a labor co-chair for the

6    March on the DNC applications a parade appeal,

7    okay?  We dealt with these parade appeals

8    previously, where Mr. Iosbaker testified.  So

9    that's how we recognized him.  And then we went

10   back and looked at the parade permits.

11         Now, these parade permits were

12   admittedly signed by different individuals, but

13   if you take a look at it, it's the same amount of

14   people, it's the same date and it's a very

15   similar route.  And we have just discovered this

16   as the line of questioning occurred with --

17   through his witness and the next witness they're

18   about to be [inaudible] to call.

19         So I think it's very valid and fair that

20   we are allowed to bring up these points at this

21   time in the hearing.  We can recall him and

22   cross.  We didn't -- we rested, but we did find

23   out this information now.

24         And I think we have the ability to cross

Page 178

1    examine these witnesses pursuant to that section

2    of the ordinance properly.

3              ADMINISTRATIVE LAW JUDGE FLEMING:

4    Well --

5              MR. WILLIAMS:  Judge, if I may?

6              MS. HAKE:  He -- it -- we also have any

7    opportunity to call adverse witnesses in our

8    rebuttal, too.  So at this point, Judge, I think

9    this is a completely fair line of questioning.

10             Because the ordinance is specific that

11   they're not supposed to be submitting parade

12   route after parade route and this is what they're

13   doing.  And that is unfair to city resources.

14             We're dragging, you know, head of CDOT

15   down here.  We're preparing for these hearings,

16   we're taking them very seriously and we expect

17   that these applicants will read the ordinance and

18   follow it.

19             ADMINISTRATIVE LAW JUDGE FLEMING:  All

20   right.  First of all, I guess you ought to give

21   Counsel a copy of the documents and give me a

22   copy of the documents.

23             MS. HAKE:  Yes, Judge.

24             ADMINISTRATIVE LAW JUDGE FLEMING:  And

Page 179

1      then I've got to see if I have the entire

2      ordinance.

3              MR. DIONNE:  Judge, I have a printout of

4      where the ordinance [inaudible].

5              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

6      What section are we specifically --

7              MS. HAKE:  I believe it's (d), Your

8      Honor.

9              MR. SPAHR:  It's (d)(2).

10              ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

11      let me ask this.  What's the status on the March

12      on the DNC?

13              MS. HAKE:  Those were denied, Judge.  We

14      had a hearing in front of Judge Lombardo.  They

15      were denied.  Basically under (d), that was a

16      duplicate application.  We would submit that we

17      ask questions or even a call in our rebuttal as

18      an adverse witness, Mr. Metz.  Mr. Iosbaker is

19      here as well.

20              We think that this is, indeed, a

21      duplicate application.  There are some

22      ramifications that if they are submitting a

23      third -- triplicate application, I guess you

24      could say.  The possibility of going further with

Page 180

1    this in another court of jurisdiction as you

2    talked about.

3              The City has rights under the ordinance

4    as well.  And therefore, we're asking to be fully

5    heard on this matter.

6              ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

7    do you need to speak with anyone?  With your

8    clients --

9              MR. WILLIAMS:  Yeah, I need -- I mean,

10   first of all, Judge, this is the Democratic

11   National Convention.  There are a lot of groups

12   that are going to be protesting.  It's as if

13   saying if the Teamsters showed up to support UAW,

14   that they would be holding a duplicate protest

15   that they later did their own protest, protesting

16   tariffs.

17             To have -- to allege that different

18   organizations, different individuals signing

19   documents and submitting a request for a parade,

20   at different times, is duplicative is absurd.

21             So I -- you know, they've rested.  This

22   is -- this was the case.  We're here on this

23   case, this is the first I'm seeing of these other

24   applications.  You know, a quick glance.  I don't

Page 181

1    know about you but I don't see the duplicative

2    nature of these.

3             I see different applicants, different

4    signatures --

5             ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

6    that's what I'm saying.  So let's take a minute,

7    speak with your clients.  I think that --

8             MR. DIONNE:  Judge, if I could just

9    respond to Counsel's assertion here.  I mean, in

10   the previous appeal now, it's signed and

11   submitted by Joe Iosbaker.  I apologize for

12   mispronouncing that.

