# ATTACHMENT 6

Page 1

IN THE CITY OF CHICAGO

DEPARTMENT OF ADMINISTRATIVE HEARINGS

MUNICIPAL HEARINGS DIVISION

APPEALS - DENIALS OF PARADE PERMITS


Students for a Democratic            )
Society UIC                          )
            Petitioner,              )
                                     )
        V.                           )
                                     ) Docket #24PA000005
CITY OF CHICAGO,                     )
(Dept. of Streets & Sanitation) ,)
                                     )
            Respondent.              )


Hearing date:                March 18, 2024


Location:                    Central Hearing Facility,
                             400 West Superior,
                             Chicago, IL


Administrative Law Judge:    Dennis Fleming

For the City of Chicago:

Attorney:                    Matthew Spahr
Attorney:                    Christopher Dionne
Witness:                     Bryan Gallardo
Witness:                     Gabriella Shemash


For the Plaintiff:

Respondent:                  None
Attorney:                    Christopher Williams
Witness:                     Henry Rathburn
Other Representative:        None

Page 2

```
 1              ADMINISTRATIVE LAW JUDGE FLEMING:  We're
 2    going to go on the record with 24PA000005A, parade
 3    application for a parade, March Against the U.S.
 4    Funded Gaza Genocide filed by Henry Rathburn,
 5    president of Students for a Democratic Society UIC.
 6              And the application was made and reviewed
 7    and denied, a Request for Hearing was made and we are
 8    here for that hearing.  So respective counsels,
 9    please identify yourselves for the record.
10              MR. SPAHR:  ACC Matthew Spahr for the
11    City.
12              MR. DIONNE:  ACC Chris Dionne for the
13    City.
14              MR. WILLIAMS:  Christopher Williams for
15    the Applicant.
16              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.
17    Do we have any stipulations for exhibits?
18              MR. WILLIAMS:  We will stipulate to
19    Exhibit 1 and to Exhibit 3A, B, and C and to Exhibit
20    4.  And hold on just a second.  Oh, that's it.
21    [Inaudible].
22              ADMINISTRATIVE LAW JUDGE FLEMING:  And can
23    I get a set of the exhibits?
24              MR. WILLIAMS:  Oh, yes.
```

Page 3

```
 1              ADMINISTRATIVE LAW JUDGE FLEMING:  Thank
 2   you.
 3              MR. WILLIAMS:  So 1, 3A, B, and C, and
 4   stipulate to 4 and we stipulate to 5A, B, and C, and
 5   stipulate to 6.  City, was it 6 [inaudible].  We do
 6   not stipulate to Exhibit 2 --
 7              ADMINISTRATIVE LAW JUDGE FLEMING:  2A.
 8   And I anticipated that except that's a choice and so
 9   I'm going to defer again on 2A, but based on --
10              MR. WILLIAMS:  2A, B, and C.
11              ADMINISTRATIVE LAW JUDGE FLEMING:  A, B,
12   C?
13              MR. WILLIAMS:  Yeah.
14              ADMINISTRATIVE LAW JUDGE FLEMING:  Based
15   upon -- I'm going to defer at this point in time.
16              MR. WILLIAMS:  Okay.
17              ADMINISTRATIVE LAW JUDGE FLEMING:  And
18   then you have your two exhibits or --
19              MR. SPAHR:  I'm going to see if I need
20   them.
21              ADMINISTRATIVE LAW JUDGE FLEMING:  If you
22   need them, great.  Okay.  Fine.  All right.  Opening
23   if we need.
24              MR. SPAHR:  Judge, we are here today
```

Page 4

1    regarding a parade permit application that was

2    submitted by Petitioner to the City of Chicago

3    Department of Transportation.  The City responded to

4    Petitioner's application and a letter denying it as

5    to the precise terms as applied for while offering an

6    alternative route that the City could approve.

7            The letter sent by the Department of

8    Transportation provides the basis for its denial

9    being there are not sufficient city resources to

10   mitigate traffic disruptions caused by the parade and

11   that there are not sufficient on duty police officers

12   or city employees to police and protect all

13   participants and non-participants of the parade at

14   the applied for date, time, and location.

15           Specifically, the day and location that

16   the Petitioner applied for is during the Democratic

17   National Convention and is encompassing one of the

18   main venues hosting the convention.

19           You will hear through testimony the strain

20   on city resources resulting from hosting such a

21   national special security event.  At no point during

22   this process did the City of Chicago Department of

23   Transportation state that Petitioner is not allowed

24   to parade.

Page 5

1          To the extent practical, the city approved

2     the Petitioner to parade on the same date, just in a

3     different location, which the city could meet its

4     obligation under the Chicago Municipal Code in terms

5     of allocating city resources to the parade.

6          Today, the City will illicit testimony as

7     to what is required of the city in terms of personnel

8     and resources needed for the Democratic National

9     Convention, on top of keeping all other city services

10    fully operational for its residents and businesses

11    during this time.  For all the reasons the city will

12    provide in this case, we are asking this Court to

13    affirm the determination of the Department of

14    Transportation and deny the route as applied for.

15          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

16    Thank you.

17          MR. WILLIAMS:  I'll defer.

18          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

19    If you remember now for this one.

20          MR. SPAHR:  At this time, the City would

21    call Bryan Gallardo.

22          ADMINISTRATIVE LAW JUDGE FLEMING:  All

23    right, Mr. Gallardo.  Again, raise your right hand.

24    Do you solemnly swear or affirm any testimony you

1    give will be the truth?

2            MR. GALLARDO:  Yes.

3

4                    DIRECT EXAMINATION

5    BY MR. SPAHR:

6        Q.    All right, Mr. Gallardo.  Please

7    introduce yourself, spelling your last name for

8    the record?

9        A.    My name is Bryan Gallardo,

10   G-A-L-L-A-R-D-O.

11       Q.    And who do you work for?

12       A.    I work for the City of Chicago,

13   Department of Transportation.

14       Q.    And what is your position in that

15   department?

16       A.    I am assistant commissioner in charge

17   of the public way permitting office.

18       Q.    And how long have you held that

19   position?

20       A.    I have held that position since October

21   of 2017.

22       Q.    And as assistant commissioner, what are

23   some of your responsibilities?

24       A.    In the public way permitting office, we

1    take in applications for use of the public way,

2    which can include construction, festivals,

3    athletic events, parades, assemblies, moving

4    vans.  Essentially any activities that take place

5    on the public way other than the standard, you

6    know, driving and walking type stuff.

7         Q.   Okay.  Staying specifically on parades,

8    what is a parade permit?

9         A.   It's a permit to march with a group

10   down the public right of way.

11        Q.   And who can apply for such a permit?

12        A.   Anyone can apply for a permit.

13        Q.   Okay.  Individuals or organizations?

14        A.   Correct.

15        Q.   And where do these individuals and the

16   organizations apply for the parade permit?

17        A.   They would come to City Hall, Room 905,

18   to submit an application.

19        Q.   And once CDOT received a parade permit

20   application, what is the process?

21        A.   Once we receive the application, we

22   will date and time stamp it.  And then we will

23   distribute it to other departments and agencies

24   for review.

1      Q.    And what other departments and agencies

2    would you relay the application to?

3      A.    We'll send it to Chicago Police

4    Department, Department of Special Events, Office

5    of Emergency Management Communications, as well

6    as Streets and Sanitation.  Those are the typical

7    ones.  We'll also send it to the ward office as

8    well.

9      Q.    And what is the purpose, or what input

10   is CDOT seeking for by relaying these permits to

11   other departments?

12     A.    Whenever there's any kind of activity

13   on the public right of way, there are times when

14   resources will be needed or activities that they

15   are normally going to be doing that may need to

16   be ceased during the time of the parade.

17          So we're seeking their input as to any

18   kind of conflicts or availability of resources if

19   needed.

20     Q.    And do you as the assistant

21   commissioner review every parade permit

22   application received by CDOT?

23     A.    No, I don't receive every single

24   application.

Page 9

1      Q.    And when would an application be

2      brought to your attention?

3      A.    If it's in a high profile district like

4      the central business district or near an

5      entertainment venue or if it's in conflict with

6      some other high profile events, in this case the

7      DNC.  Then somebody might bring it to my

8      attention on my staff to just let me know that

9      this is going to be during this specific time or

10     in this specific place.

11     Q.    And when an application is brought to

12     your attention, do you still review it with the

13     same CDOT process as reviewing all applicants?

14     A.    Yes.  We don't change the overall

15     process.  It's just brought to my attention if

16     there's a potential conflict.

17     Q.    All right.  Bringing your attention to

18     what has been marked and admitted as City's

19     Exhibit 3A through C, did City of Chicago

20     Department of Transportation receive a parade

21     application for a parade named "March Against

22     U.S. Funded Gaza Genocide?"

23     A.    Yes, we did.  We received an

24     application on February 29th.

Electronically signed by Susan Bonomo (001-416-118-4005)                                    e8a5891e-d3bf-4aed-a6ac-5ce7d71361c3

Page 10

1     Q.    And what I presented to you as City's

2     Exhibit 3, how many pages of this application are

3     there?

4     A.    There are three pages to this

5     application.

6     Q.    And where on the application is it

7     indicated the date that CDOT received it?

8     A.    In the top right-hand corner you'll see

9     a date and time stamp showing February 29th.

10     Q.    And do you recall who specifically

11     received this application at CDOT?

12     A.    The intake was done by Susan Pollack,

13     who's a member of the CDOT public way permitting

14     staff.

15     Q.    And was this parade application

16     specifically brought to your attention?

17     A.    It was.

18     Q.    And why was that?

19     A.    The requested location and date

20     conflicts with the Democratic National

21     Convention, which will be taking place in August

22     of this year.

23     Q.    And what dates, specifically, if you

24     know, is the Democratic National Convention

Page 11

1    happening on?

2        A.    It's multiple days.  The official four

3    nights of it would be August 19th through the

4    22nd.  But set up and tear down will proceed both

5    before and linger after those dates.

6        Q.    And are you familiar with what venues

7    the Democratic National Convention is set to take

8    place at?

9        A.    The two confirmed locations so far that

10   we have are the United Center and McCormick

11   Place.

12       Q.    And I will show you what -- okay,

13   reviewing what is in front of you, what does this

14   parade application tell you about the requested

15   parade?

16       A.    So this parade was requested for August

17   19th.  And is requesting a route that would

18   encircle the United Center area.

19       Q.    And what -- I believe you just

20   testified, but what day was this -- they're

21   asking to parade on?

22       A.    August 19, 2024.

23       Q.    And does this application indicate what

24   route they're proposing to parade on?

1      A.    Yes.  So they want to begin at Union

2    Park and then they want to proceed on Ashland and

3    then around the United Center area, which would

4    be just to the west of them.

5      Q.    I'll show you what's been marked and

6    admitted into evidence as City's Exhibit 4.  Do

7    you recognize this map?

8      A.    Yes.  This is an outline of the

9    proposed route in the application.

10      Q.    And do you see the United Center on

11    that map?

12      A.    Yes.

13      Q.    And where about is it in regard to the

14    overall parade?

15      A.    It is in the center of the route that's

16    being requested.

17      Q.    Okay.  Great.  Now, referring back to

18    the application, does it have a proposed number

19    of attendees seeking to parade?

20      A.    Yes.  That's a standard part of the

21    application.  And the applicant indicated that

22    they are expecting 5,000 participants.

23      Q.    And does it indicate a start time?

24      A.    Yes.  That's also a standard part of

Page 13

1      the application.  So the start time that they

2      requested is 12:00 p.m.

3          Q.    End time?

4          A.    2:15 p.m.

5          Q.    Is there a disband time?

6          A.    3:00 p.m.

7          Q.    And was this application signed by

8      anyone?

9          A.    Yes.  So it looks like it's initials

10     HMW.  And then the name printed says Henry

11     Rathburn.

12         Q.    Okay.  Thank you.  And what was your

13     next steps once you received this application on

14     February 29th?

15         A.    As we do with all parade applications,

16     it was circulated via e-mail to the various

17     departments that I had mentioned previously.

18         Q.    And did CDOT review this application

19     and its proposed route in terms of traffic on the

20     streets that are being applied for?

21         A.    Yes.  So that is part of the review

22     that we conduct.  We look for any conflicts with

23     other activities, whether they're construction or

24     other events or athletic events or festivals,

Page 14

1    things like that -- of that nature in the area.

2    As well as the traffic impacts of the proposed

3    route and subsequent closures.

4         Q.    And what, specifically, did you look at

5    and review in terms of traffic for the proposed

6    route?

7         A.    So this route would take it around the

8    United Center, as I had previously stated.

9    Several of the streets in that area are already

10   closed and this route would then close additional

11   routes, including Ashland and Western, which

12   would essentially just cause a traffic jam in

13   that area.  If you have Ashland, Damen, and

14   Western all closed it gives us limited options to

15   direct other vehicles around.

16            Especially when you consider that just

17   to the south of here is the Illinois Medical

18   District.  By closing Ashland and Western it

19   would make it very difficult for emergency

20   vehicles to get to and from those hospitals.

21        Q.    And when a organization is seeking to

22   parade on one side of the street, let's say

23   Ashland, is it possible to march on just one lane

24   of traffic heading northbound?

1      A.    It's not considered safe to do that.

2      It would actually take more resources to allow

3      live traffic next to a large group of marchers,

4      then it would to fully close the street.

5      Q.    And is there any consideration to

6      public transportation when reviewing this in

7      terms of traffic?

8      A.    All of those streets that I mentioned

9      previously; Ashland, Damen, and Western; all have

10     multiple bus routes taking them north and south

11     in the area.

12     Q.    And did you receive any response from

13     CPD regarding the review of this application?

14     A.    Yes.  They were one of the groups that

15     it was distributed to.  And they replied that

16     they would not have sufficient resources to

17     support this event.

18     Q.    All right.  And after reviewing the

19     proposed application from the CDOT perspective

20     and receiving input from other organizations

21     within Chicago, did you come to a conclusion

22     whether or not you could approve or deny this

23     permit?

24     A.    Yes.  After reviewing the responses

Page 16

1    from -- that we received from any other

2    departments, as well as the potential traffic

3    impacts and the conflict with the DNC that will

4    be in full swing on that day, we sent -- or I

5    should say, I sent a denial letter asking them to

6    change their route.

7        Q.    And did anyone from CPD or another

8    organization direct you to approve or deny this?

9        A.    No.  The denial comes from the

10   Department of Transportation.  We take in

11   information from other departments and other

12   agencies, but then we take that information and

13   we craft the letter.

14       Q.    I'll show you what's now been admitted

15   into evidence as City's Exhibit 5A through C.  Do

16   you recognize this document?

17       A.    This is a copy of the denial letter

18   that was sent to the applicant on March 7th.

19       Q.    And who authored this letter?

20       A.    I wrote this letter.

21       Q.    And to whom did you mail it to?

22       A.    Students for a Democratic Society at

23   UIC, in care of Henry Rathburn.

24       Q.    And is this a true and accurate copy of

1    the letter you prepared signed and sent?

