**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO ALLIANCE AGAINST RACIST AND POLITICAL REPRESSION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 24-cv-02347 |
| v. | ) ) | |
| | ) | Judge Andrea R. Wood |
| CITY OF CHICAGO, et al., | ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case concerns a First Amendment challenge to the manner in which City of Chicago

("City") officials have responded to requests for parade permits by protestors desiring to march

near the main site of the 2024 Democratic National Convention ("DNC"). Plaintiffs Chicago

Alliance Against Racist and Political Repression ("CAARPR"), Anti-War Committee ("AWC"),

Students for a Democratic Society at UIC ("SDS"), and U.S. Palestinian Community Network

("USPCN") each submitted a request for a parade permit to march on a route near the United

Center. Each request has been denied as to the requested route, with City officials instead

offering the same proposed alternative route ("Alternative Parade Route") to all four groups.

According to Plaintiffs, the requirement that they use the Alternative Parade Route imposes an

unconstitutional restriction on their political speech, and so they have sued the City and Tom

Carney, in his official capacity as the Commissioner of the Chicago Department of

Transportation ("CDOT") (together, "Defendants"), alleging violations of their First Amendment

rights. The scope of the parties' dispute has evolved significantly since the original complaint

was filed, and the request for relief now before the Court is relatively narrow. Plaintiffs seek a

preliminary injunction requiring Defendants to modify the Alternative Parade Route in two

ways: first, Plaintiffs seek to eliminate two turns that would take the protest parades away from Washington Boulevard, and second, they seek to extend the route further west, increasing its overall length by approximately one mile. For the reasons stated below, Plaintiffs' revised motion for a preliminary injunction (Dkt. No. 28) is denied.

## BACKGROUND

The following facts are drawn from the evidentiary record before the Court, which consists largely of two declarations submitted by Defendants in support of their response to Plaintiffs' revised motion for preliminary injunctive relief. *See Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986) (explaining that preliminary injunctions require a court to "make factual determinations on the basis of a fair interpretation of the evidence before" it). One declaration is from Jeff Burnside, a special agent with the United States Secret Service ("Secret Service") who is coordinating security plans for the DNC across various federal, state, and local agencies. (Defs.' Resp. Br., Ex. A ("Burnside Decl.") ¶¶ 1–2, Dkt. No. 32-1.) The other is from Duane DeVries, Chief of the Counterterrorism Bureau of the Chicago Police Department, who has been working closely with the Secret Service, as well as other federal, state, and local law enforcement agencies, over the past year and a half to develop public safety and security measures for the DNC. (Defs.' Resp. Br., Ex. B ("DeVries Decl.") ¶¶ 1, 5, 7, Dkt. No. 32-1.) The Court also references various exhibits Plaintiffs attached to their First Amended Complaint ("FAC").

### I.     The Parade Permits

Chicago will host the DNC from August 19 through August 22, 2024, with the United Center serving as one of two venues. (Burnside Decl. ¶ 5.) Plaintiffs desire to protest near the United Center during the DNC so they can express their views regarding the Israel-Palestine

conflict to public officials attending the event. (FAC ¶¶ 1–2, Dkt. No. 27.) In their own words, Plaintiffs seek "to direct their political speech through organized, peaceful marches designed to allow all of the participants to express their political messages on public streets directed at public officials." (*Id.* ¶ 2.) Therefore, each Plaintiff separately applied for a parade permit pursuant to Municipal Code of Chicago ("M.C.C.") § 10-8-330 ("Parade Ordinance"). (*Id.* ¶¶ 2–3.)

As relevant here, the Parade Ordinance requires the CDOT Commissioner to grant a permit request if he finds, among other things, that the proposed parade "will not substantially or unnecessarily interfere with traffic in the area" and that there will be sufficient police officers available "to police and protect lawful participants in the parade and non-participants from traffic-related hazards in light of the other demands for police protection at the time of the proposed parade." M.C.C. §§ 10-8-330(g)(1), (2). If the proposed parade would not comply with these criteria such that the permit application is denied, the CDOT Commissioner must, "to the extent practicable, authorize an event that will have comparable public visibility and a similar route, location and date to that of the proposed parade." *Id.* § 10-8-330(k). The Parade Ordinance allows any applicant who disagrees with the CDOT Commissioner's denial of a parade-permit application to appeal the decision to the City's Department of Administrative Hearings. *Id.* § 10-8-330(l).

CAARPR, AWC, and SDS submitted their respective parade-permit applications around the same time in early 2024, while USPCN submitted its application in June 2024.[1] Each Plaintiff submitted its own application proposing a different parade route near the United Center,

---

[1] The exact dates of certain applications are less than clear from the record due to discrepancies among the dates on the applications, the dates referenced in CDOT's response letters, the dates referenced in administrative decisions, and the dates cited in the parties' filings. These discrepancies, however, are immaterial to the Court's analysis.

none of which matches up exactly with the Alternative Parade Route now being offered by Defendants.