13            MR. WILLIAMS:  Osbaker [phonetic].

14            MR. DIONNE:  I'm sorry.

15            ADMINISTRATIVE LAW JUDGE FLEMING:  It's

16   signed by Mr. Iosbaker in his role there.  And he

17   clearly has a role in this case because he's been

18   described as the co-chairman.  I mean, that's --

19   that's not in dispute, okay?

20            The question that is in my head, like I

21   say, is dealing with the concept of notice.  So

22   let me do this.  Take a few minutes, I'll take a

23   few minutes myself and try and see how we get our

24   hands about it.

```
                                      Page 182
 1            And maybe while Mr. Dionne is doing --

 2    Mr. Spahr is doing this -- to get ahead of

 3    ourselves because one starting at one o'clock,

 4    look and see if we're going to be dealing with

 5    the same issue?

 6            MS. HAKE:  Yes.

 7            MR. DIONNE:  Yes, Judge.

 8            ADMINISTRATIVE LAW JUDGE FLEMING:  If at

 9    all possible, okay?  So give me a minute to

10    see --

11            MR. WILLIAMS:  Judge, if I may.  I think

12    at a minimum they would have to submit another

13    rejection.  They would have to do that to deny

14    this one and they'd have to have to submit

15    another rejection.

16            MS. HAKE:  No.  No.

17            MR. WILLIAMS:  So we would have notice

18    to be able to prepare for it.

19            ADMINISTRATIVE LAW JUDGE FLEMING:

20    Well --

21            MR. WILLIAMS:  You're asking me to go

22    out in the hallway and do something I have no

23    idea what I'm going to do.

24            ADMINISTRATIVE LAW JUDGE FLEMING:  I --
```

Page 183

1    I -- you know, I am asking you -- I asked if you

2    needed something and you kind of said yes.

3    That's why I'm doing it.  I understand the spot

4    you're in.  I understand the spot I'm in at this

5    point, too.  And I'm trying to figure out the

6    proper way of doing this.

7         Now, the ordinance does not have a

8    provision assuming it was done earlier.  It

9    doesn't have a provision telling me how you would

10   amend a denial letter within the period of time.

11        In one of the previous cases, we had a

12   situation where the applicant filed an amendment

13   to the application and it happened before we got

14   to this.  So let me just try and get my hands

15   around this, okay.

16        MR. WILLIAMS:  Okay.  But I just would

17   point, they kept me very -- on a very tight leash

18   about what the denial letter said.

19        ADMINISTRATIVE LAW JUDGE FLEMING:  I

20   understand exactly.

21        MR. WILLIAMS:  Okay.  Thank you.  I just

22   to be heard.

23        ADMINISTRATIVE LAW JUDGE FLEMING:  And

24   you certainly will be heard in terms of this.  I

Page 184

1    hate to throw this out to broach this.  And you

2    guys can discuss as attorneys.  Do we need to

3    continue this so this can be looked at?

4            And the reason I say that is I've got 48

5    hours at the conclusion of the hearing to get a

6    report there.  And in -- you know, if it's

7    something that needs to be looked at, maybe

8    that's the best situation of doing it.

9            I'm not trying to continue it.  I don't

10   look to do that with relish, but I'm trying to

11   figure out the best way of potentially, you know,

12   putting this stuff together on it so.

13           MR. WILLIAMS:  I appreciate the spot

14   you're in as well.

15           ADMINISTRATIVE LAW JUDGE FLEMING:  And

16   you know, again, we'll get to the bottom of it as

17   best we can.

18           MS. HAKE:  Judge, if you can give us

19   about like 15 to 20 minutes.  We'll take a look,

20   we'll see what [inaudible].

21           ADMINISTRATIVE LAW JUDGE FLEMING:  Look

22   and see what needs to be done.  And like I say,

23   we'll -- I've got to look at it too.

24

Page 185

1    (A SHORT RECESS WAS TAKEN.)

2

3              ADMINISTRATIVE LAW JUDGE FLEMING:

4    24PA000004.  Parties had an opportunity to discuss

5    certain matters relative to this.  I'm about to be

6    presented with a City Exhibit.