2        A.    Yes, I believe it is.

3        Q.    And what is the purpose of this letter?

4        A.    This letter is required under the city

5    ordinance.  If a parade is to be denied, we have

6    to send a formal denial letter including the

7    reason for denial as well as the proposed

8    alternate.

9        Q.    And in this letter is one of the bases

10   for denial under 10-8-330(g)(1)?

11       A.    Yes.

12       Q.    And for the benefit of the Court, can

13   you elaborate on the basis for this denial and

14   what you reviewed?

15       A.    Yes.  So based on all feedback from the

16   departments and the reviews and the ordinance

17   requirements, CDOT determined that the parade

18   would interfere with traffic in the area and that

19   there wouldn't be available resources to keep

20   both the parade participants and any other users

21   of the public way safe.

22       Q.    And did you also provide a basis for

23   that denial under 10-8-330(g)(2)?

24       A.    Yes.  So we go on further in the letter

Page 18

1   to describe the impacts of the DNC and the lack

2   of resources that would be available to keep the

3   participants safe.

4        Q.   And in this letter, you identify that

5   the City of Chicago Department of Transportation

6   provided an alternative route; is that correct?

7        A.   Yes.  That's a requirement under the

8   ordinance.

9        Q.   And what was the alternative route

10  provided?

11       A.   So the alternative provided was on

12  Columbus Drive from Roosevelt to Jackson.

13       Q.   And what was the proposed date for this

14  alternative route?

15       A.   August 19th, which was the date they

16  had originally requested.

17       Q.   And is there any differentiating factor

18  from what was applied for in terms of time for

19  the proposed alternative route?

20       A.   Yes.  So there are different assembly

21  times and step off times.  And that is due to

22  other activities that will be taking place in the

23  Columbus area on August 19th.

24       Q.   Now, I'll show you what's been admitted

Page 19

1     into evidence as City's Exhibit 6.  Do you

2     recognize this?

3          A.    Yes.  This is an overview of the

4     proposed alternative route.

5          Q.    And to your knowledge, why were you

6     able to provide this alternative route?

7          A.    So this route, given the location, is

8     still considered a high profile location, but

9     it's easier to secure, so it required fewer

10    resources.  And although it would have traffic

11    impacts, it would not be as significant as the

12    requested route.  And so that's -- this route was

13    selected so that they could still maintain a high

14    profile location, but in a manner that the city

15    would be readily able to support.

16         Q.    And is this alternative route in the

17    City of Chicago, County of Cook, State of

18    Illinois?

19         A.    Yes.

20         Q.    And to your knowledge, has the

21    Petitioner accepted the alternative route?

22         A.    No, I don't believe they have.

23              MR. SPAHR:  No further questions.  And

24    I'll tender the witness at this time.

Page 20

1           ADMINISTRATIVE LAW JUDGE FLEMING:

2     Cross?

3

4                 CROSS EXAMINATION

5     BY MR. WILLIAMS:

6         Q.    Mr. Gallardo, I feel like I know you.

7     Thank you for appearing this afternoon.  Your

8     title of Assistant Commissioner is part of the

9     Chicago Department of Transportation, correct?

10        A.    Yes.

11        Q.    And how long have you been doing that?

12        A.    I've been with the department since

13    October of 2017.

14        Q.    Okay.  And who has the authority to

15    deny or approve parade permits?

16        A.    So per the ordinance, that authority

17    rests with Chicago Department of Transportation,

18    specifically the commissioner or his designee.

19        Q.    Okay.  And for purposes of this

20    application, were you the commissioner's

21    designee?

22        A.    Yes, I manage the public way permitting

23    office, so I am the one who does the intake and

24    review of the permits, or the staff that reports

Page 21

1    to me does.

2        Q.    Which is why you sent the letter

3    responding to the permit application, correct?

4        A.    Yes.

5        Q.    Okay.  And so you were the one who

6    ultimately had the authority to deny the permit

7    application and deny the permit?

8        A.    Yes.  I'm the one who ultimately

9    crafted the letter and sent out the denial.

10       Q.    Okay.  But that's a little different

11   than what I asked.  You had the authority to deny

12   it, correct?

13       A.    Under the -- as the commissioner's

14   designee, yes.

15       Q.    Okay.  And you're the one who made the

16   decision to deny it?

17       A.    Based on the information I had, yes.

18       Q.    Okay.  And who did you -- you said you

19   got information from a variety of other

20   agencies --

21       A.    So with all parade applications, we

22   send it to multiple departments and so the Police

23   Department, Office of Emergency Management and

24   Communications, Streets and Sanitation, the ward

Page 22

1       office, Department of Special Events and Cultural

2       Affairs.  So they all received copies of it and

3       are able to provide feedback.

4            Q.    And which departments provided feedback

5       on this particular application?

6            A.    On this particular application, I

7       received feedback from the Chicago Police

8       Department.

9            Q.    Only the Chicago Police Department?

10           A.    That's the only one that I recall

11      receiving specifically back from.

12           Q.    Okay.  And did you receive that

13      feedback in a written form or verbal?

14           A.    So they provide what's called a CRL or

15      Commander's Review Letter.  And that's what they

16      provided.

17           Q.    And who provided that?

18           A.    That comes from the Chicago

19      Department -- Police Department.

20           Q.    Is it from the commander?

21           A.    Yeah.  Of the district that would be

22      the requested location.

23           Q.    Okay.  And so that was delivered to you

24      in writing?

Page 23

1        A.      It was e-mailed to me, but yes.

2        Q.      Okay.  And did you get any other

3    feedback besides the written feedback?

4        A.      Not that I can recall.

5        Q.      Okay.  And what was the nature of the

6    feedback you got from the Chicago Police

7    Department?

8        A.      Due to the drain on their resources of

9    the DNC, they did not feel they would have enough

10   resources to support the parade as requested.

11       Q.      Okay.  And did they give any specifics

12   as to why the number of police officers would be

13   required?

14       A.      We don't typically, no.  We don't

15   typically review the resources of another

16   department.  We would ask them for their input,

17   but we rely on their expertise to tell us what

18   they are able to do.

19       Q.      Okay.  So you didn't get, we would need

20   this many and we don't have that many?

21       A.      No, they didn't provide me specific

22   officer counts or time tables.  Simply that they

23   did not believe they would have the resources at

24   the time.

Page 24

1      Q.    How many people do you expect to come

2    to the Democratic National Convention?

3      A.    Based on the information we've been

4    provided so far, 50,000 or more is a typical

5    attendance.  But obviously, we won't know until

6    the time of the event.

7      Q.    Okay.  And looking at the City

8    Exhibit 5A, could you pull that out for a second?

9      A.    Yes.

10      Q.    Okay.  And [inaudible] under Number 2,

11    the second paragraph there --

12      A.    Uh-huh.

13      Q.    -- toward the bottom, do you see that?

14    Do you see 50,000?

15      A.    Yes.

16      Q.    Okay.  Is that what you relayed in this

17    letter, approximately 50,000?

18      A.    Yes.

19      Q.    Okay.  Can you read from "moreover,

20    [inaudible] to the city in or on a date many

21    attendees are expected to arrive and would create

22    significant traffic concerns [inaudible].  And

23    then, this includes resources needed for the

24    DNC."  Do you see that line?

Page 25

1       A.      Uh-huh.

2       Q.      Okay.  Did you use that exact line in

3    another application?

4           MR. SPAHR:  Objection.  Foundation.

5           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

6    the objection's overruled.  You can answer it if

7    he recalls.

8           THE WITNESS:  Yes, I believe that has

9    been in another letter.

10

11   BY MR. WILLIAMS:

12      Q.      Okay.  Did you use it for one -- an

13   application for August 22nd, the last day of the

14   Democratic National Convention?

15      A.      I believe so.

16      Q.      Okay.  When considering applications

17   for parade permits during the Democratic National

18   Convention, have you investigated each one

19   separately or do you just rely on earlier

20   investigations?

21      A.      No.  We take each application as its

22   own entity.  We don't review one based on another

23   unless there's a specific conflict between the

24   two applications.

Page 26

1          Q.    But you do cut and paste language from

2     one to the next, correct?

3          A.    Yes.  I have used similar language in

4     the letters, but the reviews of each application

5     are based on the application, itself, not on

6     other applications.

7          Q.    You mentioned that you provided an

8     alternative route; is that correct?

9          A.    Yes.

10         Q.    And that alternative route is in -- is

11    on City's Exhibit 5.  Is that right?

12              MR. SPAHR:  6, City's 6.

13              MR. WILLIAMS:  I'm sorry.

14

15    BY MR. WILLIAMS:

16         Q.    The written version of that alternative

17    route --

18         A.    Yes.  It's on -- it's in the denial

19    letter if that's what you're asking.

20         Q.    Yes.  And that would be Exhibit 5B,

21    correct?  City's Exhibit 5B?

22         A.    Yes.

23         Q.    Okay.  How did you come up with that

24    route?

Page 27

1     A.    So the ordinance requires that we

2   provide a substantially similar route in terms of

3   visibility.  And so we selected the location

4   based on what city resources were available and

5   the impacts to traffic.  But also noting that it

6   would need to be a high profile location.

7     Q.    Okay.  But the ordinance actually says

8   [inaudible] will have comparable public

9   visibility and a similar route location and date

10   to that of the proposed parade; would you agree

11   with that?

12     A.    In terms of what's in the ordinance,

13   yes.

14     Q.    Okay.  That's the actual language of

15   the ordinance, right?

16     A.    I believe so.

17     Q.    Did you come up with that route; I

18   mean, was that your idea, let's put them over on

19   Columbus Drive?

20     A.    That's a route that has been used in

21   the past and so it was one of the routes that we

22   reviewed and it was one that was agreed that all

23   the affected departments would be able to

24   support.

Page 28

1    Q.   Okay.  You realize you're using passive

2    voice.  You said it was, it was decided, or it

3    was agreed.  Who agreed?

4    A.   Well, I wouldn't just send a route out

5    there without consulting with the same

6    departments that reviewed the application.  So

7    I -- all the folks that were part of the original

8    distribution would also be alerted to the

9    proposed route.  And if they thought that they

10   would not be able to support that, then that

11   would not be the proposed route.

12   Q.   Okay.  So are you saying other

13   departments gave you feedback suggesting Columbus

14   Drive between Roosevelt and Jackson?

15   A.   Suggesting that they would be able to

16   support it, yes.

17   Q.   Okay.  But you were -- are you saying

18   that you suggested that to them and they said

19   they could support it?

20   A.   In terms of the route itself?

21   Q.   The alternative route?

22   A.   Yes, they -- so the route, itself, is

23   something that we have used in the past.  And I

24   would not have sent out the letter without

1    confirmation from them that they would be able to

2    support it.

3        Q.   Okay.  You've had protests in other

4    areas of the city before, too, and parades in

5    other areas of the city, correct?

6            MR. SPAHR:  Objection.  Relevance.

7            ADMINISTRATIVE LAW JUDGE FLEMING:

8    Overruled.

9            MR. WILLIAMS:  Well, it's not as if

10   Columbus Drive is the place to have a parade.

11           ADMINISTRATIVE LAW JUDGE FLEMING:

12   Overruled.

13           MR. WILLIAMS:  Okay.

14           THE WITNESS:  Yes, we've had parades in

15   various parts of the city.

16

17   BY MR. WILLIAMS:

18       Q.   Okay.  So I'm trying to figure out how,

19   specifically, you come up with that for this

20   parade application.

21       A.   It's a fairly common one, again.

22   That's a route that's been used for several

23   parades.  It's one that the city is capable of

24   supporting even with the strained resources at

Page 30

1    that time.  And sending them any further away

2    didn't seem practical.

3         Q.    How about sending them closer?

4         A.    I don't know of any routes that would

5    be available that would be closer that wouldn't

6    have more of an impact and wouldn't be able to be

7    supported with the resources that we have or

8    wouldn't have more significant traffic impacts.

9         Q.    What information did you base that on?

10        A.    The impacts?

11        Q.    The lack of other locations?

12        A.    By reviewing other potential locations.

13        Q.    Which ones did you review?

14        A.    We looked at areas near the United

15   Center, but knowing that the DNC is going to be

16   in the area and there will be several street

17   closures in that area, being in the immediate

18   area did not seem practical.

19             Any of the east-west streets, such as

20   Madison or Randolph, would have impacts to

21   expressway access and other residents.  So we

22   needed to find a location that would, again,

23   still be a high profile location, but would not

24   have those type of impacts.

Page 31

1      Q.     Columbus Drive is three miles away,

2    right?

3      A.     I believe that sounds about right.

4      Q.     Okay.  Do you consider that a similar

5    location?

6      A.     In terms of visibility, yes.  It's the

7    central business district, which is basically one

8    of the busiest areas in the city.

9      Q.     Okay.  But not in terms of visibility

10   because that's not what the ordinance says.  Do

11   you consider it a similar location --

12     A.     I consider it a similarly high profile

13   location.

14     Q.     That's the only similarity, the high

15   profile nature of it.

16     A.     I'm not sure I understand --

17            ADMINISTRATIVE LAW JUDGE FLEMING:

18   [Inaudible] question, the way it came out so.

19            MR. WILLIAMS:  He's saying he considered

20   a similar location in terms of visibility, but

21   the ordinance says a similar route, location, and

22   date to that of the proposed parade.  It doesn't

23   modify visibility.  So I'm trying to ask how he

24   considers a location three miles away from --

Page 32

1                    ADMINISTRATIVE LAW JUDGE FLEMING:   I'm

2      not trying to stop you.   That one statement you

3      made didn't come out as a question, is the way I

4      think it --

5

6   BY MR. WILLIAMS:

7          Q.    Is that the only basis, that you think

8      it's a similar location, the visibility aspect?

9          A.    In terms of -- I guess I'm not

10     understanding your question.

11         Q.    Well, you said -- I asked you do you

12     consider this a similar location.   And what's

13     your answer?

14         A.    Yes.

15         Q.    Why is it a similar location?

16         A.    It's going to be in the heart of the

17     city.   It's going to have visibility, a high

18     profile location, it's going to have access that

19     they need, it's going to -- we'll also be able to

20     support it with the resources that we have.

21              So those are all the factors that go

22     into selecting a location.

23         Q.    Will there be any delegates to the

24     Democratic National Convention there?

Page 33

1          MR. SPAHR:  Objection.  Speculation.

2          ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

3     sustained.  I don't think he would be able to

4     answer yes or no on that.  It's an argument.

5     It's a factual argument.

6          MR. WILLIAMS:  He made the decision for

7     the location.  He said it's similar.

8

9  BY MR. WILLIAMS:

10     Q.    Is it your understanding the delegates

11     to that Democratic National Convention are going

12     to the United Center?

13     A.    That is my understanding.

14     Q.    Are they meeting on August 19 in the

15     afternoon in the middle of Grant Park?

16          MR. SPAHR:  Objection.  Calls for

17     speculation.