To start, CAARPR submitted two applications in January 2024. First, it requested to hold a protest parade with an estimated "1,000+" participants on August 19, 2024, from 2:00 P.M. to 4:00 P.M. (FAC, Ex. C, Dkt. No. 27-3.) The second permit application sought to hold a protest parade along the same route with the same number of participants but from 2:00 P.M. to 4:00 P.M. on August 22, 2024. (FAC, Ex. F, Dkt. No. 27-6.) On January 22, 2024, CDOT denied the first application as to the requested parade route, citing the effect on traffic and inadequate resources to monitor the proposed parade. (FAC, Ex. D, Dkt. No. 27-4.) As an alternative, CDOT offered CAARPR a parade route that would proceed on Columbus Drive through Grant Park. (*Id.* at 2.) Then, CDOT denied CAARPR's second application as duplicative of the first one. (FAC, Ex. G, Dkt. No. 27-7); *see also* M.C.C. § 10-8-330(d) (limiting a group's ability to submit multiple parade-permit applications). CAARPR appealed the second denial, which the Department of Administrative Hearings affirmed on February 16, 2024. (FAC, Ex. H, Dkt. No. 27-8.)

In February 2024, AWC and SDS each applied for its own parade permit. AWC requested a time of 6:00 P.M. to 8:00 P.M. on August 22, 2024, for an estimated "1,000+" participants. (FAC, Ex. I, Dkt. No. 27-9.) For its part, SDS requested to hold a protest parade with 5,000 estimated participants on August 19, 2024, from 12:00 P.M. until 2:15 P.M. (FAC, Ex. L, Dkt. No. 27-12.) CDOT denied both these applications on March 7, 2024, again citing the effect on traffic and inadequate resources, and again offering an alternative route on Columbus Drive. (FAC, Ex. J, Dkt. No. 27-10; Compl., Ex. K, Dkt. No. 1-11.) AWC and SDS each

4

appealed, and the denials were administratively affirmed on March 20, 2024. (FAC, Ex. K, Dkt. No. 27-11; FAC, Ex. M, Dkt. No. 27-13.)

In June 2024, USPCN submitted its permit application in which it requested to hold a protest parade with an estimated 5,000 participants on August 19, 2024, from 9:00 A.M. until 12:00 P.M. (FAC, Ex. N at 3–5, Dkt. No. 27-14.) As with the earlier applications submitted by CAARPR, AWC, and SDS, on June 28, 2024, CDOT denied USPCN's application due to the effect the proposed parade route would have on traffic and inadequate resources. (*Id.* at 6–8.) But instead of offering the Columbus Drive route, CDOT offered the Alternative Parade Route in place of the route USPCN had requested. (*Id.* at 7.) Regardless, USPCN appealed the denial, which was administratively affirmed on July 11, 2024. (FAC, Ex. O, Dkt. No. 27-15.)

Meanwhile, after the Department of Administrative Hearings affirmed the denials of their permit applications, CAARPR, AWC, and SDS filed this lawsuit on March 22, 2024. (Dkt. No. 1.) Counsel for the parties began talks regarding a possible negotiated resolution to designate an alternative parade route closer to the United Center than the Columbus Drive route. At subsequent court hearings, Defendants explained that they were able to refine their proposed alternative route to better accommodate Plaintiffs' desires as they learned more information about the security plans for the United Center being developed by the responsible law-enforcement agencies. Finally, on July 11, 2024, counsel for Defendants emailed counsel for Plaintiffs to extend the offer of the Alternative Parade Route to CAARPR, AWC, and SDS "subject to all other appropriate terms and conditions." (FAC, Ex. A ("Email Offering Alternative Parade Route") at 1, Dkt. No. 27-1.) The details of the Alternative Parade Route are described below.

## II.     The Secure Perimeter and the Alternative Parade Route

The DNC is designated as a National Special Security Event. (Burnside Decl. ¶ 9.) As a result, the Secret Service has played an instrumental role in organizing security. (*Id.* ¶¶ 9–10); *see also* 18 U.S.C. § 3056(e)(1) (authorizing the Secret Service to participate in "the planning, coordination, and implementation of security operations at special events of national significance"). One of its main tasks has been establishing a hard perimeter ("Secure Perimeter") around the United Center for which entry will be restricted to credentialled persons. (Burnside Decl. ¶¶ 15–16.) In addition to establishing the Secure Perimeter, the Secret Service is tasked with creating a vehicular-screening zone around the United Center. (*Id.* ¶¶ 19–21.) The challenge here does not implicate that zone, however.

Meanwhile, the Chicago Police Department retains responsibility over the rest of the area surrounding the United Center. (DeVries Decl. ¶ 12.) This includes managing the use of streets near the Secure Perimeter as well as the transportation of DNC attendees. (*Id.*) The City has been working with the Secret Service and other agencies for over a year to develop a security protocol. (*Id.* ¶ 7.) Communications between the Secret Service and the City about the details of those plans have been ongoing over the past months as the DNC approaches. (DeVries Decl. ¶ 15; Burnside Decl. ¶ 12.)