7              MS. HAKE:  Yes, Judge, for the record,

8    Deputy Corporation Counsel Christine Hake.  Thank

9    you and the Court and Counsel for allowing us to

10   have some time.  We're now marking City's Exhibit

11   7A through 7E.  And we seek to admit this into

12   evidence at this time based on the testimony

13   previously of Mr. Metz and his direct.

14             City's Exhibit 7A for the record

15   purposes names a Joe Iosbaker, a labor committee

16   co-chair for the Chicago Alliance Against Racist

17   and Political Oppression.  The letter is dated

18   February 7, 2024, and directed to the Department of

19   Administrative Hearings.

20             It was a appeal for what is attached to

21   City's Exhibit B, an application for request for a

22   parade on August 19, 2024, submitted by Kobi,

23   K-O-B-I, Guillory, G-U-I-L-L-O-R-Y.

24             It also references City's Exhibit 7E,

Page 186

1    which is another application.  And that request for

2    that date of the parade is August 22, 2024.  And

3    that, again, is submitted by Kobi Guillory.

4              MR. WILLIAMS:  [Inaudible].

5              MS. HAKE:  Judge, may I approach?

6              ADMINISTRATIVE LAW JUDGE FLEMING:

7    Sure.

8              MS. HAKE:  At this time, Your Honor,

9    after discussing with Counsel, we'd seek to make an

10   offer of proof on this that Joe Iosbaker, based on

11   Mr. Metz's testimony, was involved in the planning

12   and application for the parade permit submitted as

13   City's Exhibit 3A.

14              That we would ask that Your Honor take

15   into consideration that testimony that Mr. Iosbaker

16   has been involved with duplicate applications for

17   parade permits, that they're substantially similar.

18   We'd ask that that be a third basis for a denial,

19   even though not included in the City's letter on

20   March 7, 2024, which is marked as City's

21   Exhibit 5A.

22              Under 10-8-330 of the City of Chicago's

23   ordinance, which states, (d)(2), "No person or

24   organization may submit an application on behalf of

Page 187

1    another person or entity that is also filing a

2    parade application."  And that would be our offer

3    of proof.

4                 ADMINISTRATIVE LAW JUDGE FLEMING:

5    Okay.  Anything you wanted to add at this point?  I

6    know you're --

7                 MR. WILLIAMS:  Yes, so nothing about

8    these other applications or about duplications,

9    duplicative, or Section (d) of the ordinance was

10   included in the denial letter.  And it's not before

11   this Court, before this tribunal.

12                And so I'm going to object to

13   everything they offer proof and the document that

14   was just submitted -- sought to be submitted into

15   evidence, they are not relevant to the case before

16   us today.

17                ADMINISTRATIVE LAW JUDGE FLEMING:  All

18   right.  The way I read the ordinance, it does

19   require that the notice list the bases for denial.

20   Now, I'm not suggesting that the City was dilatory

21   or that the City intentionally was trying to throw

22   a last minute curve ball or anything like that.

23                But I feel that the ordinance is pretty

24   clear on that.  So I am not going to consider or

Page 188

1    allow a third basis for denial since the duplicate

2    application basis for denial was not in the notice.

3             The exhibit will be allowed in and the

4    offer of proof will be allowed into the record, not

5    as evidence in this case, but in the event this

6    matter ends up on appeal, it establishes the basis

7    for the City's making their request that the third

8    basis be included in the record.

9             And I think I -- again, I think I have

10   to be consistent in the way I approach it.  I -- my

11   brother was a Circuit Court Judge for 23 years and

12   he has always told me that he was elected and he

13   was allowed to wear a black dress.  And I was not.

14   So that I don't have authority that a Circuit Court

15   Judge may or may not have had if they were dealing

16   with this particular issue.

17            We don't follow the Code of Civil

18   Procedure, we don't have amendments and pleadings

19   and the like.  So that will be it and I think that

20   covers and protects the City's right to keep that

21   argument going in the event it's necessary.

22            MS. HAKE:  And thank you, Your Honor.

23   I apologize, I didn't add this into my first offer

24   of proof.  That the City was made aware of this

Page 189

1   issue upon today's date during Mr. Metz's direct

2   testimony.