18          ADMINISTRATIVE LAW JUDGE FLEMING:  I'll

19     let him answer.

20          THE WITNESS:  I don't know their

21     specific schedule, but the 19th would be one of

22     the days of the DNC, so I'm sure they will be

23     meeting at some point.

24

Page 34

1    BY MR. WILLIAMS:

2        Q.    In the middle of Grant Park?

3        A.    Again, I don't know their schedule yet.

4        Q.    Okay.  Do you think they're going to

5    meet in the middle of Grant Park?

6            MR. SPAHR:  Objection.  Speculation.

7            ADMINISTRATIVE LAW JUDGE FLEMING:

8    That's sustained.

9

10   BY MR. WILLIAMS:

11       Q.    Have you ever been on that stretch of

12   Columbus Drive?

13       A.    Yes, I have.

14       Q.    Okay.  There's a tree line?

15       A.    There are trees on Columbus.

16       Q.    On both sides of Columbus, correct?

17       A.    I believe so, yes.

18       Q.    You're not sure?

19       A.    I don't count the trees on Columbus.

20       Q.    I'm not asking how many trees, I'm

21   asking --

22       A.    There -- yes, to my recollection there

23   are trees on Columbus, both sides.

24       Q.    Are the trees higher than you and me?

Page 35

1      A.    Most trees are, but I have not measured

2    the ones on Columbus.

3      Q.    There are multiple routes from downtown

4    Chicago out to United Center, correct?

5          MR. SPAHR:  Objection.  Vagueness.

6          ADMINISTRATIVE LAW JUDGE FLEMING:

7    Overruled.  He can answer.

8          THE WITNESS:  If you're asking, there

9    are multiple streets that you can take to go west

10   from downtown.

11

12   BY MR. WILLIAMS:

13     Q.    Okay.  [Inaudible]?

14     A.    You can.

15     Q.    You can take Lake Street?

16     A.    At this time you could not just because

17   Lake Street's under construction.  But yes, Lake

18   Street does go west.

19     Q.    Take Madison?

20     A.    You could.  Again, during the DNC,

21   though, I would expect there would be a security

22   perimeter there, so I don't know if that's going

23   to be a practical route.

24     Q.    Did you consider -- so I just want to

Page 36

1    make sure it was you who proposed the alternative

2    route.  You made the -- you put it out to other

3    agencies?

4         A.    The final decision was mine.

5         Q.    Well, no, you're prior to the final --

6    the only alternative given to other agencies was

7    that Columbus Drive route, correct?

8         A.    I'm not sure I understand your

9    question.

10        Q.    Okay.  You denied the -- your head

11   denied the application, correct, based on

12   feedback from other agencies; is that right?

13        A.    Correct.

14        Q.    Okay.  But you said before you had put

15   out another proposed route you would get feedback

16   from other agencies as well including CPD, right,

17   Chicago Police Department?

18        A.    Yes.  I've received feedback from other

19   agencies including CPD.

20        Q.    Okay.  But you [inaudible] received

21   feedback specifically about this alternative

22   route on Columbus Drive, correct?

23        A.    Well, I confirmed that they were able

24   to support it.

1     Q.   Okay.  But you can only confirm it if

2     you told them, "Hey, what about this alternative

3     route?"  Right?

4     A.   I mean, yeah, they would have to know

5     about it.

6     Q.   I guess my question -- did you give the

7     CPD like a list of five and ask them if they

8     could support any of them?

9     A.   No.  It was more of a conversation as

10    to what do we think that we'd be able to support.

11    And so we've used Columbus before, I suggested

12    Columbus, they said yes.  They provided that in

13    written form that they would be able to support

14    that.

15    Q.   Okay.  And who gave you -- what was the

16    written form that you got that on?

17    A.   That's -- again, the commander's review

18    letter that I had mentioned before.

19    Q.   You got it in an e-mail?

20    A.   Yes.

21    Q.   Okay.  So it was you who put out that

22    alternate route?

23    A.   Yes.  That's the route that was decided

24    on and that's the one that I confirmed with

Page 38

1     police that they could support.

2          Q.   Do you know if Columbus Drive is

3     visible to United Center?

4          A.   I don't think it would be.

5          Q.   Why?  Why do you think that?

6          A.   I don't they can see Columbus from --

7     the United Center from Columbus.

8          Q.   Because it's too far away?

9          A.   That would be one reason, yeah.

10         Q.   And there are buildings and trees in

11    the way?

12         A.   Sure.

13         Q.   Did you give any consideration to

14    something in the sight of United Center?

15              MR. SPAHR:  Objection.  Calls for

16    speculation, relevance.

17              ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

18    I think it was kind of asked and answered as

19    well.

20              MR. SPAHR:  And asked and answered.

21              ADMINISTRATIVE LAW JUDGE FLEMING:  But

22    I'll let you try and answer it again.  Maybe --

23              THE WITNESS:  Yes.  However, without

24    more information from the Secret Service as to

```
                                                    Page 39
 1      the full layout, providing a route that I can't

 2      promise that would be available to them seemed

 3      impractical.

 4

 5   BY MR. WILLIAMS:

 6        Q.    Are you authorized to provide a route

 7      contingent on its availability of not being in a

 8      security zone?

 9              MR. SPAHR:  Objection.  Calls for

10      speculation.

11              ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

12      it's not speculation.  I'll overrule that.  Is he

13      authorized?

14              MR. SPAHR:  Unclear.

15              ADMINISTRATIVE LAW JUDGE FLEMING:  I

16      don't know if he is or he isn't.  Do you

17      understand the question?

18              THE WITNESS:  Yeah, I think I understand

19      the question.  And what I would say is I don't

20      believe our permits supercede Secret Service

21      authority or Homeland Security authority.  So --

22

23   BY MR. WILLIAMS:

24        Q.    I don't think you understood.  Let me
```

Page 40

1     just try and clarify.  If you got a request to go

2     on Lake Street.  Could you say, you know, we're

3     going to approve that unless it's in the Secret

4     Service security zone?

5           MR. SPAHR:  Objection.  Improper

6     hypothetical.

7           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

8     again, if the witness can answer it, I'll let him

9     answer it.

10          THE WITNESS:  I don't know if per the

11    ordinance I'm allowed to do that.  But I probably

12    wouldn't do that if I thought it was going to

13    conflict with the layout of another event.  In

14    this case, the DNC.

15

16  BY MR. WILLIAMS:

17      Q.   Why would that conflict with the layout

18    of the other event?

19      A.   Because it's in the immediate area of

20    the other event and it's -- it could be part of

21    their security zone, which is not a zone that I,

22    personally, determine.

23      Q.   That wasn't my question [inaudible].

24    All right.  Did you get any information from the

Page 41

1     CPD about the specifics of the number of officers

2     that would be required to allow this parade to go

3     forward?

4              MR. SPAHR:  Objection.  Asked and

5     answered.

6              ADMINISTRATIVE LAW JUDGE FLEMING:  I

7     don't think that was asked and answered

8     specifically.

9              THE WITNESS:  No, they don't provide me

10    specific details as to how they reached their

11    determination.  They simply inform me of whether

12    or not they feel they can support the event.

13

14   BY MR. WILLIAMS:

15       Q.   Are you on a committee [inaudible],

16    committee to organize the DNC?

17       A.   There are various meetings that I

18    attend regarding the requirements for the DNC.

19       Q.   Okay.  And is public safety discussed

20    at those meetings?

21       A.   I'm not on the public safety committed.

22    I'm only on the transportation and traffic

23    committee.

24       Q.   Okay.  Do you know if the DNC is

Page 42

1    represented in the [inaudible] meeting?

2        A.    I believe so.

3        Q.    Do they -- they have some influence

4    over security zone and routes approved, et

5    cetera?

6            MR. SPAHR:  Objection as to the

7    relevance and is calling for speculation on

8    behalf of Mr. Gallardo.

9            ADMINISTRATIVE LAW JUDGE FLEMING:  I'm

10   not sure of the relevance.

11           MR. WILLIAMS:  Well, the DNC is very

12   political.  They don't want President Bidden's

13   facing protesters.  It's in the news all the

14   time.

15           ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

16   that may be true, but I don't know that it's

17   relevant to our discussion today.

18           MR. WILLIAMS:  Well, I'm going to ask

19   him if it influenced him.

20           ADMINISTRATIVE LAW JUDGE FLEMING:  You

21   may ask if anything influenced him, so yes, that

22   would be proper.  I have no problem with that.

23

24   BY MR. WILLIAMS:

Page 43

1        Q.    Did anything or any entity influence

2    your decision on a denial of the application

3    other than CPD?

4        A.    You mean, did I get feedback from other

5    entities or did they make a request that I

6    accommodate it are you asking?

7        Q.    Did anyone make a request?

8        A.    No.

9        Q.    The DNC didn't make a request?

10       A.    No.

11       Q.    Do you know how many officers it would

12   take to secure Columbus Drive?

13           MR. SPAHR:  Objection.  Calls for

14   speculation.

15           ADMINISTRATIVE LAW JUDGE FLEMING:  Can

16   you answer?

17           THE WITNESS:  No, that would be

18   something that would need to be determined by the

19   police department.

20

21   BY MR. WILLIAMS:

22       Q.    Do you know if this were accepted as

23   the alternative route if Columbus Drive would be

24   closed?

Page 44

1        A.    Yes.  If they were going to protest --

2     if they're going to march down Columbus, then,

3     yes, it would need to be closed.

4        Q.    Okay, entire strip of the alternate

5     route would be closed?

6        A.    Yes.

7           MR. WILLIAMS:  Your Honor, nothing

8     further.

9           ADMINISTRATIVE LAW JUDGE FLEMING:  Any

10    redirect?

11          MR. WILLIAMS:  Judge, can I ask -- I'm

12    sorry, I can hear what she's saying and the

13    witness is sitting right there [inaudible] --

14          ADMINISTRATIVE LAW JUDGE FLEMING:

15    Yeah --

16          MR. WILLIAMS:  [Inaudible].

17          MS. SHEMASH:  I'm sorry.

18          MR. WILLIAMS:  I just --

19          ADMINISTRATIVE LAW JUDGE FLEMING:  I

20    could -- for the record, I couldn't hear her.

21          MS. SHEMASH:  That was not [inaudible].

22          MR. WILLIAMS:  I'm not saying you

23    intended it [inaudible].

24          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

Page 45

1          MR. SPAHR:  Okay.  On redirect.

2

3                    REDIRECT EXAMINATION

4    BY MR. SPAHR:

5          Q.    Mr Gallardo, is Columbus Drive near

6    Lake Shore Drive?

7          A.    Yes, it is.

8          Q.    Do you have any numbers as to how

9    traffic is on Lake Shore Drive?

10          A.    There's typically over what they call

11    the ADT, average daily traffic, is over 120,000.

12          Q.    And is that on a per day basis?

13          A.    Yes.

14          Q.    And is -- what direction does Lake

15    Shore Drive travel on?

16          A.    Both north and south.

17          Q.    And does Lake Shore Drive travel past

18    or towards McCormick Place?

19          A.    Yes, it does.

20          Q.    And is it your understanding that a

21    secondary venue for the Democratic National

22    Convention is the McCormick Place?

23          A.    Yes, that's my understanding.

24          Q.    Do you have any information on whether

Page 46

1    or not delegates will be using Lake Shore Drive

2    to travel to McCormick Place?

3        A.    I don't have specific routes for them.

4    But yes, if any of them are staying downtown,

5    which I imagine would likely be the case, or near

6    McCormick Place, yes, they would need to travel

7    on Lake Shore Drive or nearby streets to get to

8    either the United Center or back to their hotel

9    or back and forth between the United Center and

10   McCormick Place.

11       Q.    And you testified that you've been on

12   Columbus, correct?

13       A.    Yes.

14       Q.    And when you're on Columbus, are you

15   able to see the buildings surrounding the area?

16       A.    Yes.

17       Q.    And are there hotels along the skyline?

18       A.    Yes.

19       Q.    Now, specifically focusing on the

20   United Center, when you reviewed this in terms of

21   traffic near the United Center, are you focused

22   just on the perimeter of the United Center or do

23   you take other factors into consideration of the

24   area?

Page 47

1      A.    We have to look at the area, itself,

2   but also, you know, if we're going to be closing

3   streets, where is that traffic going to go; where

4   are pedestrians going to go, where are cars going

5   to go, where are bicycles going to go, where are

6   emergency vehicles going to go.

7      Q.    Are you aware of whether or not there

8   will need to be traffic lanes for ingress and

9   egress into the United Center?

10     A.    Yes.  I mean, they're going to have

11  thousands of individuals going to and from the

12  United Center.  So they'll have to have access to

13  that area.

14     Q.    And would alternating traffic on any of

15  the surrounding streets have an impact on

16  potential ingress and egress routes for the

17  United Center?

18     A.    Yes.

19     Q.    And to your knowledge, will there be

20  any protest zones at or around the United Center

21  on August 19, 2024?

22     A.    I know that -- I've been on various

23  meetings, but I don't have specific locations

24  that have been finalized yet on where there may

Page 48

1    or may not be protest zones.

2        Q.    Will there be areas around the United

3    Center that will need to be sectioned off in

4    terms of traffic for the Democratic National

5    Convention being hosted there?

6        A.    Yes.  There will be a perimeter from my

7    understanding.  Again, I don't have any final

8    plans, but it will -- there will be a hard

9    perimeter extending likely at least a couple

10   blocks out from the United Center in which

11   traffic with either be fully closed or at the

12   very least highly restricted.

13       Q.    And to be clear, you haven't been told

14   as to what specifically the radius of the

15   perimeter would be?

16       A.    No, I have not received any kind of

17   final confirmation as to the exact radius of that

18   footprint.

19       Q.    Okay.

20            MR. SPAHR:  No further questions.

21            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

22   Anything on that?

23            MR. WILLIAMS:  Yeah.

24

Page 49

1                    RECROSS EXAMINATION

2    BY MR. WILLIAMS:

3         Q.    Are you saying that they're allowed to

4    march on -- for this parade to march on Lake

5    Shore Drive?

6         A.    No, I did not say that.

7         Q.    Okay.  So you're still limiting it to

8    this one strip of Columbus Drive, correct?

9         A.    Yes.

10        Q.    Okay.  And on this strip of Columbus

11   Drive, if you look at City's Exhibit 6?

12        A.    Yes.

13        Q.    Okay.  And the dots designate the

14   route, correct?

15        A.    Yes, I believe so.

16        Q.    The blue dots?  Okay.  And to the east

17   of the route, that's Grant Park, right?

18        A.    Yes, that is Grant Park.

19        Q.    And south of there there's softball

20   fields?

21        A.    Yes.

22        Q.    Okay.  So there's a hill down to the

23   softball fields, right?