On July 25, 2024, the Secret Service publicly announced its security plans for the DNC, including its plans for the Secure Perimeter extending around the United Center. (Burnside Decl. ¶ 22.) Notably for this dispute, Washington Boulevard will serve as the northern boundary of the Secure Perimeter between Wood Street and Damen Avenue. (*Id.* ¶ 17.) A sturdy barrier will therefore be installed along that stretch of Washington Boulevard. (*Id.* ¶¶ 15, 17.)

The Alternative Parade Route also proceeds along Washington Boulevard—at least until the Secure Perimeter begins. The map below, which Defendants submitted with their response to the revised preliminary-injunction motion, shows the Alternative Parade Route (labeled as "City's Parade Route") in relation to the United Center and the Secure Perimeter. (Defs.' Resp. Br. at 2, Dkt. No. 32-1.)



As shown on the map, the Alternative Parade Route begins at Union Park, near the United Center. (*See also* Email Offering Alternative Parade Route at 1.) It follows Washington Boulevard west, turns north at Hermitage Avenue, and proceeds west down Maypole Avenue. (*Id.*) It stops at Park #578, which lies to the south of Maypole Avenue between Wolcott Avenue and Damen Avenue. (*Id.*) It then continues west on Maypole Avenue to Damen Avenue and turns north. (*Id.*) At Lake Street, it turns east and returns to Union Park, where the protest parade

would end. (*Id.*) Plaintiffs have submitted an exhibit indicating that the Alternative Parade Route spans 1.4 miles in total. (FAC, Ex. B, Dkt. No. 27-2.)[2]

### III.    Procedural History

CAARPR, AWC, and SDS filed this lawsuit under 42 U.S.C. § 1983 on March 22, 2024, alleging First Amendment violations. (Compl.) Count One of their original complaint focused on the provisions of the Parade Ordinance that prohibit "duplicative" applications; according to Plaintiffs, those provisions are facially unconstitutional and, even apart from the denial of CAARPR's second application, unconstitutionally chill speech given the contemplated penalties for violations. (*Id.* ¶¶ 46–54.) Count Two concerned the Columbus Drive route Defendants originally offered. On that front, Plaintiffs alleged that offering them a parade route on Columbus Drive would not comply with the First Amendment given its distance from the United Center. (*Id.* ¶¶ 55–67.) As part of this Count, Plaintiffs also took issue with what they called the "take-it-or-leave-it" policy Defendants employed, referring to Defendants' alleged refusal to negotiate as to the offered alternative route. (*Id.* ¶ 67.) Therefore, in late April 2024, Plaintiffs filed a motion for a preliminary injunction. (Dkt. No. 9.) They sought an order that would prohibit Defendants from denying an application for being "duplicative" and would require Defendants to offer a route preferable to the one on Columbus Drive. (*Id.* ¶ 12.)

As mentioned above, Defendants' counsel emailed Plaintiffs' counsel on July 11, 2024, offering the Alternative Parade Route to CAARPR, AWC, and SDS. (Email Offering Alternative

---

[2] In their initial brief, Plaintiffs describe the length of the Alternative Parade Route as 1.4 miles. (Pls.' Opening Br. at 9, Dkt. No. 29.) However, in their reply brief, they describe the Alternative Parade Route as only 1.1 miles. (Pls.' Reply Br. at 2, Dkt. No. 34.) Absent anything in the record to support their revised position, the Court treats the Alternative Parade Route as spanning 1.4 miles for purposes of this ruling. Either way, the relatively minor difference between the two distances would not change the outcome.

Parade Route at 1.) Plaintiffs filed the FAC the next day, adding as an additional plaintiff USPCN, which had already been offered the Alternative Parade Route. The FAC still includes separate counts for denials of "duplicative" applications (FAC ¶¶ 71–80) and the failure to offer a parade route compliant with the First Amendment (*id.* ¶¶ 81–100). That said, despite many lingering allusions to the route on Columbus Drive, the latter count now concerns the sufficiency of the Alternative Parade Route. (*See id.* ¶¶ 92, 93, 99.)

To address the changed circumstances, Plaintiffs filed a revised preliminary-injunction motion on July 13, 2024. (Dkt. No. 28.) Reflecting the shift in the parties' positions since the time of the original filing, Plaintiffs no longer seek injunctive relief with respect to the denial of "duplicative" applications because, in their view, Defendants do not at this stage appear to be relying on those provisions of the Parade Ordinance. (Pls.' Opening Br. at 2, Dkt. No. 29.) And as to the remaining count, Plaintiffs acknowledge that the dispute has "significantly narrow[ed]." (*Id.* at 1.) Plaintiffs grant that the Alternative Parade Route is within "sight and sound" of the United Center; in addition, because Defendants have offered a new route, Plaintiffs set aside their claim related to the alleged "take-it-or-leave-it" policy for purposes of the preliminary injunction. (*Id.* at 1–2.) Instead, Plaintiffs object to two specific aspects of the Alternative Parade Route: that it turns off Washington Boulevard to follow Hermitage Avenue and Maypole Avenue and that it does not proceed further west than Damen Avenue. (*Id.* at 9–10.)