3            ADMINISTRATIVE LAW JUDGE FLEMING:

4   Yeah.  Because that's in the record from this

5   morning.

6            MS. HAKE:  Thank you.

7            ADMINISTRATIVE LAW JUDGE FLEMING:  And

8   that's why I was putting in there that I was not

9   suggesting in any way that it was some sort of

10  curve ball --

11           MS. HAKE:  Appreciate it.

12           ADMINISTRATIVE LAW JUDGE FLEMING:  --

13  or some last minute Hail Mary pass to throw

14  something in.  It was clear that this was something

15  that came up based upon the testimony.

16           MS. HAKE:  Thank you, Your Honor.

17           ADMINISTRATIVE LAW JUDGE FLEMING:

18  Okay.  Are we at that point, both sides are --

19           MR. WILLIAMS:  I do just want to --

20           ADMINISTRATIVE LAW JUDGE FLEMING:  No,

21  go ahead.

22           MR. WILLIAMS:  -- add to my objection

23  that the only basis they're suggesting is that

24  there was testimony that Mr. Iosbaker is a member

Page 190

1    of the Anti-War Committee and consulted with Mr.

2    Metz on helping to organize the parade.

3                 ADMINISTRATIVE LAW JUDGE FLEMING:

4    Yeah.  Again, I -- nothing I say should suggest

5    that I was insinuating that either side would be

6    successful with that argument.  It's an argument

7    that's made.  I just don't feel it's necessary at

8    this point with the way I'm going to rule in terms

9    of getting into that to have any detailed testimony

10   in the record on it.

11                Again, if a reviewing court wants the

12   issue to be examined, then they can send it back

13   and direct us to examine it at that point.

14                MR. WILLIAMS:  Just wanted to get it in

15   the record.

16                ADMINISTRATIVE LAW JUDGE FLEMING:  No,

17   no problem.  Okay.  Both sides done, then?

18                MR. WILLIAMS:  [Crosstalk].

19                ADMINISTRATIVE LAW JUDGE FLEMING:  You

20   had an opening that you deferred and we never got

21   to.  So you can do your opening and then your

22   closing --

23                MR. WILLIAMS:  And then closing, right?

24   Yeah.  So give me a second, I got everything out of

Page 191

1    order while we were doing all that stuff.

2              ADMINISTRATIVE LAW JUDGE FLEMING:

3    Well, actually City could -- you want your opening

4    to stand -- you had an opening and for whatever

5    reason we didn't bring it up.  So now both sides

6    have rested, you know.

7              MR. WILLIAMS:  Let the City go first.

8              ADMINISTRATIVE LAW JUDGE FLEMING:  Do

9    your --

10             MR. DIONNE:  Judge, thank you, and just

11   for the record ACC Chris Dionne for the City.

12   Judge, we ask that this Court affirm the

13   determination made for the parade permit

14   application that was submitted on February 29,

15   2024, for both bases that were enumerated in the

16   denial letter.

17             First, under Subsection 10-8-330(g)(1)

18   of the code in which the commissioner found that

19   the parade would substantially and unnecessarily

20   interfere with traffic in the area contiguous to

21   the activity.  And there were not available at the

22   time of the proposed parade sufficient city

23   resources to mitigate the disruption.

24             We heard from Mr. Gallardo today who

Page 192

1    directly testified the Department of Transportation

2    that the route would necessarily impact traffic in

3    the area.  That was further confirmed by the Deputy

4    Chief indicating that all streets on the proposed

5    route would have to be closed.  In addition to not

6    just the proposed streets of the parade route, but

7    ingress and egress streets surrounding that.

8              Which directly goes into the second

9    subsection denial underneath (g)(2), in that there

10   are not sufficient number of on-duty police

11   officers, or other city employees authorized to

12   regulate traffic.

13             Looking at the application that was

14   submitted for the date and time, we know that this

15   is during when the Democratic National Convention

16   will be occurring in Chicago.  That the area this

17   parade route proposes directly abuts to not just

18   the United Center, which is one of the primary

19   locations of the Democratic National Convention,

20   but also runs through the medical district in which

21   three hospitals are also located.