24        A.    I don't recall.

Page 50

1      Q.    My daughter plays lacrosse there.

2    There's a hill there.  And then you go further to

3    Lake Shore Drive, there's another hill down to

4    Lake Shore Drive, right?

5          MR. SPAHR:  Objection.  Form.

6          ADMINISTRATIVE LAW JUDGE FLEMING:

7    Overruled.

8          THE WITNESS:  Again, I don't recall.

9

10   BY MR. WILLIAMS:

11     Q.    Okay.  If you're in a car on Lake Shore

12   Drive, can you see activity on Columbus Drive?

13     A.    Yeah, we've had issues with events in

14   the past where folks will gather on Lake Shore

15   Drive because they see activity in Grant Park or

16   on Columbus Drive.

17     Q.    What -- what activity?

18     A.    Whether it's Lollapalooza, NASCAR,

19   other parades that we have on Columbus.  Folks

20   will stop and gather on Lake Shore Drive.  It has

21   happened multiple times in the past.

22     Q.    Okay.  Lollapalooza takes over the

23   whole area, including the park area; is that

24   correct?  All the way up to Michigan Avenue?

Page 51

1      A.    Yes.

2      Q.    Yeah.  Okay.  NASCAR drove through the

3   whole city, didn't it?

4      A.    No, it drove through the Grant Park

5   area.

6      Q.    Oh, so it only went on this strip of

7   Columbus Drive?

8      A.    No, other streets as well, but in the

9   immediate area, not the entire city.

10     Q.    Okay.  Then that part was blocked off,

11   it had stands, the city shut down traffic for the

12   whole downtown, right?

13     A.    In the immediate area, like on their

14   footprint.

15     Q.    Okay.  My point is that this is not

16   equivalent to NASCAR to restrict people to

17   walking only on Columbus Drive, on the street.

18   Not in the park, not all over downtown, not on

19   Michigan Avenue; isn't that correct?

20         MR. SPAHR:  Objection.  Argumentative.

21         ADMINISTRATIVE LAW JUDGE FLEMING:  It's

22   sustained.

23

24   BY MR. WILLIAMS:

Page 52

1      Q.    This is limited only -- the alternate

2    route is limited to marching only on Columbus

3    Drive, correct?

4            MR. SPAHR:  Objection.  Asked and

5    answered.

6            ADMINISTRATIVE LAW JUDGE FLEMING:

7    Sustained.

8            MR. WILLIAMS:  [Inaudible] it's like

9    NASCAR.

10            ADMINISTRATIVE LAW JUDGE FLEMING:  But

11    the question is -- the proposed route is Columbus

12    Drive.  They're not authorized to go to Grant

13    Park, go up and down the hill, or any of that

14    situation.  They're only allowed on Columbus

15    Drive.

16

17  BY MR. WILLIAMS:

18      Q.    How much traffic control does Columbus

19    Drive require as opposed to -- Columbus Drive

20    alternate route as opposed to the requested

21    route, more or less?

22      A.    It would be less.

23      Q.    And in part, that's because the

24    activity is going to be at United Center,

Page 53

1   correct; the DNC activity?

2          MR. SPAHR:  Objection to the form of the

3   question.  I didn't understand it.

4          ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah,

5   I'll sustain that.  I'm not sure the form is

6   right on that.

7

8   BY MR. WILLIAMS:

9      Q.   Okay.  The reason you're giving for the

10  more traffic control need to allow a parade

11  around United Center is because of the DNC,

12  right?

13     A.   That's one contributing factor.  But

14  the route, itself, would -- even without the

15  existence of the DNC would require more traffic

16  control.

17     Q.   Without the DNC would it require more

18  traffic control than Columbus or less?

19          MR. SPAHR:  Objection.  Relevance.

20          ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

21  I'm -- overruled.  I'm not sure where we're going

22  yet but overruled at this point.

23          THE WITNESS:  Yes.  It would still

24  require more.

Page 54

1

2    BY MR. WILLIAMS:

3        Q.    That would require more than Columbus

4    Drive.  So there's really not much required at

5    Columbus Drive.

6        A.    Well, part of the reason it was

7    selected is because it requires fewer resources.

8        Q.    Because it's set off to the side, away

9    from the United Center, correct?

10            MR. SPAHR:  Objection.  Argumentative.

11            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

12    I'll sustain that.  That's part of your argument.

13            MR. WILLIAMS:  [Inaudible].

14            ADMINISTRATIVE LAW JUDGE FLEMING:

15    Anything else?

16            MR. SPAHR:  No further questions.

17            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

18    Let's go off real quick.  We'll take about --

19

20    [OFF THE RECORD.]

21

22            ADMINISTRATIVE LAW JUDGE FLEMING:

23    Deputy, raise your right hand.

24            DEPUTY CHIEF SHEMASH:  Thank you.

Page 55

1                    ADMINISTRATIVE LAW JUDGE FLEMING:  Do

2    you solemnly swear or affirm any testimony you give

3    will be the truth?

4                    DEPUTY CHIEF SHEMASH:  Yes.

5                    MR. SPAHR:  Proceed, Judge?

6                    ADMINISTRATIVE LAW JUDGE FLEMING:

7    Proceed.

8                    MR. SPAHR:  All right.

9

10                       DIRECT EXAMINATION

11   BY MR. DIONNE:

12        Q.    Good afternoon.  Could you please state

13     your name, spelling it for the record?

14        A.    Gabriella Shemash, last name is

15     S-H-E-M-A-S-H.

16        Q.    And who is your current employer?

17        A.    Chicago Police Department.

18        Q.    How long have you worked for the

19     Chicago Police Department?

20        A.    22 years.

21        Q.    What is your current position with CPD?

22        A.    I'm a Deputy Chief of Area 3 Patrol.

23        Q.    All right.  And how long have you held

24     that position?

Page 56

1          A.      Since December of 2021.

2          Q.      Where is Area 3?

3          A.      Physically it's at Belmont and Western

4     and encompasses four districts, the 12th, 19th,

5     20th, and 24th Districts.

6          Q.      And where are those districts located

7     roughly?

8          A.      Anywhere from -- south from Pilsen all

9     the way up to the Evanston border.

10         Q.      What is your role as Deputy Chief of

11    the Chicago Police Department?

12         A.      I oversee the patrol op, day-to-day

13    patrol operations of those four districts.

14    Anything that happens in them, including events.

15         Q.      What is included in day-to-day

16    operations?

17         A.      Oversight of police officers,

18    sergeants, lieutenants.

19         Q.      Approximately, how many officers,

20    sergeants, and lieutenants do you oversee?

21         A.      Approximately 1,200.

22         Q.      And what are those individuals tasked

23    with in this district?

24         A.      Patrol operations.  So answering 911

Page 57

1    calls, in-progress calls, [inaudible]

2    disturbances, arrests, et cetera.

3        Q.    Do you also oversee any large city

4    events?

5        A.    Yes.

6        Q.    Which ones?

7        A.    Anything that happens in the area.  And

8    a couple of the larger ones are Pride Parade in

9    the 19th District and Puerto Rican Festival and

10   Parade in the 12th District.

11       Q.    What do you have to do for these other

12   events?

13       A.    Ensure we have the appropriate

14   resources in terms of personnel and equipment for

15   all of them.

16       Q.    What types of equipment do you use

17   here?

18       A.    Equipment for the officers, radios,

19   body cams, vehicles, and equipment for road

20   closures, such as barricades, fencing, irons, et

21   cetera.

22       Q.    How does the Democratic National

23   Convention compare to some of these other events

24   you've overseen?

Page 58

1      A.    It will be larger than our typical

2   events.

3      Q.    And have you been tasked with working

4   on the DNC?

5      A.    Yes.

6      Q.    What is your specific role for the DNC?

7      A.    So anything -- United Center falls in

8   the 12th District, so anything outside of the

9   United Center and its perimeter falls to me.

10     Q.    What has CPD been called upon to do

11  while the DNC is in Chicago?

12     A.    To secure anything outside that

13  perimeter, ensure the public safety of everybody

14  around the event, as well as the safety of the

15  dignitaries going to and from their venues and

16  the event spaces.

17     Q.    And you just mentioned perimeter.  What

18  are you referring to when you said perimeter?

19     A.    The secure perimeter of the United

20  Center.  Anything outside that will fall to CPD.

21     Q.    When did you start working on this

22  event?

23     A.    January of 2023.

24     Q.    And what are the dates of the DNC in

Page 59

1    Chicago?

2        A.    August 19th through the 22nd.

3        Q.    What are the primary locations for the

4    DNC?

5        A.    United Center and McCormick Place.

6        Q.    Generally speaking, what will the

7    Chicago Police Department's role be while the DNC

8    is in Chicago?

9        A.    Safety of everything outside of those

10   two venues.

11       Q.    Does that include motorcades?

12       A.    Yes.

13       Q.    Is CPD also tasked with any kind of

14   security details?

15       A.    Yes.  We will have dignitary protection

16   for the dignitaries.

17       Q.    What role to you have in safe travel

18   routes?

19       A.    Just securing the motorcade routes from

20   the venues, from any hotels or venues, event

21   spaces, as well as public transit.

22       Q.    I'm going to switch gears for a second

23   and just talk about other large events that are

24   in Chicago.  Are you aware of when the Air and

Page 60

1    Water Show is typically held in Chicago?

2        A.    It's typically held during the week the

3    DNC is this year.

4        Q.    All right.  Is it also being held

5    during that time this year?

6        A.    It is not.  It's being moved to the

7    10th and 11th of August.

8        Q.    Do you know why it's being moved to

9    those dates?

10       A.    Because the police department does not

11   have the resources to ensure the safety of

12   individuals attending that event due to them

13   being utilized at DNC.

14       Q.    And what kind of resources are we

15   talking about here?

16       A.    Personnel, vehicles, barricade

17   equipment, street closure equipment.

18       Q.    Are you aware of if this event's been

19   rescheduled?

20       A.    Yes, it's been rescheduled to the 10th

21   and 11th of August.

22       Q.    And why was that?

23       A.    Not during the DNC so that we will have

24   adequate resources for it to take place.

Page 61

1      Q.    What about the start of Chicago public

2   schools this year?

3      A.    It's been postponed one week.

4      Q.    Why was that postponed by a week?

5      A.    Typically, during first week, we

6   perform safe passage or we have police and

7   resources on safe passage routes so that kids can

8   get to and from school safely.  And during DNC we

9   will not have the personnel available to do that.

10      Q.    Besides personnel, are there any other

11   resources that are in consideration for the safe

12   travel routes?

13      A.    Yes.  Vehicles and the equipment for

14   the officers and body cams, radios.

15      Q.    Now, going back to the Democratic

16   National Convention, do you know what a national

17   special security event is?

18      A.    Yes.

19      Q.    What is it?

20      A.    It's an event designated by the

21   Department of Homeland Security as a

22   significant -- a nationally significant event

23   that draws extra security due to possible

24   terrorist activity or criminal activity around

Page 62

1    it.

2         Q.    To your knowledge is the DNC considered

3    an NSSE event?

4         A.    Yes.

5         Q.    How did you find that out?

6         A.    Through the Secret Service.

7         Q.    Do you recall who, specifically, at the

8    Secret Service told you about this?

9         A.    I do not.

10        Q.    Was it an agent from the Secret

11   Service?

12        A.    Yes.

13        Q.    So what is required of CPD during a

14   designated NSSE event?

15        A.    Just to provide extra security around

16   the event.

17        Q.    What date do you have to start

18   deploying CPD resources in anticipation of this

19   event?

20        A.    It will likely be up to a week prior to

21   the event.

22        Q.    And do you have an idea when these

23   special deployments will end?

24        A.    Sometime a couple days after the event.

Page 63

1      Q.    Do you know why it's going to be

2   lasting until a couple days after?

3      A.    Yes.  We still have to maintain

4   security while Secret Service takes down the

5   event and any fencing, any infrastructure they've

6   put in place for the event.

7      Q.    During this time, how many officers

8   from CPD will be required to accomplish the

9   directives?

10     A.    Thousands.

11     Q.    During this time, are officers

12  permitted vacations?

13     A.    No.

14     Q.    Are officers in CPD allowed furlough

15  during this time?

16     A.    No.

17     Q.    What about officer trainings?

18     A.    Training has been cancelled during that

19  time frame.

20     Q.    Will detectives also be tasked to

21  working this event?

22     A.    Yes.

23     Q.    Do you know what their assignments are

24  going to be generally?

Page 64

1    A.    Dignitary protection.

2    Q.    Are officers going to be tasked and

3    assigned to the Chicago Transit Authority?

4    A.    Yes.

5    Q.    What, specifically, will be their

6    assignments for that?

7    A.    To secure the trains, buses, as well as

8    the platforms.

9    Q.    How are officers being deployed on

10   barricaded streets?

11   A.    There'll be either full closures or

12   partial closures intermittent depending on what

13   type of closure needs to be put on the street.

14   Q.    Is CPD working with any other local or

15   federal agencies in anticipation of this event?

16   A.    Yes.  The State Police, Cook County

17   Sheriff's, some surrounding suburbs, and Secret

18   Service.

19   Q.    And what, exactly, are you doing to

20   work along with those other agencies?

21   A.    Just meeting and coordinating with them

22   to make sure that we're all on the same page.

23   Q.    Does the Secret Service direct the

24   Chicago Police Department on how to deploy its

Page 65

1    resources?

2         A.    No.

3         Q.    Do any other local or federal agencies

4    make that direction on how to deploy CPD

5    resources?

6         A.    No.

7         Q.    Whose decision is it as to how to

8    deploy those CPD resources?

9         A.    The CPD.

10         Q.    Are you currently aware as to how many

11    people will be coming to Chicago during the DNC?

12         A.    Anticipating over a million.

13         Q.    And are those people coming and going

14    during the entirety of the event?

15         A.    Yes.

16         Q.    Do you have an anticipation or number

17    of how many delegates will be arriving in

18    Chicago?

19         A.    About 135 heads of state, and tens of

20    thousands of delegates with them.

21         Q.    Are you anticipating either the

22    President or Vice President also attending the

23    DNC?

24         A.    They will both be in attendance.

Page 66

1     Q.    General speaking, how large of an event

2     is this for all of Chicago?

3     A.    It's the largest that I will have seen

4     in my 22-year career.

5     Q.    In your career, have you worked other

6     large scale events?

7     A.    I've worked the Pride Parade, would be

8     the largest parade.  Puerto Rican Fest.

9     Q.    And how does the DNC compare to these

10    other parades that you've been a part of?

11    A.    This will be significantly larger.

12    Q.    I want to move on, now, to parade

13    application requests more generally.  How does --

14    how do you receive a parade application request?

15    A.    From the Chicago Police Department

16    Special Events Section.

17    Q.    All right.  Is that from a specific

18    person or through something else?

19    A.    Just through e-mail from the unit.

20    Q.    And when you receive an application

21    request, generally, who, if anybody, do you

22    contact?

23    A.    The commander of the district in which

24    the event is occurring.

Page 67

1        Q.    Is that one specific commander or does

2    it vary by location?

3        A.    It varies by location.

4        Q.    And do you overlook or look at the

5    route that's proposed in an application?