The parties briefed the revised motion, and the Court heard oral argument on August 5, 2024. (Dkt. No. 38.) Notably, Plaintiffs broadly allege in the FAC that they expect "tens of thousands" of protestors to participate in the marches, if not more. (FAC ¶ 2.) During oral argument, they clarified that they now expect between 20,000 and 25,000 protestors. Citing the need to accommodate such a large number of expected protestors, Plaintiffs ask the Court to

issue a preliminary injunction that would require Defendants to revise the Alternative Parade Route so that it stays on Washington Boulevard and proceeds west past Damen Avenue. For their part, Defendants contend that Plaintiffs have not shown entitlement to any injunctive relief because the Alternative Parade Route satisfies the First Amendment.

## DISCUSSION

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). Plaintiffs, as the moving parties, bear the burden of justifying their requested injunction. *Id.* A movant "must show that (1) he has some likelihood of success on the merits of his claim; (2) traditional legal remedies are inadequate; and (3) he would suffer irreparable harm without preliminary injunctive relief." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). Upon a showing of those "threshold requirements," the court considering preliminary injunctive relief "must balance the equities, weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public—including third parties—if it is granted." *Id.*; *see also Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023) ("[T]he greater the movant's likelihood of success on the merits, the less the harms need be in its favor."), *cert. denied,* No. 23-757, 2024 WL 2883756 (U.S. June 10, 2024).

In the First Amendment context, "the likelihood of success on the merits will often be the determinative factor." *Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017) (internal quotation marks omitted). That is because a violation of the First Amendment "unquestionably constitutes irreparable injury, and injunctions protecting First Amendment freedoms are always in the public interest." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830

(7th Cir. 2014) (internal quotation marks omitted). The crucial likelihood-of-success factor requires "a 'strong' showing that reveals how [the movant] proposes to prove its case"; a "mere possibility" of success does not suffice. *Bevis*, 85 F.4th at 1188. That said, the government actor "bears the burden of proving the constitutionality" of restrictions on speech, including at the preliminary-injunction stage. *Barland*, 751 F.3d at 830 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014)).

There is no doubt Plaintiffs' intended protest parade through the streets near the United Center constitutes expressive conduct and speech protected by the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568 (1995) (explaining that "protest marches" qualify for First Amendment protection due to "the inherent expressiveness of marching to make a point"). And the City does not dispute that the streets and sidewalks upon which Plaintiffs seek to conduct their parade, including those excluded from the Alternative Parade Route, qualify as public forums. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021). But "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech." *Navratil v. City of Racine*, 101 F.4th 511, 519 (7th Cir. 2024) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Indeed, time, place, and manner restrictions are often subject to First Amendment challenges in cases like this one, where the plaintiffs seek to protest at major political events. *See, e.g.*, *Coal. to March on the RNC v. City of Milwaukee*, No. 24-CV-0704-BHL, 2024 WL 3358149 (E.D. Wis. July 8, 2024) (considering a similar challenge to restrictions around the Republican National Convention). Such restrictions will be found to pass constitutional muster "provided [that they] are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open

ample alternative channels for communication of the information." *Navratil*, 101 F.4th at 519 (quoting *Ward*, 491 U.S. at 791).

Here, Plaintiffs do not contend that the restriction of their speech—that is, the requirement that it be made within the confines of the Alternative Parade Route—is content-based.[3] As a result, the Court proceeds directly to the narrow-tailoring and alternative-channels requirements.

## I.    Narrowly Tailored to a Significant Governmental Interest

The Court begins with the question of whether Defendants' restrictions on the time, place, and manner of Plaintiffs' speech are narrowly tailored to a significant governmental interest. Defendants primarily cite two such interests: ensuring the safety of DNC attendees (along with other persons in the area) and managing traffic around the United Center. Many courts have observed that the government has a strong interest in promoting safety and security, particularly in the context of high-profile political events. *E.g.*, *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1149–50 (6th Cir.), *cert. denied,* 143 S. Ct. 448 (2022). Likewise, courts routinely acknowledge the governmental interest in managing traffic around these types of events. *E.g.*, *Coal. to March on the RNC*, 2024 WL 3358149, at *12. Plaintiffs do not dispute the significance of the proffered interests as a general matter. Rather, Plaintiffs contend that the Alternative Parade Route is not narrowly tailored to further those interests.

The "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799; *see also Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) (reasoning that

---

[3] While Plaintiffs suggested in their original complaint that Defendants' actions were content-motivated (*see* Compl. ¶¶ 63–64), the FAC no longer contains any such allegations and Plaintiffs have not raised that argument in support of their revised preliminary-injunction motion.

"[s]ecurity is not a talisman that the government may invoke to justify *any* burden on speech"). But the speech restriction need not represent "a perfect or least restrictive fit" with the proffered interest. *GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 825 (7th Cir. 2022). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. Therefore, courts "give deference to a reasonable judgment by the [government] as to the best means" of furthering its interests. *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007).