22             Asking the Chicago Police Department to

23   allocate resources that they simply do not have

24   available, and that's both in the form of actual

Page 193

1    officer, boots on the street, as well as all the

2    equipment and all the necessary pieces, including

3    barricades, various metal gates, transportation

4    cars, and all the like that would be required to

5    accommodate this request.

6              Based upon the analysis by the Deputy

7    Chief, the Chicago Police Department simply does

8    not have the resources available to accommodate

9    this request.

10             Additionally, Judge, the City did

11   provide an alternative route that was proposed,

12   which is by a major park, Grant Park, in the City,

13   by a major north and south route on Lake Shore

14   Drive in which many different cars pass by.  And

15   very close to the financial and hotel district off

16   of Michigan Avenue.

17             Additionally, Mr. Gallardo also

18   testified that hundreds if not thousands of people

19   regularly go through that park and it can be

20   anticipated there will be just as much if not more

21   people while the over a million people descend upon

22   the City during this time and event.

23             All this testimony was unrebutted,

24   unimpeached, and effectively it illustrates the

Page 194

1   exact reason as to why both of these provisions

2   should be denied.  And for those reason, Judge, we

3   respectfully ask that you affirm the determination.

4                   ADMINISTRATIVE LAW JUDGE FLEMING:

5   Okay.  Counsel?

6                   MR. WILLIAMS:  Thank you, Judge.  We

7   respectfully ask that you overturn the denial.  The

8   City of Chicago, like all municipalities,

9   [inaudible] districts, is bound by the First

10  Amendment of the Constitution.  We were [inaudible]

11  inherently understand that and recognize that in

12  that the ordinance in Section (f) a full

13  [inaudible] investigation.

14                  It requires in Section (k) if the route

15  sought is not practicable, that a -- to the extent

16  practicable a similar -- the City authorize an

17  event that will have comparable public visibility,

18  similar route, location, and date.

19                  We're talking about here about the

20  Democratic National Convention.  This is an

21  inherently political event.  The federal

22  legislators, the President of the United States,

23  who is responsible for policy related to foreign

24  affairs and specifically wars, will be in town at

Page 195

1    the United Center.

2              And so the permit sought here is very

3    clearly for the purpose of political speech on

4    public property and; therefore, it should be

5    entitled to its greatest protection according to

6    the Supreme Court.

7              The offer -- any restrictions imposed

8    on the applicant's free political speech rights by

9    the ordinance must be compliant.  The burden is on

10   the government here, the Department of

11   Transportation to show that they complied with

12   Section (f) of the ordinance by conducting a

13   thorough investigation.

14             The City has not established that they

15   conducted and thorough investigation.  In fact, we

16   heard testimony from the person at the Chicago

17   Department of Transportation, the assistant

18   commissioner, that while he has the ultimate

19   authority, he does not have any written record or

20   report setting forth, specifically, what the

21   reasons are that the parade could not occur.

22             It seems clear from the denial letter

23   that this was a -- this was actually referencing a

24   different parade application because it talked

Page 196

1    about people arriving when the parade sought to be

2    held on the last day of the convention, when people

3    would not, most likely, be arriving.  There's no

4    mention of people leaving.

5              The City made an offer of an alternate,

6    but that alternate is three miles away, nowhere

7    near the target of the political message.  No

8    federal legislators will be anywhere near Lake

9    Shore Drive at that time of day.  They're going to

10   be at the United Center.

11             It's three miles away, it's on a

12   tree-lined street, so both Lake Shore Drive and

13   Michigan Avenue are -- do not have view.  The

14   trees, there's been testimony, are taller than a

15   human holding a sign.  So those trees will block

16   any view.

17             It's not clear but there seemed to be

18   testimony that Columbus Drive would be shut down

19   for purpose of the march.  Therefore, there

20   wouldn't even be traffic on Columbus Drive.  So

21   certainly not anywhere near the public presence.

22   Not anywhere near the present party to the

23   political speech -- to whom the political speech is

24   targeted.  Certainly no comparable public

Page 197

1    visibility, similar route, location, and date.

2              Witnesses here have admitted that they

3    cannot -- they made no effort to find other

4    alternatives that would be within sound or sight of

5    the United Center or anything even in the area; two

6    blocks, three blocks, four blocks.