6        A.    Yes.

7        Q.    All right.  What do you do once you've

8    looked at that route?

9        A.    I look at the route, also the time, the

10   day of the week, the time of day, and make a

11   determination as to whether it's feasible for the

12   resources we have to handle it.  Or if it's

13   something that would require an outside resource

14   request.

15       Q.    As part of that resource analysis, does

16   that include how many officers it might take?

17       A.    Yes.

18       Q.    And other equipment?

19       A.    Yes.

20       Q.    What are some of those other pieces of

21   equipment from CPD or resources that would be

22   anticipated?

23       A.    Vehicles, radios, body cameras.

24       Q.    Now, you said that you may contact

Page 68

1    other city departments depending upon the size

2    and scale?

3         A.    Correct.

4         Q.    All right.  And what is that

5    determination -- sorry, strike that.

6               Who would you contact if you determine

7    you had to contact another department?

8         A.    OEMC, Streets and Sanitation, fire

9    department.

10        Q.    And why would you contact those other

11   resources?

12        A.    To get resources such as barricades,

13   irons, traffic cones, type 3 barricades.

14        Q.    Is CPD then tasked with coordinating

15   all those other departments?

16        A.    Yes.

17        Q.    And what's their specific role then if

18   required to do so?

19        A.    Just have a meeting and make sure that

20   everybody else also has the resources that we

21   deem necessary to get -- to ensure public safety

22   at an event.

23        Q.    Now, you mentioned that you have prior

24   experience working on parades that have used the

Page 69

1    public way.

2         A.    Yes.

3         Q.    Approximately how many?

4         A.    Approximately a dozen.

5         Q.    And have you dealt with parades of the

6    kind in the Petitioner's application here today?

7         A.    Yes.

8         Q.    Are you aware of the types of CPD

9    resources it would take to allow for these types

10   of parades?

11        A.    Yes.

12        Q.    So let's look, actually.  I put in

13   front of you what's previously been entered as

14   City's Group Exhibit 3A through C.  Do you

15   recognize what's in front of you?

16        A.    Yes.

17        Q.    All right.  And were you given a copy

18   of the Petitioner's parade that was submitted on

19   February 29, 2024?

20        A.    Yes.

21        Q.    Do you recall when you received this?

22        A.    It was several weeks ago.

23        Q.    And do you recall by whom you received

24   it?

```
                                                   Page 70
 1        A.    From the Chicago Police Department's

 2   Special Events Section.

 3        Q.    When you received it, did you have an

 4   opportunity to review it?

 5        A.    Yes.

 6        Q.    And looking at that application, what

 7   was the requested date of this parade?

 8        A.    This is the 19th of August 2024.

 9        Q.    And what's the assembly time?

10        A.    11:00 a.m.

11        Q.    The start time?

12        A.    12:00 p.m.

13        Q.    End time?

14        A.    2:15 p.m.

15        Q.    And disbursement time?

16        A.    3:00 p.m.

17        Q.    Is there an estimated number of

18   participants for this parade?

19        A.    Yes.  5,000.

20        Q.    And is there a proposed route for this

21   parade?

22        A.    Yes.

23        Q.    What is that route?

24        A.    The route begins at Union Park, goes
```

Page 71

1      west on Washington Boulevard until Western.  At

2      Western Avenue it goes south until Jackson.  At

3      Jackson, it turns east.  On Jackson it goes east

4      until Ashland and then northbound on Ashland

5      returning to Union Park.

6           Q.   Are you familiar with this area of the

7      city?

8           A.   Yes.

9           Q.   And how are you familiar with it?

10          A.    It's entirely in the 12th District.  I

11     was the commander there for approximately two

12     years prior to my current assignment.

13          Q.   Would you please describe what Union

14     Park is like at this location?

15          A.   Sure.  Quite a large park, mostly

16     grass, a field house, has several baseball

17     diamonds, tennis courts, sports areas.

18          Q.   And how about Washington Boulevard,

19     could you please describe that street?

20          A.    Sure.  It's a one-way going westbound,

21     west of Union Park.  And it's eastbound going

22     east of Union Park.  In this case, the westbound

23     lanes, primarily residential and then passes the

24     United Center to the north.

Page 72

1        Q.    So the United Center is south of

2    Washington at this location?

3        A.    Correct.

4        Q.    Can you next describe Western Avenue?

5        A.    A large thoroughfare, runs north south,

6    has two lanes of traffic on each side and a

7    parking lane.

8        Q.    And Jackson Boulevard?

9        A.    Jackson Boulevard is an one-way street

10   going eastbound, primarily there's some schools,

11   some residences, and it encompasses Malcolm X

12   College just to the north of it.

13       Q.    And finally, can you describe Ashland

14   Avenue?

15       A.    Ashland is another major thoroughfare,

16   runs north south, two lanes of traffic in each

17   way and a parking lane.  Also a thoroughfare to

18   our medical district.

19       Q.    And the medical district you just

20   mentioned, where is that in relation to this

21   proposed route?

22       A.    Just south of this.

23       Q.    Is the United Center encompassed by

24   this proposed route?

Page 73

1       A.    Yes.

2       Q.    And what kind of resources,

3    officer-wise, would it require to secure this

4    proposed route?

5       A.    This would take hundreds of officers.

6       Q.    Why would it take hundreds of officers?

7       A.    It's almost a three-mile route and it

8    would require us to close at least 30 major

9    intersections, as well as additional minor

10   arterial streets and alleyways.

11      Q.    When you say "close the street," would

12   that just be -- would you have to close all

13   directions of traffic for this proposed route on

14   these streets?

15      A.    Yes.

16      Q.    Why?

17      A.    With a group of 5,000 walking through

18   the streets, we'd have to make sure there was no

19   traffic that would drive into this parade.

20      Q.    And you also mentioned arterial

21   streets.  Could you elaborate on that?

22      A.    Sure.  The small streets or driveways,

23   alleyways, the people will inevitably try to

24   bypass road closures to get around.  We'd still

Page 74

1    have to station officers there and/or barricades

2    there to ensure that traffic doesn't drive into

3    the parade.

4        Q.    Approximately, how many other streets

5    besides the four on this application would have

6    to be closed to secure this route?

7        A.    I estimate approximately 30, a little

8    over 30 major intersections.

9        Q.    And do you know what a security

10   perimeter is?

11       A.    Yes.

12       Q.    Does a security perimeter exist at or

13   near the location of the United Center?

14       A.    It will, yes.

15       Q.    It will.  So what does that mean,

16   exactly?

17       A.    During the DNC there will be secure

18   perimeter.

19       Q.    Is that around the United Center?

20       A.    Yes.

21       Q.    Do you know how large the secure

22   perimeter is going to be at this point?

23       A.    I don't know exactly, but it will

24   likely extend a few blocks in every direction

Page 75

1    from the United Center.

2        Q.    And every direction being north, east,

3    south, and west?

4        A.    Yes.

5        Q.    All right.  And who is going to inform

6    you as to what that perimeter is going to be?

7        A.    Secret Service.

8        Q.    And at this point, have they informed

9    you of that?

10       A.    No.

11       Q.    So based upon the Petitioner's

12   application, was there recommendation was made?

13   Excuse me.  Was there a recommendation made?

14       A.    Yes.

15       Q.    And who made that recommendation?

16       A.    I did.

17       Q.    And what recommendation did you make?

18       A.    That it should be denied.

19       Q.    And what was that denial recommendation

20   based upon?

21       A.    It based upon the day and time in

22   question.  It coincides with the DNC where our

23   resources already for tasks related to DNC, as

24   well as the streets -- the route this is on, the

1    likelihood is that much of it will be within the

2    secure perimeter.  And both pedestrian and

3    vehicle traffic will not be allowed.

4        Q.    Was that recommendation also based upon

5    any proximity to the medical district?

6        A.    Well, Ashland Avenue, yes.  Any closure

7    on Ashland does affect, potentially, emergency

8    vehicles going to emergency rooms at several

9    hospitals.

10       Q.    Did the time of this proposed parade

11   affect your determination?

12       A.    It is in the middle of the day, so yes.

13   I mean, there's always heavy traffic in the area,

14   but it will be especially heavier traffic due to

15   DNC.

16       Q.    And what about the amount of people

17   anticipated for this parade?

18       A.    Yes, 5,000, that's a lot of

19   participants.

20       Q.    Did CPD or yourself anticipate more

21   than the 5,000 or less than 5,000?

22       A.    We always anticipate that there could

23   be more.

24       Q.    Why do you anticipate that there could

Page 77

1    be more?

2        A.    So that we can have the adequate

3    resources if needed.

4        Q.    So going back to the streets, you said

5    that Ashland and Western are major north south

6    roads?

7        A.    Yes.

8        Q.    And why can't CPD close off Ashland

9    specifically?

10       A.    That's the major thoroughfare right

11   into the medical district, several hospitals and

12   their emergency rooms.  So any ambulance coming

13   from the north could possibly be coming down

14   Ashland.

15       Q.    And what about for Western?

16       A.    The same goes for Western, it's a

17   little bit west of the medical campus, but still

18   leads to the general area.

19       Q.    Deputy Chief, what is a security

20   bubble, if you know?

21       A.    I don't know what a security bubble is.

22       Q.    What about a secure footprint?

23       A.    Yes.

24       Q.    What is a secure footprint?

Page 78

1       A.      It's an area designated by either the

2    police department or, in this case, Secret

3    Service that determines what can and cannot come

4    out of that.  So whether that be pedestrians,

5    vehicles, et cetera, or would require people to

6    be subject to search if entering the perimeter.

7       Q.      Is the United Center during this time

8    going to be part of a secure footprint?

9       A.      Yes.

10      Q.      And who is in charge of setting up the

11   perimeter of this footprint?

12      A.      The Secret Service.

13      Q.      Do you know what that entails?

14      A.      I know they do a blast assessment, but

15   I don't know how they make their final

16   determination.

17      Q.      Is CPD going to be part of this

18   footprint?

19      A.      I don't know.

20      Q.      Do you have an anticipation of how many

21   officers are going to be needed to secure the

22   area around the United Center at this time?

23      A.      Likely be hundreds if not thousands.

24      Q.      And besides officers, what other

Page 79

1    resources are going to required of CPD at this

2    time in that area?

3        A.    Keeping motorcade routes clear and then

4    actually assisting motorcades, taking them to and

5    from hotels, venues, event spaces.

6        Q.    Did you do an analysis as to how many

7    officers, roughly, it would take to secure the

8    proposed route on this application?

9        A.    Yes.

10       Q.    And do you have a rough figure as to

11   just the officers that would be required?

12       A.    It would take a couple hundred.

13       Q.    In anticipation just to the bodies,

14   what, if any, other resources would be required?

15       A.    Vehicles, equipment for every officer

16   on the route, and barricades.

17       Q.    Approximately how many vehicles, do you

18   believe?

19       A.    I don't know.  I didn't do a vehicle

20   analysis in depth.

21       Q.    Now, after you made this determination,

22   did you report it?

23       A.    Yes.

24       Q.    And who did you report that to?

Page 80

1          A.     To Commander Giltmier.

2          Q.     And after Commander Giltmier got that

3     determination, do you know where it went next?

4          A.     To the Chicago Police Department

5     Special Events Section.

6          Q.     And do you know where it goes from

7     there?

8          A.     To the Chicago Department of

9     Transportation.

10         Q.     And do you know if it goes to any

11    specific person at the Chicago Department of

12    Transportation?

13         A.     I do not.

14         Q.     But it does go to the Department of

15    Transportation, to your knowledge?

16         A.     Yes.

17         Q.     Now, Deputy Chief, are you aware of an

18    alternate parade route that was proposed?

19         A.     Yes.

20         Q.     All right.  Do you know what that

21    alternative route is?

22         A.     Columbus, between Roosevelt and

23    Jackson.

24         Q.     Do you happen to know why that route

Page 81

1    was chosen?

2       A.    Yes.  It's downtown, it's highly

3    visible, and it's much less manpower-intensive

4    for us to provide closures for.

5       Q.    Why is it much less manpower-intensive?

6       A.    It's shorter and it's one straight

7    route.

8       Q.    In addition to requiring fewer

9    officers, does it require fewer other resources

10   from CPD?

11      A.    Yes.  It would require less vehicles,

12   less equipment, less barricades, and it's also

13   not near any hospitals.

14      Q.    Besides providing all of this while the

15   DNC is in Chicago, what else is CPD responsible

16   at the same time?

17      A.    Maintaining public safety in all of our

18   districts and responding to over 20,000 911 calls

19   per day.

20      Q.    And is that all throughout the city

21   limits of Chicago?

22      A.    Yes.

23           MR. DIONNE:  Judge, nothing further at

24   this time.  We tender the witness.

Page 82

1          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

2     Cross?

3          MR. WILLIAMS:  Okay.

4

5               CROSS EXAMINATION

6     BY MR. WILLIAMS:

7          Q.    Thank you.  Good afternoon.

8          A.    Good afternoon.

9          Q.    It sounds like a lot work to

10     accommodate the DNC, is that correct?

11         A.    Yes.

12         Q.    Okay.  Why not just shut down all

13     parades, marches, and protests during that

14     period?

15              MR. DIONNE:  Objection.  Argumentative.

16              ADMINISTRATIVE LAW JUDGE FLEMING:

17     Sustained.

18

19     BY MR. WILLIAMS:

20         Q.    Would you recommend that the City shut

21     down all marches, protests, and parades during

22     that period of time?

23              MR. DIONNE:  Objection.  Relevance.

24              ADMINISTRATIVE LAW JUDGE FLEMING:

Page 83

1    Sustained.  It's a recommendation and she may

2    have personal feelings one way or the other, but

3    that's not what we're dealing with here.

4               MR. WILLIAMS:  But she's made a

5    recommendation about approving a parade.

6               ADMINISTRATIVE LAW JUDGE FLEMING:  About

7    this particular parade.  But you're asking about

8    parades in general.  Again, the fact --

9               MR. WILLIAMS:  Nothing different than

10   esteemed counsel here asking parade applications

11   in general.  He asked.

12              ADMINISTRATIVE LAW JUDGE FLEMING:  No.

13   I don't see it that way, I'm sorry.  I thought

14   the question was directed as to whether the

15   deputy felt that there basically shouldn't be any

16   parades during the DNC.  And maybe she does, but

17   that's not relevant to this case.

18              MR. WILLIAMS:  Okay.

19

20   BY MR. WILLIAMS:

21       Q.    You testified about parade applications

22   in general, correct, and you were asked about

23   that?

24       A.    Sure, yes.

Page 84

1     Q.   Do you make recommendations on parade

2   applications?

3     A.   Yes.

4     Q.   Given all that you testified has to

5   happen during the DNC, is it your recommendation

6   that no parades, marches, or protests be held in

7   Chicago during the DNC?

8         MR. DIONNE:  Objection.  Relevance.

9         ADMINISTRATIVE LAW JUDGE FLEMING:

10   Again, where's the relevance?

11         MR. WILLIAMS:  Well, this is a parade

12   application.  She is recommending it not be held

13   [inaudible] United Center.