Plaintiffs first take issue with the course of the Alternative Parade Route as it proceeds west towards Damen Avenue. The record before the Court shows that the Secure Perimeter will be installed along Washington Boulevard between Wood Street and Damen Avenue. (Burnside Decl. ¶ 17.) The Alternative Parade Route bypasses that stretch of Washington Boulevard by turning north at Hermitage Avenue and following Maypole Avenue west to Park #578 and then Damen Avenue. (DeVries Decl. ¶ 25.) Plaintiffs do not challenge the decision to use Washington Boulevard as the northern boundary of the Secure Perimeter. Yet they argue that Defendants have not sufficiently demonstrated that the protest parades cannot proceed down Washington Boulevard notwithstanding the presence of the Secure Perimeter.

At oral argument, Defendants reiterated their position that the requested route down Washington Boulevard is simply not possible. Defendants cite, in part, the dangers posed by protestors marching closely alongside the fencing demarcating the Secure Perimeter. Although it is not clear at this point exactly how far the Secure Perimeter will extend into Washington Boulevard, the record shows that it will encompass "at least some portion" of the street.

13

(Burnside Decl. ¶ 17.) The Secure Perimeter itself will consist of "metal fencing" that is "between eight and ten feet high, non-scalable, and designed not to move or flex." (*Id.* ¶ 15.) In addition, it will be buttressed with "concrete barriers" at "many locations." (*Id.*) Due to the sturdiness of the Secure Perimeter, DeVries attests that allowing the parade route to continue west on Washington Boulevard would create a "crush zone" in which protestors and officers "would be at great risk of bodily injury or death if a crowd were to surge or press up against the barrier." (DeVries Decl. ¶ 36.) He further attests that the Secure Perimeter would inhibit efforts of medical personnel to treat anyone who was injured in such an event. (*Id.* ¶ 37.)

Plaintiffs take issue with Defendants' description of the risks associated with allowing a protest parade down Washington Boulevard alongside the boundary of the Secure Perimeter. Among other things, Plaintiffs point out that Defendants' witnesses cannot state with certainty exactly how far into Washington Boulevard the barriers will be placed. Accordingly, Plaintiffs suggest that Defendants' proffered interest is overly speculative at this stage. Indeed, perhaps the potential danger to officers and protestors on Washington Boulevard will differ depending on where the Secure Perimeter is installed on the street.

But that does not mean Defendants must wait until the Secure Perimeter has actually been installed to confirm the plans for the parade route. To the contrary, the First Amendment does not demand the level of precision Plaintiffs suggest. "As long as a designed security protocol reduces a plausible and substantial safety risk, it directly and effectively advances a substantial government interest." *Citizens for Peace in Space*, 477 F.3d at 1224. As mentioned above, the information in the record indicates that the Secure Perimeter will be installed **somewhere** on the width of Washington Boulevard. (Burnside Decl. ¶ 17; *see also* DeVries Decl. ¶ 34 (attesting that the Secure Perimeter will likely "leav[e] open, at most, one lane for traffic").) And even if

the Secure Perimeter ultimately encompasses only a minimal portion of Washington Boulevard, it can still create a "crush zone" in the manner DeVries describes. Plaintiffs claim that roughly 20,000 to 25,000 people will march in the protest parades. Simply put, allowing a crowd of that size (or even a smaller one) to march directly alongside an unyielding barrier—no matter how much of the street is available for pedestrian use—poses an obvious risk of injury. *See Luce v. Town of Campbell*, 872 F.3d 512, 516–17 (7th Cir. 2017) (explaining that speech restrictions do not require an "empirical justification" if "the potential benefits of the rule can be appreciated without one"). Because this risk is "plausible and substantial," Defendants have a significant interest in implementing mitigating restrictions, regardless of the fact that they may be addressing the "worst-case scenario." *Citizens for Peace in Space*, 477 F.3d at 1224.

Given the legitimacy of the asserted governmental interest, the Court finds the Alternative Parade Route to be narrowly tailored. When traveling west on Washington Boulevard, Hermitage Avenue (where the Alternative Parade Route turns) directly precedes Wood Street (where the Secure Perimeter begins). Thus, Defendants have designed the Alternative Parade Route quite precisely to further their proffered significant interest. *Cf. Coal. To March on the RNC*, 2024 WL 3358149, at *13 ("[T]he odd shape of the Secure Perimeter shows Defendants' efforts to draw the secured area narrowly . . . .").

In further support of the diverting the Alternative Parade Route off Washington Boulevard at Hermitage Avenue, Defendants cite the need to maintain accessibility to the United Center. DeVries attests that, as the northern boundary of the Secure Perimeter, "Washington Boulevard would be one of the primary streets that first responders would use to enter or exit" the United Center in case of an emergency. (DeVries Decl. ¶ 40.) So, if protest parades were to proceed along Washington Boulevard, "the ingress or egress of emergency responders would be

delayed or stymied altogether." (*Id.* ¶ 41.) Plaintiffs do not squarely address this proffered interest in their briefing.[4] They also failed to offer a fulsome response when asked during oral argument.