7              Their testimony was we found an

8    alternative that fit.  It's Columbus Drive, three

9    miles away, it's behind trees, and nobody from the

10   United Center can see it.  So they didn't comply

11   with the Section (k) of the ordinance.

12             And while we heard generalized

13   testimony about resources, we didn't hear specific

14   testimony.  We heard from someone from the CPD, who

15   testified she reported to the commander, but

16   doesn't know what the commander reported to the

17   Chicago Department of Transportation.

18             We heard that nobody offered or even

19   asked if the applicant would like to modify or

20   accept modifications to their application.  It was

21   a take-it-or-leave-it offer of a place buried in

22   Grant Park, three miles away from the activity at

23   the Democratic National Convention.

24             And no other effort to find the least

Page 198

1  restrictive and most narrowly tailored restriction

2  on First Amendment rights, as well as to meet the

3  requirement of Section (k).  So we think the City

4  has not met its burden to show that this

5  application -- that there was a legal basis to deny

6  this application.

7            When the government is denying First

8  Amendment, it is subject to the highest level of

9  scrutiny and the government is required to find the

10  least restrictive alternative.

11            ADMINISTRATIVE LAW JUDGE FLEMING:

12  Okay.  Final word?

13            MR. DIONNE:  Yes, Judge.  The municipal

14  code itself doesn't require that the alternative

15  has to be provided exactly at the same location.

16  Just that it has to be able to be practicable.

17            And in this case, Judge, we have a

18  national special security event around one of the

19  main event locations being the United Center.  That

20  all testimony that's been elicited today specifies

21  that there's going to be a security zone around

22  that is yet at this point undefined and will be

23  defined by the Secret Service, the federal

24  government is going to do that.

Page 199

1        So what Counsel's is basically alluding

2  that we should have proved a alternative route that

3  was right by the United Center is just not

4  practicable given that we don't have a determined

5  security bubble zone at this point.

6        And because we don't know that, we

7  can't provide a route that's at or near that

8  location.  The alternative route provides what is

9  required within the municipal code, Judge.  And for

10  that we ask that you affirm the determination.

11        ADMINISTRATIVE LAW JUDGE FLEMING:

12  Okay.  All right.

13        MR. WILLIAMS:  Judge, I do have to

14  correct him.  I didn't say right next to the United

15  Center.

16        ADMINISTRATIVE LAW JUDGE FLEMING:  I

17  understand.

18        MR. WILLIAMS:  There's a lot of

19  distance between three miles.  Short of three

20  miles.

21        ADMINISTRATIVE LAW JUDGE FLEMING:  You

22  know 2.9, 2.7 -- I mean, we can go -- I understand

23  the argument.

24        MR. WILLIAMS:  Three blocks, four

Page 200

1   blocks, five blocks.

2              ADMINISTRATIVE LAW JUDGE FLEMING:  I am

3   hearing the argument in terms of that.  All right.

4   Unless you guys want to be nice and waive it, and I

5   don't know that you can, I'll have a decision by

6   the end of business in two days, okay?

7              MR. WILLIAMS:  Okay.  Wednesday

8   expected --

9              ADMINISTRATIVE LAW JUDGE FLEMING:  It

10  gives me 48 hours.

11             MR. WILLIAMS:  48 hours, okay.

12             ADMINISTRATIVE LAW JUDGE FLEMING:

13  That's why I say.  I don't want to say you guys can

14  extend it because I don't know if you can and

15  again, I don't want to find ourselves in that

16  situation.

17             So I'll have it to you -- it's not

18  going -- when we have this time frame, I can't ask

19  for you to have case law or anything like that.

20  It's just not possible to do briefs or something

21  like that.

22             If you wanted to do that or something,

23  we would have to work out an arrangement where we

24  would actually continue this case to another date.

Page 201

1    [Inaudible].  So that said, this one's done and we

2    take just a couple minutes and get ready to roll on

3    the next one.

4

5                     (END OF PROCEEDING)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 202

1        I, Susan Bonomo, do hereby certify or affirm

2    that I have impartially transcribed the foregoing

3    from an audiotape record of the above-captioned

4    proceedings to the best of my ability.

5

6                    _____

7                          Susan Bonomo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24