14         ADMINISTRATIVE LAW JUDGE FLEMING:  Based

15   upon the specific factors that she enumerated.

16   But again, I don't feel these questions are

17   relevant to this particular case.

18

19  BY MR. WILLIAMS:

20     Q.   Do you believe citizens in Chicago have

21   the right to exercise First Amendment

22   [inaudible].

23         MR. SPAHR:  Objection, Judge.

24   Relevance.

Page 85

1          ADMINISTRATIVE LAW JUDGE FLEMING:

2    Sustained.

3

4    BY MR. WILLIAMS:

5          Q.    Did you take into consideration the

6    First Amendment rights of Chicago citizens

7    [inaudible] recommending the parade route not be

8    approved?

9          A.    Yes.  I always take that into

10   consideration.

11         Q.    And what did you consider?

12         A.    I consider whether or not we can ensure

13   the safety of citizens while they exercise those

14   rights.

15         Q.    And you determined that the CPD could

16   not for the proposed route?

17         A.    That's correct.

18         Q.    Were you asked to consider alternate

19   routes?

20         A.    I gave an alternate route.

21         Q.    Did you provide the route on Columbus

22   Drive, the alternate route?

23         A.    I was given that route as an option and

24   it was provided.

Page 86

1          Q.    Did you consider anything -- any other

2     alternate route within three miles of the United

3     Center?

4          A.    It was not presented to me as an option

5     to do so.  We were --

6          Q.    So you weren't given an option to

7     consider any alternative route?

8               MR. DIONNE:  Objection.

9               ADMINISTRATIVE LAW JUDGE FLEMING:  I

10    think that's unclear.  Because I took it as the

11    Deputy was not given the option of herself

12    proposing routes.

13              THE WITNESS:  Correct.

14              ADMINISTRATIVE LAW JUDGE FLEMING:

15    You're -- there's an assumption that that's part

16    of her responsibility that I didn't pick up.

17              MR. WILLIAMS:  No, I think I asked -- I

18    agree that's the answer she gave.  And that's

19    what I was trying to get at.

20

21    BY MR. WILLIAMS:

22         Q.    So the only alternate you were

23    presented with and asked to give an opinion about

24    was the one on Columbia Drive; is that correct?

Page 87

1      A.    Correct.

2      Q.    Do you believe there could be other

3   alternates closer to United Center?

4           MR. DIONNE:  Objection.  Call for

5   speculation.

6           ADMINISTRATIVE LAW JUDGE FLEMING:

7   Sustained.

8

9   BY MR. WILLIAMS:

10     Q.    Do you know why you were not asked?

11          MR. DIONNE:  Objection.  Calls for

12   speculation.

13          ADMINISTRATIVE LAW JUDGE FLEMING:

14   Sustained.

15

16   BY MR. WILLIAMS:

17     Q.    You said you were given the permit

18   application, City's Exhibit 3A through 3C, by the

19   police department special events; is that right?

20     A.    Correct.

21     Q.    Okay.  Were you given that by e-mail?

22     A.    Yes.

23     Q.    And what were you asked to do?

24     A.    To review the application.

Page 88

1          Q.    And specifically, what were you asked

2     to do?

3          A.    We review the application and determine

4     whether or not we have any objections.

5          Q.    And who is we?

6          A.    We, I.  And I always confer with the

7     District Commander.

8          Q.    Okay.  And you testified that there

9     would be hundreds, if not thousands of police

10    officers around the United Center during the DNC;

11    is that correct?

12         A.    Correct.

13         Q.    So if there were a parade nearby the

14    United Center there would already be a pretty

15    large police force directing traffic, is that

16    right?

17              MR. DIONNE:  Objection, Judge.  Improper

18    hypothetical.

19              ADMINISTRATIVE LAW JUDGE FLEMING:  It's

20    sustained.  I mean, she's testified there's

21    policemen in the area, but rephrase it if you

22    want to try.

23

24    BY MR. WILLIAMS:

Page 89

1      Q.    Would the thousand or so police

2   officers in the area be directing traffic in

3   part, some of them?

4      A.    They will have tasks that will be

5   specific to the DNC at any given time.

6      Q.    Including directing traffic?

7      A.    Possibly.

8      Q.    Okay.  Including blocking

9   intersections?

10      A.    At times.

11      Q.    Okay.  When you look at City's

12   Exhibit 4, the proposed route and the

13   application, you understand this is a -- the

14   proposal is to have a march, correct?

15      A.    Yes.

16      Q.    And by march, it indicates that they

17   will continue to move; is that right?

18      A.    Yes.

19      Q.    Okay.  And so the crowd would not be in

20   all the way around this route at the same time.

21          MR. DIONNE:  Objection, Judge.  It calls

22   for speculation.

23          ADMINISTRATIVE LAW JUDGE FLEMING:  No.

24   I think I see where he's going but overruled.

Page 90

1    You can answer.

2         THE WITNESS:  Well, they likely wouldn't

3    be -- yes, around the entire thing at the same

4    time.

5

6  BY MR. WILLIAMS:

7       Q.   So in other words, I mean, just

8    specifically when they were marching down

9    Western, they wouldn't be on Ashland, right?

10      A.   That's assuming the group stays

11   together.  It's also assuming they can get from

12   one place to the other.  Because likely they

13   won't be able march through portions of this due

14   to the perimeter being in effect.

15      Q.   Okay.  I'm going to refer to the

16   section of Ashland on this map and a section of

17   Western on this map.  Okay.  So when I say

18   Ashland and Western, just talking about this

19   section.

20      A.   Uh-huh.

21      Q.   Are you aware of this section of

22   Ashland ever being shut down for anything; a

23   parade, a marathon, a march, anything?

24        MR. DIONNE:  Objection.  Relevance.

Page 91

1          ADMINISTRATIVE LAW JUDGE FLEMING:

2     Overruled.  If she knows.

3          THE WITNESS:  I know it's been

4     temporarily shut down if there's an emergency.

5     But we always move swiftly to clear it due to its

6     proximity to the hospital district.

7

8  BY MR. WILLIAMS:

9        Q.    Okay.  But never for an event?

10       A.    To my knowledge, no.

11       Q.    Okay.  So this concern about Ashland

12    and the medical district, that concern is all the

13    time, correct?

14       A.    Yes.  It's always next to the medical

15    district.

16       Q.    It's not just associated with the DNC

17    event, correct?

18       A.    Correct.

19       Q.    Okay.  Have you ever permitted a march

20    on Ash -- this section of Ashland Avenue?

21          MR. DIONNE:  Objection.  Relevance.

22          ADMINISTRATIVE LAW JUDGE FLEMING:  Well,

23    I'll sustain the objection because it assumes,

24    first of all that she was ever asked to approve a

Page 92

1    march on Ashland Avenue.

2            MR. WILLIAMS:  I'll ask that --

3            ADMINISTRATIVE LAW JUDGE FLEMING:  I'm

4    mean, you're pulling it out, so yeah.  And it

5    also, again, assumes whether the deputy has the

6    authority now.  Once we -- the situation would be

7    what has she ever recommended or approved, make a

8    recommendation in favor of a march in that area.

9

10   BY MR. WILLIAMS:

11       Q.    Have you ever been asked to allow a

12   group to march on Ashland Avenue?

13       A.    By permit, no.

14       Q.    Have you ever been asked at all?

15       A.    No.  Have I been asked by a permit or

16   asked?  No.  However, have protesters done it?

17   Yes.  Not with my permission or recommendation.

18       Q.    Have you ever agreed that protesters

19   could march on half of Ashland Avenue

20   [inaudible].

21       A.    Not agreed to it.  What -- we've had

22   protesters that were marching on Ashland so we

23   had to kind of, on the fly, make amended street

24   closures for the safety of people on that street.

Page 93

1    But it was never anything that I would,

2    personally, recommend or advocate for.

3            Sometimes protesters do -- unpermitted

4    protesters do what they want to do and we can't

5    let them get run over by vehicular traffic.  So

6    we have to make decisions on the fly.

7            But had I ever seen a permit or written

8    request for the use of Ashland, I would never

9    consider closure, whether it be partial or full.

10       Q.   When -- you testified you're involved

11   in other events that occur in Chicago; is that

12   correct?

13       A.   Correct.

14       Q.   Permitted events, correct?

15       A.   Permitted and unpermitted.

16       Q.   Okay.  If there is a -- for example,

17   the Chicago Marathon, by definition goes 26.3

18   miles, I believe, through the City of Chicago; is

19   that correct?

20            MR. DIONNE:  Objection as to relevance.

21   It's not a question, Judge.

22            ADMINISTRATIVE LAW JUDGE FLEMING:  I

23   overrule --

24            MR. WILLIAMS:  Judge, I just want to

Page 94

1      establish that they can close streets and then

2      open them.  Because if it's a moving target they

3      can close and open.  They do it all the time for

4      the Chicago Marathon, Bike the Ride, you name it,

5      they can close and open streets.

6              ADMINISTRATIVE LAW JUDGE FLEMING:  Who

7      is "they?"

8              MR. WILLIAMS:  The City.  The witness.

9              ADMINISTRATIVE LAW JUDGE FLEMING:

10     You're dealing with the police officers.

11             MR. WILLIAMS:  Yes, the witness.

12             ADMINISTRATIVE LAW JUDGE FLEMING:  So

13     the --

14             MR. WILLIAMS:  She testified to his

15     questions that she's been involved in these for

16     three years.

17             ADMINISTRATIVE LAW JUDGE FLEMING:  I'll

18     let you try and do it, but I -- well, proceed and

19     we'll see where we go.  And at any time that you

20     don't understand, you can ask him to rephrase.

21             THE WITNESS:  So can you please ask the

22     question one more time?

23

24   BY MR. WILLIAMS:

Page 95

1      Q.    If you have a permitted event that is

2      moving, you can close streets and then when the

3      event passes open them up, correct?

4            MR. DIONNE:  Objection as to vagueness,

5      then, Judge.

6            ADMINISTRATIVE LAW JUDGE FLEMING:

7      Again, she can -- I didn't mean to [inaudible].

8            THE WITNESS:  All right.  Assuming that

9      we have the personnel and the vehicles and the

10     equipment to do so, then yes, it's possible.

11

12     BY MR. WILLIAMS:

13     Q.    Okay.  It happens all the time in

14     Chicago, right?

15     A.    Sure, it's like something for the

16     marathon.  That's makes sense.

17     Q.    I went to the Irish parade the other

18     day, right?  All the time.  And you testified

19     there'd be thousands of police officers around

20     United Center?

21     A.    Yes.

22     Q.    Would most of those officers have

23     vehicles.

24     A.    I don't know.

Page 96

1      Q.    Okay.  Did you provide any kind of

2    traffic analysis around -- to the Chicago

3    Department of Transportation around the United

4    Center?

5      A.    No.

6      Q.    Okay.  It's been a while since

7    Chicago's hosted a Democratic National

8    Convention, right?

9      A.    Yes.

10     Q.    '68 was the last time.

11          MR. DIONNE:  Objection.  Relevance.

12          ADMINISTRATIVE LAW JUDGE FLEMING:

13    Sustained.  '96.

14          MR. WILLIAMS:  Was it '96?  [Inaudible].

15          ADMINISTRATIVE LAW JUDGE FLEMING:  Bill

16    Clinton.

17          MR. WILLIAMS:  Okay.  All right.

18    [Inaudible].

19

20  BY MR. WILLIAMS:

21     Q.    Do you ever reach out -- does the

22    police department, Chicago Police Department, to

23    your knowledge, ever reach out to other cities to

24    get advice on conducting the Democratic National

Page 97

1    Convention?

2         MR. DIONNE:  Objection.  Relevance.

3         ADMINISTRATIVE LAW JUDGE FLEMING:  Yes.

4    It's sustained.  You could ask -- I suppose you

5    could ask the deputy if she in her capacity in

6    planning has reached out, but that might be

7    irrelevant, too.  But you could ask it.

8

9  BY MR. WILLIAMS:

10        Q.    Have you ever reached out to New York

11   to ask where they allow protests if conventions

12   were held in Madison Square Garden?

13        MR. DIONNE:  Objection.  Relevance.

14        ADMINISTRATIVE LAW JUDGE FLEMING:

15   Overruled.

16        THE WITNESS:  No.

17

18  BY MR. WILLIAMS:

19        Q.    Did you reach out to any other city

20   agencies to get information about the request

21   [inaudible] parade route?

22        A.    No.

23        Q.    So the recommendation you made was

24   based just on Chicago Police Department?

Page 98

1        A.      Correct.

2        Q.      And who did you give that

3    recommendation to?

4        A.      Commander Giltmier.

5        Q.      Okay.  And how did you give that

6    recommendation to Commander Giltmier?

7        A.      We spoke.

8        Q.      And what did you say?

9        A.      That I recommend that the permit be

10   denied based on what I've already testified to.

11       Q.      You told her that verbally?

12       A.      Yes.

13       Q.      How long was that conversation?

14       A.      I don't know.

15       Q.      You told her all the things you said

16   today?

17       A.      Yes.

18       Q.      Did you provide her anything in

19   writing?

20       A.      No.

21       Q.      And did you ever speak to anyone in the

22   Chicago Department of Transportation?

23       A.      No.

24       Q.      Do you know what information was

Page 99

1    relayed from CPD to the Chicago Department of

2    Transportation?

3        A.    Just Commander Giltmier's objection

4    letter.

5        Q.    And do you know what was in the

6    objection letter?

7        A.    I don't recall without looking at it.

8        Q.    Do you know if there were specific

9    bases for objecting?

10       A.    I don't.

11       Q.    Do you know if Commander Giltmier

12   recommended any other areas closer to the United

13   Center than Columbus Drive?

14            MR. DIONNE:   Objection.   Calls for

15   speculation.

16            ADMINISTRATIVE LAW JUDGE FLEMING:

17   Overruled.  If she knows.

18            THE WITNESS:  I don't.

19

20   BY MR. WILLIAMS:

21       Q.    In other words, you didn't see the

22   communications between Commander Giltmier and

23   Chicago Department of Transportation, correct?

24       A.    I don't recall without seeing it.

Page 100

1      Q.    The Air and Water Show has been

2    rescheduled, correct?

3      A.    Yes.

4      Q.    [Inaudible] required for that, correct?

5      A.    Correct.

6      Q.    Okay.  Chicago public school opening

7    has been delayed, is that correct?

8      A.    Yes.

9      Q.    So any officers assigned to that would

10   not be required for that during the DNC, correct?

11     A.    They'll be at DNC.

12     Q.    Okay.  Yeah, but they wouldn't be

13   dealing with helping the schools, correct?

14     A.    Correct.

15     Q.    If you were asked if the parade could

16   be held outside of the security perimeter of the

17   United Center, would you recommend that --

18          MR. DIONNE:  Objection.  Improper

19   hypothetical.