The Court finds that the need to maintain an accessible route to and from the United Center in case of emergency constitutes a separate significant governmental interest. Clearly, Defendants "have a significant government interest in keeping" the area around the United Center "free of congestion and clear for emergency responders and evacuation plans in case emergency services are needed during the convention." *Coal. to March on the RNC*, 2024 WL 3358149, at *13; *see also* M.C.C. § 10-8-330(g)(3) (listing as one of the considerations in the Parade Ordinance whether "persons, animals, vehicles or things at the assembly and disbanding areas and along the parade route" would "prevent proper fire and police protection or ambulance service"). The record before the Court shows that designing the Alternative Parade Route to turn off Washington Boulevard right before the Secure Perimeter begins reasonably furthers the significant interest of maintaining ample entry and exit points in case of emergency.

Defendants point to a similar interest as motivating the second restriction about which Plaintiffs complain: the City's refusal to extend the Alternative Parade Route west past Damen Avenue. Plaintiffs appear to make this request with the thought that they would proceed west via Washington Boulevard. (*See* Pls.' Reply Br. at 4.) But as explained above, Defendants have a strong rationale for diverting the Alternative Parade Route from Washington Boulevard before it

---

[4] Plaintiffs do reference what appears to be a slide from a DNC committee meeting indicating that the entry points to the United Cener on Washington Boulevard will be closed due to protests. (Pls.' Reply Br., Ex. A ("Committee Notes"), Dkt. No. 34-1.) The Court affords this evidence minimal weight given the scant details Plaintiffs provide. *See Grubhub*, 80 F.4th at 852 (describing the district court "[a]s the factfinder at the preliminary injunction stage," meaning it "weigh[s] the evidence submitted by the parties"). In any case, the statement on the slide does not contradict the notion that Washington Boulevard must remain clear for use in case of an emergency.

reaches the stretch of the street that serves as the boundary of the Secure Perimeter. To extend the protest parade further west in the manner Plaintiffs envision, the Alternative Parade Route would need to rejoin Washington Boulevard at Damen Avenue.[5]

In their initial brief, Plaintiffs propose to extend the parade route as far west as Western Avenue. In response, Defendants point out that Western Avenue serves as a vital north-south thoroughfare providing access to the "Illinois Medical District, which includes Rush University Medical Center, John H. Stroger Jr. Hospital of Cook County, University of Illinois Hospital, and the Jesse Brown VA Medical Center." (DeVries Decl. ¶¶ 29–30.) Thus, Defendants argue, any protest parade along Western Avenue would disrupt not only residents and businesses in the area, but also transportation to and from the United Center, such as ambulances that may need to pass through in an emergency. Indeed, Plaintiffs conceded in their reply brief (and again at oral argument) that a protest parade down Western Avenue may not be tenable for this reason. They now propose using a street between Damen Avenue and Western Avenue, such as Oakley Boulevard, as the western end of the parade route.

Defendants, however, insist that even a shorter extension of the Alternative Parade Route west past Damen Avenue would introduce major safety concerns. In support, they point to the need to maintain "paths of ingress and egress to the United Center" by keeping the surrounding streets "clear of obstruction." (*Id.* ¶ 28.) Likewise, because the Alternative Parade Route "forecloses some of the ingress and egress routes in and around the northeast sector" of the Secure Perimeter, it is important to maintain "ingress and egress routes elsewhere"—including on the "northwest and western side" of the Secure Perimeter. (Burnside Decl. ¶ 26.) In his

---

[5] Plaintiffs propose only to extend the Alternative Parade Route to the west. They do not make any argument regarding extending it in other directions.

declaration, Burnside attests that there may be a need for emergency services in the surrounding residential and commercial areas too. (*Id.*) Allowing the protest parades to proceed along Washington Boulevard west of Damen Avenue would "compromise[]" the accessibility that may be required in case of emergency. (*Id.*)

As discussed previously, the governmental interest in maintaining access points to the United Center (and the surrounding areas) in case of emergency is substantial. *See, e.g.*, *Reform Am.*, 37 F.4th at 1149–50 (reasoning that "[p]ublic safety and security against potential violence are no doubt significant governmental interests"). That Washington Boulevard provides a channel to Western Avenue—which in turn leads to the Illinois Medical District—along the northern end of the Secure Perimeter only heightens "the substantial government interest in" maintaining access "for emergency vehicles." *Coal. to March on the RNC & Stop the War v. The City of St. Paul*, 557 F. Supp. 2d 1014, 1028 (D. Minn. 2008). Stopping the Alternative Parade Route at Oakley Boulevard would not nullify this concern in the manner Plaintiffs suggest. To the contrary, the Court is persuaded that reserving for pedestrian use the stretch of Washington Boulevard to the west of the Secure Perimeter would substantially impede emergency access to the United Center via Washington Boulevard; this is especially apparent when considering that the Alternative Parade Route already occupies Washington Boulevard to the ***east*** of the Secure Perimeter. Accordingly, designing the Alternative Parade Route so that it does not proceed west of Damen Avenue appropriately comports with the significant security interests identified by Defendants.