20          ADMINISTRATIVE LAW JUDGE FLEMING:

21   Sustained.

22

23   BY MR. WILLIAMS:

24     Q.    Is there anywhere other than Columbus

Page 101

1    Drive that you would recommend a parade to be

2    held at this time?

3              MR. DIONNE:  Objection.  Relevance.

4              ADMINISTRATIVE LAW JUDGE FLEMING:

5    Sustained.

6

7    BY MR. WILLIAMS:

8         Q.   Are you here to testify on behalf of

9    the Secret Service today?

10        A.   No.

11        Q.   Are you -- do you create -- are you

12   part of creating any incident action plans

13   related to DNC?

14        A.   No.

15        Q.   Has one been created for the week of

16   the DNC?

17        A.    Not to my knowledge.

18             MR. WILLIAMS:  I don't have anything

19   else.

20             ADMINISTRATIVE LAW JUDGE FLEMING:

21   Anything on --

22             MR. WILLIAMS:  Again, Judge --

23             ADMINISTRATIVE LAW JUDGE FLEMING:

24   You're getting a little too close --

Page 102

1          MR. WILLIAMS:  [Inaudible] right?

2          ADMINISTRATIVE LAW JUDGE FLEMING:  I can

3     almost hear you now.

4          MR. DIONNE:  One moment, please, Judge.

5     Sorry.  Judge, no redirect based upon that.

6          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

7          MR. WILLIAMS:  Any other witness?

8          MR. DIONNE:  No other witnesses at this

9     time but --

10          ADMINISTRATIVE LAW JUDGE FLEMING:  No,

11     but we have to address the Exhibit --

12          MR. DIONNE:  Yes, Judge.  But just for

13     clarification of the record, the only City

14     Exhibit that's at issue is Group 2, correct?

15          ADMINISTRATIVE LAW JUDGE FLEMING:  It's

16     the affidavit.

17          MR. DIONNE:  Yes.  Everything else has

18     been --

19          ADMINISTRATIVE LAW JUDGE FLEMING:

20     Everything else was in by stipulation.

21          MR. DIONNE:  Right.

22          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

23     And I know we addressed this earlier.  But that's

24     a separate transcript, so Counsel, your

Page 103

1   objections to Rashad Sprague [phonetic] is --

2        MR. WILLIAMS:  Okay.  I'm going to

3   object.  This is attempting to introduce

4   significant relevant testimony presumably it

5   provides some context.  But without [inaudible]

6   due process [inaudible] allowing us to cross

7   examine this witness as to what he's testifying

8   to, including the necessary security perimeters,

9   security checkpoints, and other activities that

10  would be required during the DNC, his testimony

11  is self-serving for the City without an

12  opportunity to object or to cross examine.

13        ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

14  City?

15        MR. DIONNE:  So Judge, in response, the

16  testimony of this affidavit is relevant and the

17  standard here at the Department of Administrative

18  Hearings, which allows for hearsay, ultimately

19  goes upon whether or not this is reasonably

20  relied upon.

21        We know this can be reasonably relied

22  upon because it is signed by the attestant,

23  Rashad Sprague, who works for the Secret Service,

24  as well as signed by a notary public at the

Page 104

1    bottom.

2         The information in here and any

3    admissibility determination would ultimately go

4    to weight and whether or not the Court is to

5    consider the information that's contained within

6    this directive, Judge.

7         Because we believe we've met the

8    evidentiary standards as required by this

9    courthouse, we ask that Group Exhibit 2 be

10   admitted into evidence at this time.

11        ADMINISTRATIVE LAW JUDGE FLEMING:  All

12   right.  It will be allowed in evidence.  We do

13   allow hearsay.  And additionally, balancing the

14   question of having the opportunity to confront

15   the witness, the affidavit does not render any

16   opinion from the affiant, individually, or on

17   behalf of the Secret Service as to whether or not

18   the parade should be allowed, should not be

19   allowed, whether the route was fine, whether the

20   alternate was [inaudible].

21        So it does give some -- flushes out some

22   of the information that we have, including from

23   the exhibit from Homeland Security, which was

24   allowed in evidence.  So the document will be

Page 105

1    allowed in.  So with that, City rests?

2

3                    (Whereby, City's Exhibit Number

4                     2 having been admitted into

5                     evidence.)

6

7              MR. DIONNE:  Yes, Judge.

8              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

9              MR. WILLIAMS:  For the record, over our

10   objection.  It's allowed --

11             ADMINISTRATIVE LAW JUDGE FLEMING:  Oh,

12   yeah.  Allowed over objection.  Do you need a couple

13   of minutes to talk to your guys?

14             MR. WILLIAMS:  No.

15             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

16             MR. DIONNE:  Judge, may we excuse Deputy

17   Chief Shemash?

18             ADMINISTRATIVE LAW JUDGE FLEMING:  Sure.

19             DEPUTY CHIEF SHEMASH:  Thank you.

20             ADMINISTRATIVE LAW JUDGE FLEMING:  Thank

21   you.

22             MR. WILLIAMS:  You're done then?

23             MR. DIONNE:  Yes, the City is resting.

24             ADMINISTRATIVE LAW JUDGE FLEMING:  All

Page 106

1    right, Counsel, so I don't make the same mistake as

2    last time, you did defer your opening statement so.

3              MR. WILLIAMS:  I'll pass on the opening,

4    Judge.

5              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

6    Sir, please raise your right hand.  Do you solemnly

7    swear or affirm any testimony you give will be the

8    truth?

9              MR. RATHBURN:  I do.

10

11                   DIRECT EXAMINATION

12   BY MR. WILLIAMS:

13        Q.    Can you state and spell your name for

14   the record?

15        A.    Henry Rathburn, H-E-N-R-Y,

16   R-A-T-H-B-U-R-N.

17        Q.    Okay.  And that's the legal name given

18   to you at birth?

19        A.    Yes, it is.

20        Q.    Do you go by a different name?

21        A.    Yes, I do.

22        Q.    What's that name?

23        A.    Liz Rathburn.

24        Q.    Okay.  Would you prefer I called you

Page 107

1    Liz?

2         A.    Yes, I would.

3         Q.    Okay.  Are you affiliated with an

4    organization called Students for a Democratic

5    Society at UIC?

6         A.    Yes, I am.  I'm the president.

7         Q.    Is it okay if I call it SDS?

8         A.    Yeah, sure.

9         Q.    Thank you.  I'm going to show you

10   what's been marked -- previously marked as City's

11   Exhibit 3A through C.  Can you take a look at

12   that?

13        A.    This is an application [inaudible].

14        Q.    Please turn to the last page.  Is that

15   your signature on the last page?

16        A.    Yes, it is.

17        Q.    And you are submitting a request for a

18   parade on behalf of SDS at UIC?

19        A.    Yes.

20        Q.    Are you the only one submitting the

21   request?

22        A.    No.  We're submitting it as an

23   organization, but, you know, I'm the one who

24   filed the paperwork.

Page 108

1      Q.    Okay.  And who's in SDS; what's the

2    group made up of?

3      A.    It's about 30-ish UIC students.

4    Essentially all folks who go to UIC.  Different

5    levels, some are graduates, some are under

6    graduates.

7      Q.    Okay.

8      A.    That's [inaudible].

9      Q.    But all are students?

10     A.    Absolutely.

11     Q.    That's a criteria for the group?

12     A.    Correct.

13     Q.    And can you tell me what the title of

14   the march you put in your application?

15     A.    Yes.  March Against the U.S. Funded

16   Gaza Genocide.

17     Q.    And so is the purpose of this march

18   focused on the war in the Middle East?

19     A.    Yes.  We're hoping to express our

20   political view that the U.S. funding of the State

21   of Israel and their military is [inaudible].

22     Q.    Okay.  And why did you use the term

23   march?

24     A.    We going to be moving fairly quickly.

Page 109

1    We're not going to stop and we're going to try to

2    keep the crowd going from Union Park all the way

3    over and around.

4        Q.    Okay.  And can you summarize -- well,

5    let me show what's been previously marked

6    Exhibit -- City's Exhibit 4.  Can you look at

7    that?

8        A.    Yeah.  So this looks like the march

9    route.

10       Q.    So this is the requested parade route

11   in your application, correct?

12       A.    Yes.

13       Q.    Okay.  What time period were you

14   looking to march?

15       A.    August 19th, from 12:00 to 2:15, I

16   think is what I [inaudible].

17       Q.    Okay.  And this is an accurate --

18   City's Exhibit 4 is an accurate reflection of the

19   parade route?

20       A.    Yeah, [inaudible].

21       Q.    Okay.  Would you intend to be on

22   Washington Avenue at the same time the crowd is

23   on Jackson Boulevard?

24       A.    No.  We would be turning onto -- yeah,

Page 110

1    we'd be turning to Western.  [Inaudible].

2        Q.    Okay.  I guess, in other words, your

3    group would be staying together, they wouldn't be

4    all around the square, correct?

5        A.    No, that's what the marshals are for.

6        Q.    And when you mention marshals, what are

7    you plans to organize the marshals?

8        A.    Yes, we're going to be having

9    volunteers in [inaudible] jackets to guide people

10   along the route, to make sure everybody knows

11   where restrooms, water, [inaudible].

12       Q.    Okay.  And is it your intention to have

13   a non-violent, family-friendly march or something

14   different?

15       A.    We want it to be as peaceful, as

16   family-friendly, and as accessible to the general

17   public as possible.

18       Q.    And will the marshals be directing

19   [inaudible]?

20       A.    Yes, that route.

21       Q.    And the leaders of the march as well?

22       A.    [Inaudible].

23       Q.    Who is your message [inaudible]

24   directed at?

Page 111

1           MR. DIONNE:  Objection.  Relevance.

2           ADMINISTRATIVE LAW JUDGE FLEMING:

3    Overruled.

4           THE WITNESS:  The message of our protest

5    is directed very specifically.  It's directed at

6    the Democratic Party apparatus and even more

7    specifically than that, at the folks in federal

8    power; the senators, congressmen, ambassadors,

9    and of course, President Joe Biden.

10

11   BY MR. WILLIAMS:

12        Q.    And why are you targeting that

13   audience?

14        A.    They have the authority to end U.S. aid

15   to Israel.

16        Q.    They have the federal authority to

17   [inaudible]?

18        A.    Exactly.

19        Q.    How do you intend to convey your

20   message?

21        A.    Through chants, banners, speeches, and

22   I guess, yeah, protest signs.

23        Q.    Okay.  So is it important for you to be

24   within sight and sound of the Democratic National

Page 112

1    Convention at the United Center?

2        A.    It absolutely is.

3        Q.    Why is that?

4        A.    Well, we're trying to get the message

5    to the Democratic Party.  If we are shunted off

6    away somewhere where they can't see us, they are

7    safe to ignore us.  They can freely --

8            MR. DIONNE:  Objection.  Argumentative.

9            ADMINISTRATIVE LAW JUDGE FLEMING:

10    Overruled.

11            THE WITNESS:  They can freely, you know,

12    ignore our protest.  And so we want to be within

13    sight and sound, that way we can actually express

14    this in a way where we can be sure it is being

15    heard by the people we want to hear it.

16

17  BY MR. WILLIAMS:

18        Q.    Okay.  And the route you requested is

19    all on public streets, correct?

20        A.    Correct.

21        Q.    Did you get a response from the Chicago

22    Department of Transportation about your parade

23    application?

24        A.    We received a rejection letter, yes.

Page 113

1      Q.    And I'm going to show you what was

2   previously marked as Exhibit 5A, B, and C.  Is

3   this that rejection letter?

4      A.    Yes, it is.

5      Q.    Okay.  The Chicago Department of

6   Transportation offered an alternate parade route;

7   is that correct?

8      A.    Yes, they did.

9      Q.    And [inaudible] City's Exhibit 6.

10      A.    Uh-huh.

11      Q.    It's a little hard to show you, it's a

12   lot of blue, but can you see the blue dots on

13   there?

14      A.    Yes.  This looks like the route.

15      Q.    Okay.  Is that, to your knowledge, the

16   alternate route proposed by the Chicago

17   Department of Transportation?

18      A.    Yes, it is.

19      Q.    Okay.  And that's on Columbus Drive in

20   downtown Chicago, correct?

21      A.    Yes.

22      Q.    From Roosevelt Road to Jackson?

23      A.    That is correct [inaudible].

24      Q.    What's wrong with that route?

Page 114

1      A.   Well, there's a number of things.  The

2    first is the distance to the Democratic National

3    Convention.  It's over three miles, I believe,

4    and you know, I don't think anyone can hear that

5    far.  Beyond that, it's also in an area that is

6    largely, you know, a public park, there's Lake

7    Michigan, there's a lot of tree-lined streets,

8    you know, on a very busy weekend.

9        There's still not going to be that many

10   people down there.  It's a beautiful place but

11   it's not going to be [inaudible].

12      Q.   Have you ever driven on Lake Shore

13   Drive?

14      A.   Yes, I have.

15      Q.   Can you see Columbus Drive activity

16   from Lake Shore Drive, do you know?

17      A.   Sometimes.  But a lot of times it's

18   also blocked by trees.

19      Q.   And are you familiar with hills going

20   from Lake Shore Drive up to the park and then up

21   to Columbus Drive?

22      A.   Yes.

23      Q.   Does that block the vision from Lake

24   Shore Drive?

Electronically signed by Susan Bonomo (001-416-118-4005)        e8a5891e-d3bf-4aed-a6ac-5ce7d71361c3

Page 115

1        A.    I would say yes.

2        Q.    And if the Chicago Department of

3    Transportation closes down south Columbus Drive

4    between Roosevelt Road and Jackson Boulevard

5    during the time of the march, would that further

6    limit the number of the public that would see

7    your protest?

8        A.    In my understanding, I think it would

9    drastically limit the number.

10       Q.    Why do you think that the Chicago

11   Department of Transportation proposed this as the

12   alternative route?

13            MR. DIONNE:  Objection.  Calls for

14   speculation.

15            ADMINISTRATIVE LAW JUDGE FLEMING:

16   Sustained.

17

18   BY MR. WILLIAMS:

19       Q.    Before rejecting your proposed parade

20   route, did anybody from Chicago Department of

21   Transportation reach out to you [inaudible]

22   alternative?

23            MR. DIONNE:  Objection.  Relevance.

24            ADMINISTRATIVE LAW JUDGE FLEMING:

Page 116

1    Sustained.

2            MR. WILLIAMS:  It's not relevant whether

3    anybody reached out?

4            ADMINISTRATIVE LAW JUDGE FLEMING:  No.

5    Why is it -- where, again, in the ordinance does

6    it say that the Department of Transportation

7    needs to reach out?  Department of Transportation

8    pursuant to the ordinance gave a proposed route.

9    But you know what?  To move things along, answer

10   the question.

11           THE WITNESS:  No, no one reached out to

12   us.

13

14   BY MR. WILLIAMS:

15       Q.   Did they explain how they came up with

16   the alternate route?