In short, bypassing the stretch of Washington Boulevard where the Secure Perimeter will be installed furthers significant safety interests—both with respect to those outside the Secure Perimeter and those within it. The same is true of the decision not to extend the Alternative

Parade Route west of Damen Avenue due to significant interests related to safety and traffic-management. The Court finds that Defendants have satisfied their obligation to narrowly tailor the design of the Alternative Parade Route to meet the needs of those significant governmental interests.

## II.     Ample Alternative Channels for Communication

In addition to satisfying the narrow-tailoring requirement, Defendants' time, place, and manner restriction must still provide Plaintiffs with an adequate alternative channel to "reach the minds of willing listeners." *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (quoting *Hill v. Colorado*, 530 U.S. 703, 728 (2000)). To be "adequate," an alternative channel "cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham v. Peterson*, 225 F.3d 899, 906–07 (7th Cir. 2000). For example, if a restriction prohibits plaintiffs from speaking near their intended audience, their speech may be unduly inhibited. *See, e.g.*, *Coal. to March on the RNC & Stop the War*, 557 F. Supp. 2d at 1028 (considering whether the protestors could march "within sight and sound of the convention site"). *But see Bl(a)ck Tea Soc'y*, 378 F.3d at 14 (noting that protestors can also "reach the delegates through television, radio, the press, the internet, and other outlets"). To be sure, a plaintiff's preferred method of communication does not necessarily reflect the constitutional baseline. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

In this case, Defendants have offered the Alternative Parade Route as an alternative channel for communication. Plaintiffs concede that the Alternative Parade Route is "within sight and sound of the" United Center—the location of their intended audience. (Pls.' Opening Br. at

1.) And the Alternative Parade Route does indeed bring the protest parades close to the United Center, particularly when it passes through Park #578, which is approximately two blocks from the United Center and even closer to the location where many DNC attendees will be dropped off. (*See* Burnside Decl. ¶ 23.) Further, shortly after leaving Park #578, the Alternative Parade Route turns onto Damen Avenue, which will serve as a main thoroughfare for delegates leaving the DNC. (*Id.*); *cf. Coal. to March on the RNC*, 2024 WL 3358149, at *15 (observing that protestors could speak at locations "proximate to convention attendees as they arrive and depart"). Such close proximity is a significant indicator of the adequacy of the Alternative Parade Route. *See Marcavage v. City of New York*, 689 F.3d 98, 107 (2d Cir. 2012) ("In this Circuit, an alternative channel is adequate and therefore ample if it is within close proximity to the intended audience." (internal quotation marks omitted)).

Nonetheless, Plaintiffs raise logistical concerns regarding the course of the Alternative Parade Route. With respect to the decision to bypass the portion of Washington Boulevard where the Secure Perimeter will be installed, they contend that the use of Hermitage Avenue and Maypole Avenue risks the crowding of protestors. And with respect to the decision not to extend the Alternative Parade Route west past Damen Avenue, Plaintiffs contend that the route will be so short that some protestors may still be waiting to leave the staging area by the time the protest parade has finished. While somewhat of an awkward fit for a traditional time, place, and manner analysis, these concerns implicate the adequacy of the Alternative Parade Route as an alternative channel, as they raise the question of whether the restriction will prevent participants in the protest parades from conveying their message. *See Weinberg v. City of Chicago*, 310 F.3d 1029, 1042 (7th Cir. 2002) ("[W]e cannot say the alternatives are ample, precisely because [the

20

plaintiff's] 'ability to communicate effectively is threatened.'" (quoting *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984))).

Beginning with the use of Hermitage Avenue and Maypole Avenue rather than Washington Boulevard, the concerns Plaintiffs raise fail to demonstrate the inadequacy of Defendants' approach. For one thing, Plaintiffs allege that Hermitage Avenue and Maypole Avenue are "smaller" streets than Washington Boulevard, suggesting that taking the protest parade down those streets increases the risk of "log jams." (FAC ¶ 31.) But that claim is not supported by anything in the record; in fact, DeVries attests that "[a]ll three streets have two lanes of traffic and two additional lanes for parking" and concludes that "[a]ny difference that may exist in the precise width of these streets at the relevant portions is negligible." (DeVries Decl. ¶ 23.) Moreover, as discussed above, the Secure Perimeter will encompass "at least some portion" of Washington Boulevard, thereby limiting the space available for pedestrians. (Burnside Decl. ¶ 17.)

At oral argument, Plaintiffs pivoted their focus to the supposed difficulty of large crowds maneuvering the two turns onto Hermitage Avenue and Maypole Avenue. Yet, again, Plaintiffs cite no evidence to support the proposition that those turns will introduce problems that staying on Washington Boulevard would avoid. Indeed, DeVries attests to the contrary, explaining that "temporary standstills or delays in movement are practically inevitable in parades or protests involving large groups of people," whether the parade proceeds "on a straight route" or on "one that has turns." (DeVries Decl. ¶ 22.) Plaintiffs also allude to a concern that the configuration of the Alternative Parade Route may lead to increased confrontations with police. But there will be a significant police presence no matter which route the protest parades follow. (*See id.* ¶¶ 20, 32.) And the Court is unpersuaded that asking the protestors to navigate the two turns in the

Alternative Parade Route will somehow create a greater risk of confrontation than having them march alongside the confining barrier of the Secure Perimeter on Washington Boulevard.