17           MR. DIONNE:  Objection, Judge.

18           ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah.

19   Objection's noted.  Continue.

20

21   BY MR. WILLIAMS:

22       Q.   Did anyone from Chicago Department of

23   Transportation tell you they considered other

24   alternate routes closer to the United Center?

Page 117

1           MR. DIONNE:  Same objection.

2           ADMINISTRATIVE LAW JUDGE FLEMING:  Same

3    ruling.  [Inaudible].  You can answer.

4           THE WITNESS:  No, they did not.

5

6    BY MR. WILLIAMS:

7        Q.   Is it fair to say that the Chicago

8    Department of Transportation presented the

9    alternate parade route on Columbus Drive

10   [inaudible] proposal?

11          MR. DIONNE:  Objection.  Argumentative.

12          ADMINISTRATIVE LAW JUDGE FLEMING:

13   Sustained.

14

15   BY MR. WILLIAMS:

16       Q.   Did the Department of Transportation

17   give you any other option besides the Columbus

18   Drive alternate route?

19       A.   No, this was the only alternate route

20   presented to us in the rejection letter.

21       Q.   If the Department of Transportation

22   informed you that they couldn't approve the route

23   as requested, but could move it two blocks north

24   or two blocks south, would you have considered

Page 118

1    that?

2            MR. DIONNE:  Objection.

3            ADMINISTRATIVE LAW JUDGE FLEMING:

4    That's speculation.  Sustained.

5

6  BY MR. WILLIAMS:

7        Q.   Is the route you proposed the only

8    route you would consider?

9            MR. DIONNE:  Objection.  Relevance.

10           ADMINISTRATIVE LAW JUDGE FLEMING:

11   What's the relevance of the other ones?  He

12   hasn't pro -- they haven't proposed other ones.

13   I have to deal with the route that's proposed

14   in --

15           MR. WILLIAMS:  And that's the relevance,

16   Judge.  Because they have not identified a

17   comparable public [inaudible] -- that's our

18   position.  That's what we want --

19           ADMINISTRATIVE LAW JUDGE FLEMING:  I

20   understand that's your position.  But I'm saying

21   that my interpretation of the ordinance is that

22   we are dealing with this particular route.

23           MR. WILLIAMS:  I understand.  But it

24   does say in (k) that they have to make an

Page 119

1    evaluation.

2            ADMINISTRATIVE LAW JUDGE FLEMING:  It

3    doesn't say in (k) that they have to meet with

4    the applicant and sit down and ask the applicant

5    questions whether they would take this route or

6    that route.  It doesn't say that.  It says they

7    have to propose --

8            MR. WILLIAMS:  I'm not suggesting it

9    says it.  But they do have to make -- they have

10   to make an assessment, evaluation.  They have to

11   consider what is comparable.  They have to

12   consider similar time, date, and location.  They

13   have to consider those things.  So I'm inquiring

14   to the factual basis of what they did to consider

15   [inaudible].

16           ADMINISTRATIVE LAW JUDGE FLEMING:  You

17   can't get that testimony from your witness.

18           MR. WILLIAMS:  Well, if --

19           ADMINISTRATIVE LAW JUDGE FLEMING:  He

20   can testify --

21           MR. WILLIAMS:  -- if they did reach out

22   to him, I'm sure they would [inaudible] it out.

23           ADMINISTRATIVE LAW JUDGE FLEMING:  I

24   mean, I gave you the leeway to ask him the

Page 120

1    questions that there wasn't contact.  And that,

2    you know, lets you make your argument on there.

3    But it doesn't lead to some sort of conclusion

4    that we're required to do so.

5         MR. WILLIAMS:  I am not making that

6    assertion.  There's nothing in the ordinance that

7    says they can't reach out to the applicant and

8    try and work out something.

9         ADMINISTRATIVE LAW JUDGE FLEMING:  But

10   there's nothing in the ordinance that says they

11   are required to, which is what you seem to be

12   positing your position on.  You seem to be --

13        MR. WILLIAMS:  It's --

14        ADMINISTRATIVE LAW JUDGE FLEMING:  You

15   seem to be positing part of your argument that

16   somewhere in that ordinance is a silent

17   requirement that when the parade application is

18   denied, the Department of Transportation has an

19   affirmative obligation to try to mediate.

20        MR. WILLIAMS:  Well, I'm -- my position

21   is that Columbus Drive is not a reasonable

22   alternative and the department did nothing to

23   consider other reasonable alternatives.  I'm not

24   saying they have to do A, B, or C.  But I'm

Page 121

1    saying in determining reasonable and in complying

2    with this Section (k) of the ordinance, those are

3    relevant facts.

4              ADMINISTRATIVE LAW JUDGE FLEMING:  But

5    how can this witness testify as to the mindset of

6    the Department of Transportation?

7              MR. WILLIAMS:  I didn't ask his mindset.

8    All I asked was did they call him.

9              ADMINISTRATIVE LAW JUDGE FLEMING:  And I

10   let you answer that.

11             MR. WILLIAMS:  All right.  I have

12   nothing further.

13             ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

14

15                  CROSS EXAMINATION

16   BY MR. DIONNE:

17        Q.   All right.  So you said for the purpose

18   of your parade proposal it's for a friendly and

19   was supposed to be for the community or something

20   to that effect?

21        A.   Broadly speaking, yes.

22        Q.   Right.  And you're anticipating at

23   5,000 people; is that right?

24        A.   That's [inaudible] information, yes.

Page 122

1        Q.    Are you also anticipating counter

2    protesters to your march?

3        A.    I'm anticipating negative reaction from

4    the attendees at the DNC, but I don't expect a

5    counter protest.

6        Q.    But you said that your organization was

7    providing vested marshals?

8        A.    Yes, we are.

9        Q.    And these vested marshals, though, they

10    do not have policing powers, do they?

11        A.    Not unless they are undercover police.

12        Q.    None of your marshals are undercover

13    police, though, are they?

14        A.    Not to my knowledge.

15        Q.    Okay.

16            MR. DIONNE:  Nothing further, Judge.

17            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

18    Anything else?

19            MR. WILLIAMS:  Nothing further.

20            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

21    Does anyone need time for closing?

22            MR. DIONNE:  We could -- City's

23    answering ready to move into it if Counsel is.

24            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

Page 123

1          MR. WILLIAMS:  We're ready.

2          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

3     All right.  Proceed, City.

4          MR. DIONNE:  Thank you.  Judge, the City

5     is asking the Court affirm the denial of this

6     parade permit application based upon the bases

7     that are set forth in the denial letter, which is

8     City's Group Exhibit 5.

9          Specifically, addressing the first

10    subsection under Municipal Code of Chicago

11    10-8-330(g)(1) in the code in which the

12    commissioner found that the proposed parade route

13    will substantially interfere with traffic in the

14    area contiguous to the activity and there is not

15    available at the time of the parade sufficient

16    city resources to mitigate the disruption.

17         What we have here in this proposed

18    application is a route that entirely encircles

19    the United Center during the time and dates in

20    which the Democratic National Convention will be

21    taking place at the United Center.

22         Furthermore, we have testimony that this

23    is going to be an NSSE event in collaboration

24    with not only CPD, but also the Secret Service

Page 124

1    and other federal agencies, which require a

2    massive amount of resources to secure this area

3    and this footprint.

4         The route that's being proposed would

5    completely shut down all streets surrounding this

6    United Center asking for all traffic to be

7    diverted into areas that cannot absorb that

8    traffic flow.  Mr. Gallardo from Transportation

9    basically said that it's going to create gridlock

10   in this area.

11        We have further testimony that

12   establishes that the United Center is just north

13   of the medical district and that Ashland Avenue

14   is a major thoroughfare that requires access to

15   that area.  Asking to shut that street down is

16   basically asking ambulances and other emergency

17   equipment to find another way to get to these

18   hospitals.  So it's simply impossible to

19   accommodate this proposed route and shut down

20   those streets.

21        Going into Subsection -- Municipal Code

22   of Chicago 10-8-330(g)(2) the Court should find

23   that there is not available at the time of the

24   parade a sufficient number of on-duty police

Page 125

1    officers or other city employees authorized to

2    regulate traffic and to police the public and

3    protect participants, et cetera.

4         We know that every officer that works

5    for CPD, from patrol person to detective to

6    sergeant, is being tasked upon and called upon to

7    provide the necessary resources to secure the DNC

8    during this time.

9         We also know that it is such a large

10   drain on the personnel and resources, that

11   various events that normally occur during this

12   time, such as the Air and Water Show and the

13   start of Chicago public schools, have had to have

14   been changed and essentially rescheduled just

15   because the CPD does not have the resources to

16   even accommodate those activities.

17        They're going to be working the DNC.

18   All vacations have been cancelled, all training

19   has been cancelled, furloughs have been

20   cancelled.  Every able-bodied person is going to

21   be tasked with this monumental requirement to

22   provide the security for the City during the DNC.

23   And the job doesn't just stop there.

24        We still have to staff -- the Chicago

Page 126

1    Police Officers have to staff every district in

2    the entirety of the City of Chicago.  Just

3    because the DNC is here, doesn't mean that all

4    other business stops.  It doesn't mean that all

5    of the responses to 911 call have to stop.

6              So based upon the inability to provide

7    the officers for the application -- Petitioner's

8    safety, that was denied.  But then we go into the

9    proposed alternative route, which was proposed by

10   CPD.

11             Is it in the exact same location?  No,

12   it's not.  But it is in a location that is highly

13   visible.  It's right by a park.  It's right by

14   Lake Shore Drive.  And it's to the extent

15   practical.  That is what Subsection (k) says.

16             It doesn't say it has to be the same or

17   close to.  What we do know is that we're going to

18   have hundreds, if not thousands of people coming

19   through the parks of the area, going across Lake

20   Shore Drive.  It's right by the main hotel

21   district where there will be delegates and other

22   attendees staying.

23             And furthermore, we've got over 5,000

24   people that are part of this march.  Last I

Page 127

1    checked, trees can't block sound.  We've got

2    plenty of voices that can be heard to Lake Shore

3    Drive, to Michigan Avenue.  And in that location

4    a message can be heard.

5          Judge, the City has met all of its

6    requirements required by the municipal code

7    including the proposed alternative route and we'd

8    ask that the Court affirm the determination from

9    the Department of Transportation.

10          ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

11   Thank you.  Counsel?

12          MR. WILLIAMS:  The City of Chicago, as

13   with all municipal and other divisions of

14   government, is bound by the First Amendment.  The

15   ordinance in question seems to have implicitly

16   acknowledged that by including Section (k), which

17   requires if a parade permit is denied, the

18   commissioner shall authorize the conduct of a

19   parade on a date, at a time, and at a location or

20   a route different from that named by the

21   applicant.

22          This alternate permit shall, to the

23   extent practicable, authorize an event that will

24   have comparable public visibility and a similar

Page 128

1    route, location, and date to that of the proposed

2    parade.  I note that there is an "and" between

3    visibility and similar route, location, and date.

4         The -- so we ask you to overturn the

5    denial of the permit or at a minimum to require

6    that the City come up with a more reasonable

7    alternative.

8         I'm not suggesting that there's anything

9    in the statute that requires them to meet with

10   the Petitioner, but they are required to

11   recognize the First Amendment and Section (k)

12   requires them to provide a comparable public --

13   comparable place -- similar route, location, and

14   date.

15        Columbus Avenue is -- Columbus Boulevard

16   is three miles away.  It's on tree-lined streets.

17   It's -- the plan is to shut it down, there will

18   be no visibility.  The target -- the DNC is

19   inherently a political event.  It's when the

20   Democratic Party, the party who currently with

21   the presidency, currently with control of the

22   senate are present in the Chicago area at the

23   United Center.

24        That is the target of the speech, the

Page 129

1    political speech being held on public grounds or

2    being sought to be held on public grounds on this

3    parade route where speech, according to the

4    Supreme Court, finds it's greatest traditional

5    protection.

6         The alternative does not allow the

7    Petitioner to be -- the applicant for the permit

8    to have their message heard by the targets of

9    their political speech.

10        First of all, we have heard evidence

11   that the City did not comply with Section (f) of

12   the ordinance by conducting a full, thorough

13   investigation [inaudible].  We have heard vague

14   language about it will take a lot of police

15   officers.

16        And honestly, Judge, their own testimony

17   says all the police are going to be around the

18   DNC already.  This is going to be a highly

19   controlled area and to suggest that there could

20   be no area within three miles of the United

21   Center that could be controlled and more narrowly

22   tailored to meet the rights of the permit

23   applicant is ludicrous.

24        Second of all, the City has not met the

Page 130

1    requirements of Section (k) and find a more

2    reasonable alternative.  So for that reason, we'd

3    ask this body to overturn the decision or at a

4    minimum to require the City to consider other

5    parade routes at the same time and date and

6    closer to the event that its speech is targeted

7    at.

8              ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

9    Final word?

10             MR. DIONNE:  Judge, Counsel has

11   mischaracterized exactly where the officers are

12   going to be.  Yeah, there's going to be

13   heightened officer presence at the United Center,

14   but they're still responsible for being all

15   throughout the rest of the City of Chicago.

16             And going into Subsection (k), nowhere

17   in the ordinance or the code does it say that we

18   have to -- the City has to provide an area that

19   allows the voice to be heard by the same

20   designated targets.  That's not anywhere in the

21   code.  It's to the extent practical.

22             And we're proposing an alternative that

23   high visibility, by another large park within the

24   city limits, and for that reason, Judge, we ask

Page 131

1    that you affirm the determination?

2            ADMINISTRATIVE LAW JUDGE FLEMING:  Okay.

3    Thanks everyone.  It's been a long day.  And I

4    apologize if I got out of sorts at all at any

5    point.

6            And like I say, I've got to get home and

7    start typing.  I have 48 hours, I will get it

8    down here.  I'm assuming that they will e-mail it

9    out to you guys at that point in time?

10           It's 48 hours for me to get it here, so

11   it gets here at, you know, 4:28 and two days.

12   You may not get the e-mail till the next day.

13   But I'll get it all done.  Good luck to you all.

14           MR. DIONNE:  Thank you, Judge.

15           MR. WILLIAMS:  [Inaudible] my e-mail

16   address --

17           MR. DIONNE:  We have your --

18           ADMINISTRATIVE LAW JUDGE FLEMING:  It's

19   on your appearance form, isn't it?

20           MR. WILLIAMS:  It's on my appearance

21   form, yes.

22           ADMINISTRATIVE LAW JUDGE FLEMING:  So

23   the appearance form will be in the file.

24           MR. WILLIAMS:  [Inaudible].

```
                                              Page 132
1              ADMINISTRATIVE LAW JUDGE FLEMING:  Yeah.

2

3                   (END OF PROCEEDING)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 133

1        I, Susan Bonomo, do hereby certify or affirm

2    that I have impartially transcribed the foregoing

3    from an audiotape record of the above-captioned

4    proceedings to the best of my ability.

5

6    _____

7                    Susan Bonomo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24