Plaintiffs' contentions regarding the use of Hermitage Avenue and Maypole Avenue rest in large part on their assumption regarding the number of people who will join the protest parades. As mentioned above, Plaintiffs expect the protestors to number between 20,000 and 25,000. If accurate, such a figure would dwarf the estimated crowd of protestors at the Republican National Convention recently held in Milwaukee. *See, e.g.*, Adam Edelman and Alicia Victoria Lozano, *Protesters Made a Tiny Footprint at the RNC in Milwaukee*, NBC NEWS (July 19, 2024, 12:06 PM), https://www.nbcnews.com/politics/politics-news/protesters-rnc-milwaukee-rcna162253 (comparing the organizers' estimate that "3,000 people turned out" to the police's estimate of "700 to 800" participants). But even assuming the protest parades draw as many people as Plaintiffs expect, they cite no prior event precedent or other evidence suggesting that such a crowd could not navigate the two turns onto Hermitage Avenue and Maypole Avenue. To the extent there is a logistical problem based on the size of the parades, Defendants offer a ready solution: staggering groups of marchers to manage the number of people passing through a given stretch of the Alternative Parade Route at a given moment. *See Coal. To Mar. on the RNC*, 2024 WL 3358149, at *6 (noting a similar approach to scheduling that was used at the Republican National Convention).

Similarly, Plaintiffs provide no reason to conclude that a longer parade route is necessary to satisfy the First Amendment. Plaintiffs cite fears that some protestors will be unable to leave the start of the march before its scheduled end time. In theory, this concern could support a First Amendment claim so far as individual protestors may not receive a chance to express their views. *See Weinberg*, 310 F.3d at 1042. However, Plaintiffs once more fail to provide support for

the notion that the length of the Alternative Parade Route—1.4 miles according to their own exhibit (FAC, Ex. B)—would prevent people from marching. The most they offer is their supposition that participants who complete the route may linger at the end, which also serves as the starting point, thus backing up the parade. Conversely, DeVries attests to his belief that the Alternative Parade Route can accommodate protests numbering in the tens of thousands. (DeVries Decl. ¶ 17.)

Ultimately, Plaintiffs' challenges to the Alternative Parade Route boil down to a complaint that Defendants have not offered the exact route Plaintiffs desire—despite their concession that the Alternative Parade Route allows them to speak near their intended audience. This falls well short of a First Amendment violation. *Heffron*, 452 U.S. at 647; *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1140 (9th Cir. 2005) (concluding that it would be "impossible" to accommodate each protestor's preferences when the "protestors numbered in the tens of thousands"). As such, the Alternative Parade Route represents an adequate alternative channel of communication.

As Defendants have met their burden of showing both that the Alternative Parade Route is narrowly tailored to significant governmental interests and that it provides an adequate alternative channel of communication, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their First Amendment challenge. *Bevis*, 85 F.4th at 1188. Absent a showing of a likelihood of success on the merits, the Court need not reach the other preliminary-injunction factors. *See, e.g.*, *Higher Soc'y of Ind.*, 858 F.3d at 1116 ("[T]he analysis begins and ends with the likelihood of success on the merits of the First Amendment claim." (internal quotation marks omitted)). As such, Plaintiffs' motion for a preliminary injunction that would

require Defendants to alter the Alternative Parade Route so it stays on Washington Boulevard and proceeds west past Damen Avenue is denied.

## CONCLUSION

For the reasons explained above, Plaintiffs' revised motion for a preliminary injunction (Dkt. No. 28) is denied. The Court finds that the Alternative Parade Route is narrowly tailored to address significant governmental interests and leaves open alternative channels of communication, as the First Amendment requires. With the challenge to the Alternative Parade Route resolved, the Court observes that at the time of oral argument there appeared to be additional, unsettled matters concerning Plaintiffs' plans to protest during the DNC that fell beyond the scope of the revised preliminary-injunction motion and thus have not been addressed with this ruling. Those matters included the status of Plaintiffs' applications for park permits (to which they had not received any responses) and their desire to use the speaker's platform at Park #578. In addition, it remains unclear to the Court whether Defendants intend to approve four separate parades along the Alternative Parade Route—one for each Plaintiff—or one larger parade. (To be clear, the Court's finding that the Alternative Parade Route passes constitutional muster holds regardless of whether Plaintiffs stage four parades or one parade.) As the start of the DNC is rapidly approaching, the Court urges the parties to work expeditiously to identify and resolve any remaining issues that must be addressed prior to the planned protest parades. The Court will discuss a plan for doing so at the status hearing on August 13, 2024.

ENTERED:

Dated: August 12, 2024

Andrea R. Wood
United States District Judge